UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMELIA ROSKIN-FRAZEE,<br><br>                Plaintiff,<br><br>     v.<br><br>COLUMBIA UNIVERSITY.<br><br>                Defendant. | No. 17-cv-2032 (GBD)<br><br>Oral Argument Requested |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for The Trustees of Columbia
University in the City of New York*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

ARGUMENT ..................................................................................................................... 12

I.     PLAINTIFF FAILS TO STATE A TITLE IX CLAIM ...................................... 14

     A.     Plaintiff Fails to Allege That Columbia's Actions  Were "Clearly Unreasonable" under the Circumstances ................................................ 16

          1.     The Timing and Nature of the University's Response Was  Not "Clearly Unreasonable" under the Circumstances ................................... 16

          2.     The University's Response to Plaintiff's Requested Accommodations Was Not "Clearly Unreasonable" under the Circumstances ................................................................................ 20

II.     PLAINTIFF'S STATE LAW CLAIMS SHOULD BE DISMISSED ............................. 23

     A.     Plaintiff Fails to State a Claim for Negligence ..................................... 23

     B.     Plaintiff Fails to State a Claim for Premises Liability .......................... 24

     C.     Plaintiff Fails to State a Claim for Gross Negligence ........................... 25

CONCLUSION .................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Arnold* v. *ABC, Inc.*,
   No. 06 Civ. 1747, 2007 WL 210330 (S.D.N.Y. Jan. 29, 2007)...........................................13

*Ashcroft* v. *Iqbal*,
   556 U.S. 662 (2009)...................................................................................................................13

*Atlantica Holdings, Inc.* v. *Sovereign Wealth Fund Samruk-Kazyna JSC*,
   No. 12 Civ. 8852, 2014 WL 917055 (S.D.N.Y. Mar. 10, 2014) ............................................13

*Bell Atl. Corp.* v. *Twombly*,
   550 U.S. 544 (2007).............................................................................................................13, 20

*Blake* v. *Prudential Ins. Co. of Am.*,
   No. 14-cv-7042, 2016 WL 1301183 (S.D.N.Y. Mar. 31, 2016), *aff'd*, No. 16-
   1383, 2017 WL 1087885 (2d Cir. Mar. 21, 2017)..................................................................14

*Burgos* v. *Aqueduct Realty Corp.*,
   92 N.Y.2d 544 (N.Y. 1998) ......................................................................................................24

*Butler* v. *Mountain View Sch. Dist.*,
   No. 12 Civ. 2038, 2013 WL 4520839 (M.D. Pa. Aug. 26, 2013)...........................................16

*Chambers* v. *Time Warner*,
   282 F.3d 147 (2d Cir. 2002)......................................................................................................13

*Colnaghi, U.S.A., Ltd.* v. *Jewelers Prot. Servs., Ltd.*,
   611 N.E.2d 282 (N.Y. 1993) .....................................................................................................25

*Cortec Indus., Inc.,* v. *Sum Holding LP*,
   949 F.2d 42 (2d Cir. 1991)........................................................................................................13

*Davis* v. *Monroe Cnty. Bd. of Educ.*,
   526 U.S. 629 (1999).............................................................................................................15, 16

*DeCecco* v. *Univ. of S.C.*,
   918 F. Supp. 2d 471 (D.S.C. 2013)...........................................................................................18

*DiLaura* v. *Power Auth. of State of N.Y.*,
   982 F.2d 73 (2d Cir. 1992)........................................................................................................23

*Food Pageant, Inc.* v. *Consol. Edison Co.*,
   429 N.E.2d 738 (N.Y. 1981)......................................................................................................25

**Page(s)**

*Gomez-Jimenez* v. *N.Y. Law Sch.*,
   956 N.Y.S.2d 54 (N.Y. App. Div. 2012) ....................................................23

*Hayut* v. *State Univ. of N.Y.*,
   352 F.3d 733 (2d Cir. 2003).....................................................................20

*Hyman* v. *Cornell Univ.*,
   834 F. Supp. 2d 77 (N.D.N.Y. 2011) .......................................................14

*Karasek* v. *Regents of Univ. of California*,
   No. 15-cv-03717, 2016 WL 7406431 (N.D. Cal. Dec. 22, 2016)...................20, 22

*Lane* v. *Fein, Such & Crane, LLP*,
   767 F. Supp. 2d 382 (E.D.N.Y. 2011) .....................................................26

*Merchants Mut. Ins. Co.* v. *Quality Signs of Middletown*,
   973 N.Y.S.2d 787 (N.Y. App. Div. 2013) ................................................23

*Moore* v. *Regents of the Univ. of Cal.*,
   No. 15 Civ. 05779, 2016 WL 2961984 (N.D. Cal. May 23, 2016) ................20, 21

*Nungesser* v. *Columbia Univ.*,
   169 F. Supp. 3d 353 (S.D.N.Y. 2016).....................................................23

*Nungesser* v. *Columbia Univ.*,
   No. 15-cv-3216, 2017 WL 1135647 (S.D.N.Y. Mar. 24, 2017), *appeal
   docketed*, No. 17-900 (2d Cir. Mar. 31, 2017)................................13, 22

*Pasquaretto* v. *Long Island University*,
   106 A.D.3d 794 (N.Y. App. Div. 2013) ..................................................23, 25

*Siino* v. *Reices*,
   628 N.Y.S.2d 757 (N.Y. App. Div. 1995) ...............................................24

*Spinka* v. *H.*,
   No. 14 Civ. 583, 2016 WL 1294593 (S.D. Ill. Mar. 31, 2016).....................21

*Talbot* v. *N.Y. Inst. of Tech.*,
   639 N.Y.S.2d 135 (N.Y. App. Div. 1996) ...............................................23

*Vought* v. *Teachers Coll., Columbia Univ.*,
   511 N.Y.S.2d 880 (N.Y. App. Div. 1987) ...............................................23

*Walton* v. *Mercy Coll.*,
   940 N.Y.S.2d 54 (N.Y. App. Div. 2012) .................................................25

*Weitz* v. *State*,
   696 N.Y.S.2d 656 (N.Y. Ct. Cl. 1999).....................................................23

**Page(s)**

*Williams* v. *Columbia Univ.*,
   No. 11-cv-8621, 2012 WL 3879895 (S.D.N.Y. Aug. 28, 2012)..............................................23

*Williams* v. *Utica Coll. of Syracuse Univ.*,
   453 F.3d 112 (2d Cir. 2006)...................................................................................................25

*Zeno* v. *Pine Plains Cent. Sch. Dist.*,
   702 F.3d 655 (2d Cir. 2012)...................................................................................................18

Defendant Columbia University[1] respectfully submits this memorandum of law in support of its motion to dismiss the Complaint filed by Plaintiff Amelia Roskin-Frazee.

## PRELIMINARY STATEMENT

Plaintiff's account of the two sexual assaults she allegedly suffered while a student at Columbia is heartbreaking, but her own recitation of the events establishes that the University responded appropriately when she reported them and is not liable under Title IX.

Plaintiff's Title IX claim rests on conclusory allegations that Columbia failed (1) to timely investigate the alleged underlying incidents, and (2) to provide Plaintiff with the academic and housing accommodations she requested.  But Plaintiff's own Complaint makes clear—and the contemporaneous communications that she expressly references and relies on in the Complaint further confirm—that not only did she wait nearly a year to report the underlying incidents, but she also did not provide any information that would have allowed Columbia to identify her alleged assailant, and she repeatedly indicated that she did not want to report the incidents nor did she want the University to investigate them.  Once Plaintiff did decide to report the underlying incidents, the University promptly and thoroughly investigated them.  The University also promptly provided the accommodations that Plaintiff requested.  Plaintiff therefore does not—and cannot—plausibly allege that Columbia was "deliberately indifferent" for purposes of liability under Title IX.

Plaintiff's state law claims fare no better.  Plaintiff's negligence and gross negligence claims fail because, under New York law, universities owe their students no non-contractual duty of care since the New York courts have rejected the doctrine of *in loco parentis* at the university level.  And even if that were not the case, the fact that Columbia did not undertake an

---

[1]   The University is officially incorporated under the name "The Trustees of Columbia University in the City of New York."  Defendant nonetheless has no objection to the omission of the full corporate name from the case caption.

investigation until almost a year after the alleged assaults was the direct result of Plaintiff's documented desire for the University *not* to initiate any such investigation.  Columbia cannot be liable in negligence for failing to do something that Plaintiff asked the University not to do.  Plaintiff's premises liability claim is similarly deficient.  Under New York law, landlords (including universities) do not have a duty to shield one tenant from the conduct of another tenant because tenants have a right to be on the premises.  Because Plaintiff alleges that her assailant was another Columbia student, her premises liability claim should be dismissed as well.

## STATEMENT OF FACTS

The University, informed by guidance from the federal government under Title IX, has implemented policies for investigating and disciplining gender-based misconduct on campus.  These policies, which define such misconduct and provide procedures for the investigatory and hearing process, demonstrate Columbia's commitment to "fostering an environment that is free from gender-based discrimination and harassment, including sexual assault and all other forms of gender-based misconduct."  (*See* Ex. 1 at 1.)  Under the policies, "[t]he University encourages students to report gender-based misconduct to the Gender-Based Misconduct Office [(the "Office")] so that the University can investigate and respond effectively."  (*Id.* at 9.)  The report may be made directly to the Office or "to a University employee they know well, such as a faculty member, coach, or resident advisor," who then shall inform the Office.  (*Id.*)

Columbia's Title IX policies take into account, however, the possibility that a student may not wish to make a report, in which case "a non-confidential resource will direct the student to confidential resources, which will not report without the student's permission."  (*Id.*)  The policies contemplate that a complainant may "request that the Office not disclose his or her identity to anyone else," and that the University "will consider the request in light of the University's commitment to provide a safe and non-discriminatory environment for all students

2

and will honor the request whenever possible." (*Id.*)  The policies note, however, that "such a request may limit [Columbia's] ability to investigate and respond to the reported misconduct." (*Id.*)  Columbia's policies similarly warn that while Columbia "does not limit the time for submitting a report of gender-based misconduct," the University's "ability to investigate and respond effectively may be reduced with the passage of time." (*Id.* at 10.)  Finally, the University's Title IX policies recognize that while victims of gender-based misconduct may wish to speak out at "public awareness events," including "survivor speak outs" and "other forums" in order to "help inform the need for campus-wide education and prevention efforts," the fact that a student may discuss specific examples of "gender-based misconduct at such events is not considered a report to the University for purposes of triggering an investigation of a particular incident." (*Id.* at 11; *see also* OCR, Questions and Answers on Title IX and Sexual Violence at 24 (Apr. 29, 2014) (noting that a school is *not* "required to investigate information regarding sexual violence incidents shared by survivors during public awareness events"), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.)

## The Underlying Incidents

Plaintiff is an undergraduate student who enrolled at Columbia as a freshman in the fall semester of 2015.  (Compl. ¶ 27.)  She alleges that she was raped in her dorm room in Hartley Hall on two occasions—once on October 5, 2015, and again on December 14, 2015.  (*Id.* ¶¶ 29, 47.)  Although Plaintiff does not know who allegedly raped her (she was only able to describe him in very general terms: "a bit taller than" 5' 4", "but not over 6'", with "[s]ome wavy/body to hair," and "[a] little heft, but not a ton"), she believes that it was the same person on both occasions, and that her alleged assailant was another Columbia student.  (*Id.* ¶¶ 53, 78, 98; Ex. 2 at 4.)

Plaintiff also alleges that she was subjected to two incidents of harassment following the second alleged rape.  First, she alleges that on February 10, 2016 someone (who she believes to be her assailant) posted a note on the public bulletin board in Hartley Hall that read:  "Isn't it fun to wake up to someone fucking you?"  (Compl. ¶ 53.)  Second, she alleges that on February 16, 2016, in the same handwriting, another note was posted on the same bulletin board that read:  "I'll buy you a new phone charger," a purported reference to a phone charging cable that Plaintiff's assailant allegedly used to tie her hands during the second rape.  (*Id.* ¶ 54.)  Plaintiff later told Columbia that she threw the notes away and did not make copies of them.  (Ex. 3 at 3.)

**October 2015 – January 2016**

Although Plaintiff alleges that Columbia received "actual notice" of Plaintiff's rape "as early as October 14, 2015 but no later than December 3, 2015" (Compl. ¶ 83), Plaintiff concedes that she did not report that she had been raped pursuant to the above-referenced Title IX policies until August 5, 2016, ten months after the first alleged rape occurred, and nearly eight months after the second alleged rape occurred (*id.* ¶ 55).  Significantly, in this ten-month period, although Plaintiff did have numerous contacts with various University officials about sexual assault on campus and her own situation, she repeatedly and adamantly refused to report the incident or to provide Columbia with any information necessary to identify the student who allegedly attacked her.[2]  Indeed, Plaintiff herself concedes that until the time of her report, she was insistent in communicating to various Columbia representatives that she did not want to file a report and did not want Columbia to investigate.  (*See, e.g.*, *id.* ¶¶ 30, 52.)

---

[2]  Plaintiff's reason for not reporting may be reflected in a blog post she published on the Huffington Post on June 6, 2016, in which Plaintiff discusses in detail why up to that point in time she had chosen *not to report* the alleged rapes.  *See* Amelia Roskin-Frazee, *Why We Don't Report It*, Huffington Post Blog (June 6, 2016), http://www.huffingtonpost.com/amelia-roskinfrazee/why-we-dont-report-it_b_10314634.html.   In that post, Plaintiff discusses why it is "an act of bravery" not to "tell administrators at our schools what happened."  (*Id.*)  And with respect to her own decision not to report, she says: "**I don't report it** because it's not best for me.  Reporting is detrimental to my wellbeing, and I have no obligation to do anything after an assault that doesn't have my best interests, and *only* my best interests, at heart."  (*Id.* (emphasis in original).)

Plaintiff did, however, reach out to her advisor and other University personnel in order to request certain accommodations (which were provided, as discussed below), at which point she was informed of the various resources on campus available to victims of gender-based misconduct.[3]   Plaintiff made use of some of these resources during this period, while still maintaining her desire not to file a report or open an investigation, as discussed below:

Sexual Violence Response Hotline.  Plaintiff alleges that on October 13, 2015 she called Columbia's 24/7 Sexual Violence Response Hotline ("SVR") and was connected to a representative who purportedly "commented that even though Plaintiff is lesbian, she should have been on birth control."  (Compl. ¶ 32.)  But the transcript of that conversation reveals that the Columbia representative on the call said no such thing.[4]  (See Ex. 4.) ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮      ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮▮      ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Id. at 1, 2, 9.)

Plaintiff further alleges that the representative did not apprise her of the University's Title IX procedures or any possible accommodations.  (Compl. ¶ 33.)  But again, the recording of the conversation makes it clear that the representative did in fact inform Plaintiff of the many

---

[3]   Some of these accommodation requests may have been based on a sexual assault that Plaintiff has said happened to her while she was still in high school.  See Amelia Roskin-Frazee, Applying to Columbia as a Survivor, Huffington Post Blog (Apr. 21, 2015), http://www.huffingtonpost.com/amelia-roskinfrazee/applying-to-columbia-as-a-survivor_b_7108594.html.

[4]   This call was recorded as a matter of course by a third-party vendor and obtained by the University.

possible resources at her disposal, ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

(Ex. 4 at 4, 5, 7–8.)  In fact, at Plaintiff's request, the SVR representative contacted a staff advocate who connected with Plaintiff within an hour.  (Compl. ¶ 34.)

Columbia Medical Services Visit.  Similarly, Plaintiff alleges in the Complaint that she went to Columbia Medical Services in mid-October 2015 after the first assault "in an effort to be seen for pain and injury to her genitalia" (Compl. ¶ 30), and that while there, "she explained that she was experiencing genital pain," but that "[n]o one at Medical Services attempted to probe further to see if perhaps Plaintiff had been raped and was too afraid to come forward."  (*Id.* ¶ 31.) However, Plaintiff concedes that when she made the appointment, she indicated that she was "seeking an appointment for flu like symptoms," not for pain and injury to her genitalia.  (*Id.*) Indeed, the contemporaneous record from her appointment demonstrates ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████  (Ex.

5 at 1.)  In other words, since Plaintiff did not report her alleged assault or any symptoms from her alleged assault to the physician who was treating her, there was no way for anyone to inquire about the alleged rape.  Plaintiff offers no plausible explanation for why the physician would not have noted in the record that she was complaining of genital pain if that is what she had said.

Conversation with Academic Advisor.  Plaintiff alleges that on October 14, 2015 she emailed her academic advisor, and that her advisor did not report the alleged rape to the Gender-Based Misconduct Office, as she was purportedly obligated to.  (Compl. ¶¶ 39–40.)  But Plaintiff

---

[5]    Plaintiff provided this record to Columbia in the course of its investigation of the underlying incidents.

concedes that she did not actually tell her academic advisor that she was raped.  (*Id.* ¶ 39.)  What Plaintiff's email said was that she needed "help getting accommodations because of something I experienced, but I don't want it to be reported; I just want access to resources/you to help work with my professors without doing reports, investigations, etc."  (Ex. 6 at 1.)  Moreover, Plaintiff's assertion that the University did not provide her with accommodations as a result of this conversation is directly contradicted by the subsequent correspondence with her academic advisor, who noted in a subsequent email that she had followed up with Plaintiff and secured at least two academic extensions for Plaintiff, at Plaintiff's request.  (Ex. 7 at 1.)

<u>Student Advocacy Group Meeting</u>.  Plaintiff also describes a student advocacy group meeting with the Executive Vice President for University Life at Columbia and "several other student advocacy organization members," during which Plaintiff allegedly "shared that she had been raped."  (Compl. ¶ 44.)  Plaintiff does not allege that she considered this discussion to constitute a "report" of the rape pursuant to Columbia's Title IX policies.  Indeed, this meeting took place on December 3, 2015, at which time, as is made clear by her correspondence with a case manager at Columbia's Student Conduct and Community Standards ("SCCS") the following month (see below), Plaintiff was still clearly insisting that she did not want to file a report and did not want the University to conduct an investigation.

<u>SCCS Conversation</u>.  On January 19, 2016, a case manager at SCCS "informed Plaintiff that her office had been contacted by a Columbia employee who had a duty to report sexual misconduct under the Policy."  (Compl. ¶ 51.)  In response, Plaintiff again reiterated her desire not to "'officially' report her sexual assaults," and asked Columbia officials to "not contact me ever again."  (*Id.* ¶ 52; Ex. 8 at 3.)  In other words, more than three months after the first alleged rape occurred, and more than a month after the second alleged rape occurred, Plaintiff continued

to make clear that she did not want to report the underlying incidents and did not want the University to investigate those incidents.

**Plaintiff's Report of the Alleged Assaults**

Plaintiff ultimately changed her mind and decided to report the alleged assaults to SCCS while she was on summer recess on August 5, 2016.  (Compl. ¶ 55; Ex. 9.)  Once again, the Complaint in this case mischaracterizes the nature and substance of the communications between Plaintiff and SCCS, which are expressly referenced in and integral to Plaintiff's Complaint, and thus may be considered on this motion.  (*See infra* at 13–14.)

For example, Plaintiff alleges that three days later, on August 8, 2016, the Associate Vice President of SCCS sent a letter to Plaintiff "informing [her] that Columbia would not investigate her report unless she was able to identify her assailant." (Compl. ¶ 56.)  In fact,  in the August 8 letter, the Associate Vice President of SCCS acknowledged receipt of Plaintiff's incident report, assured Plaintiff that "[a]lthough the respondent is an unknown affiliate of Columbia University, SCCS takes reports of such behavior seriously," asked Plaintiff to let her know "[i]f you learn the identity of the respondent and wish to move forward with the investigative and disciplinary process," and informed Plaintiff that "you can report your incident or file a formal complaint with Columbia University Public Safety (CUPS) and The New York City Police Department (NYPD), if you have not done so already." (Ex. 10 at 1.)  The Associate Vice President of SCCS also enclosed a list of confidential and non-confidential opportunities for support and assistance within the Columbia community.  (*Id.*)

**Columbia's Investigation**

Plaintiff further suggests that Columbia did not "officially open[] an investigation" until September 8, 2016.  (Compl. ¶ 58.)  But that is inconsistent with the fact that SCCS then reached

out to Plaintiff on August 15, 2016 to set up a meeting to discuss the "SCCS investigative process, and University resources to support you, including any housing and/or academic accommodations you may require." (Ex. 11.) Three days later, on August 18, 2016, an SCCS Case Manager and a Title IX Investigator spoke with Plaintiff on the phone (since Plaintiff was still on summer recess), at which time Plaintiff "was informed of the investigative process" and "of her right to participate in this process." (Ex. 3 at 8.) Because she was not yet back at Columbia, Plaintiff agreed to meet with the Title IX Investigators "when she returns to campus on September 8." (*Id.*) At the end of the call, Plaintiff confirmed "that she is connected to resources within the University and that she feels safe in Hartley Hall," and that she "is aware that she can follow-up with her case manager regarding potential accommodations." (*Id.*)

Plaintiff then met with the Title IX Investigators on September 8, 2016, as planned, shortly after she returned to campus. (Compl. ¶ 59.) With respect to the first incident, Plaintiff confirmed that she had left her door unlocked when she went to sleep that evening. She also said that she has "terrible vision," was not wearing contacts or glasses, could not "see anything in the dark at all," and that she did not scream or make any other noise that might have been heard by her suitemates. (Ex. 2 at 3–4.) ███████████████████████████

███████████████████████████████████████████████

█████████████████████████████ When asked to describe her assailant, Plaintiff gave a very general description: he was "a bit taller than" 5' 4", "but not over 6'", "[s]ome wavy/body to hair," and "[a] little heft, but not a ton." (*Id.* at 4.)

As for the second incident, Plaintiff said ████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

9

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ In terms of the notes left on the dorm bulletin

board, Plaintiff said she threw the notes away and did not make copies of them. (Ex. 3 at 7.)

On the day after she met with Columbia's Title IX Investigators (September 9, 2016), Plaintiff emailed one of the Investigators to request that a lock be installed on her suite door. (Compl. ¶ 60.) The Investigator referred this request to an executive director in Columbia's Office of Public Safety, who, along with the Associate Vice President of SCCS, met with Plaintiff on September 14, 2016. (*Id.* ¶¶ 61–62.) "Prior to the start of the meeting, [an SVR representative] made herself available to discuss safety planning with [Plaintiff], but she did not want to speak with [the SVR representative] at that time." (Ex. 3 at 9.) During the September 9 meeting, the executive director in Columbia's Office of Public Safety "had a detailed discussion about providing [Plaintiff] with an escort on campus, reviewing video footage, and what she could do if she felt afraid or that someone was following her." (*Id.*) In response to Plaintiff's request for a lock on her suite door, the Associate Vice President of SCCS and the executive director in Columbia's Office of Public Safety agreed to "inquir[e] with Housing and Residence Life about the ability to lock the suite door and whether there were other rooms available that would meet her expectations for safety." (*Id.*)

On September 16, 2016, the executive director in Columbia's Office of Public Safety informed Plaintiff that the University was "ready to implement either of [two] options today in light of the safety concerns you expressed and our conversations this week." (Ex. 12 at 1; *see also* Compl. ¶ 63.) The two options were "to move to a studio apartment with a private bathroom located at 400 West 119th Street, Apt 2C," or to have "the lock installed on the outer

most door of [] your current suite." (Ex. 12 at 1.)  "Plaintiff chose to have the lock installed on her suite door." (Compl. ¶ 63.)

On October 7, 2016, the Associate Vice President of SCCS and one of the Title IX Investigators met with Plaintiff again to review the information gathered during the course of Columbia's investigation. (*Id.* ¶ 64; Ex. 3 at 10.) At the end of their presentation, the Associate Vice President of SCCS and the Title IX Investigator "asked if there was any other information [Plaintiff] thought should be explored." (Ex. 3 at 10.) Plaintiff asked about swipe records (logs of which students entered Hartley Hall on the days in question) and video surveillance. (*Id.*) The Title IX Investigator informed Plaintiff "that a review of swipe records yielded hundreds of results and that based on the broad time frame the alleged assaults could have occurred, the number could not be reduced." (*Id.*) She also explained "that there was no video surveillance as the report was received by [the investigators] several months after the alleged assaults." (*Id.*) The Associate Vice President of SCCS concluded the meeting by once again confirming that Plaintiff "was connected to campus resources, including Public Safety," and Plaintiff said that she was, and that "[the officer] in Public Safety had been responsive." (*Id.*)

**Investigation Report**

On October 17, 2016, "Plaintiff received the official investigation report from Columbia." (Compl. ¶ 65.) The report, written by the Title IX Investigator, describes the information reviewed by the investigators and the actions taken during the course of the investigation. (Ex. 13.) "In response, Plaintiff sent an e-mail to [the Title IX Investigator] criticizing Columbia's investigation." (Compl. ¶ 65; Ex. 14.) On October 24, 2016, the Associate Vice President of SCCS sent a letter responding to each of the criticisms levied by Plaintiff in her email to the Title IX Investigator. (Ex. 6 at 1.) The response made the following

four key points:

- *First*, as a practical matter, there was no way to identify Plaintiff's assailant because she did not provide any distinctive characteristics such as hair color, height or race.  As a result, Plaintiff would not have been able to identify her assailant.  Also, because of the passage of time, no physical evidence was still available to assist with the identification of her assailant.  (*Id.*)

- *Second*, analysis of the 2,000+ card swipes during the relevant time period would not have yielded useful information because there was no practical way to use that information to identify Plaintiff's assailant.  (*Id.*)

- *Third*, the decision not to interview anyone on Plaintiff's floor was based on the determination that interviews would not yield any useful information and on Plaintiff's desire to protect her privacy.  (*Id.*)

- *Fourth*, the Gender-Based Misconduct Office did not open a gender-based misconduct file based on the information Plaintiff shared with her academic advisor after the October 2015 incident because Plaintiff's email not only did not contain information about gender-based misconduct that would have made a report appropriate under the circumstances, but specifically noted that she did not want to make a report.  (*Id.*)

\* \* \*

In sum, while the assaults Plaintiff alleges are extremely disturbing, Plaintiff fails to identify any accommodation that she requested that Columbia failed to provide.  And the University was unable to identify her alleged assailant because Plaintiff waited almost a year to report the alleged assaults to the University, repeatedly insisted that she did not want to open an investigation, and did not provide any information that would have permitted the University to identify her alleged assailant.

## **ARGUMENT**

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court "must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff."  *Atlantica Holdings, Inc.* v. *Sovereign Wealth Fund Samruk-Kazyna JSC*, No. 12 Civ. 8852, 2014 WL 917055, at \*4 (S.D.N.Y. Mar. 10, 2014).  However, "[m]atters other than

allegations of existing facts, however, are not entitled to the assumption of truth." *Nungesser* v. *Columbia Univ.*, No. 15-cv-3216, 2017 WL 1135647, at *10 (S.D.N.Y. Mar. 24, 2017) (internal citations and quotation marks omitted), *appeal docketed*, No. 17-900 (2d Cir. Mar. 31, 2017). Where the plaintiff has failed to plead sufficient facts "to state a claim to relief that is plausible on its face," the claim "must be dismissed." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). This means that the allegations must support "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing a motion to dismiss, a court may consider a document if it is incorporated by reference into the complaint or "if the plaintiff 'relies heavily upon its term and effect,' rendering 'the document "integral" to the complaint.'" *Arnold* v. *ABC, Inc.*, No. 06 Civ. 1747, 2007 WL 210330, at *1 (S.D.N.Y. Jan. 29, 2007) (Daniels, J.); *see also Chambers* v. *Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002). Indeed, "[w]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Cortec Indus., Inc.,* v. *Sum Holding LP*, 949 F.2d 42, 48 (2d Cir. 1991). Moreover, "to the extent that the allegations [in the complaint] are contradicted by facts of which the Court may take judicial notice, such as the findings of a prior court or documents integral to the complaint, '[d]istrict courts possess the inherent power to pierce the veil of a complaint to determine if it is without factual basis.'" *Blake* v. *Prudential Ins. Co. of Am.*, No. 14-cv-7042, 2016 WL 1301183, at *2 (S.D.N.Y. Mar. 31, 2016), *aff'd*, No. 16-1383, 2017 WL 1087885 (2d Cir. Mar. 21, 2017) (summary order) (alteration in original) (quoting *Grimes* v. *Fremont Gen. Corp.*, 933 F. Supp. 2d 584, 600 n.7 (S.D.N.Y. 2013)).

Here, all of the additional documents discussed in this motion and attached as exhibits to

the Declaration of Roberta A. Kaplan are either incorporated by reference in or integral to the

Complaint.  For example:

- Plaintiff expressly references and relies on a phone call on October 13, 2015 between Plaintiff and a nurse from Columbia's 24/7 Sexual Violence Response Hotline, who purportedly "was unaware of Title IX or any possible accommodations" and allegedly told Plaintiff that "even though Plaintiff is lesbian, she should have been on birth control."  (Compl. ¶¶ 32–33.)  But the contemporaneous transcript of the phone call contradicts Plaintiff's allegation.  (Ex. 4.)

- Likewise, Plaintiff expressly references and relies on communications she had with her academic advisor, and alleges that in those communications her advisor "never informed Plaintiff about any of her rights or options under Title IX."  (Compl. ¶ 39.)  But again, the contemporaneous record is to the contrary.  (Ex. 7.)

- Plaintiff also expressly references and relies on a visit she made to Columbia Medical Services, which she claims failed to "attempt[] to probe further to see if perhaps Plaintiff had been raped."  (Compl. ¶ 31.)  But the contemporaneous record of Plaintiff's visit gives no indication that she even mentioned that she was experiencing genital pain and thus gave no reason for a physician to inquire into the alleged assaults.  (Ex. 5.)

- And Plaintiff expressly references and relies on a series of communications she had with the Associate Vice President of SCCS and a Title IX Investigator, whom she claims failed to take appropriate steps to investigate the underlying incidents and identify her alleged assailant.  (Compl. ¶¶ 55–65.)  But the contemporaneous record of those communications contradicts Plaintiff's allegations, and makes clear that the investigators did everything possible under the circumstances.  (*See, e.g.*, Exs. 10, 13.)

Accordingly, the Court may consider these documents in deciding this motion.  *See, e.g., Hyman*

v. *Cornell Univ.*, 834 F. Supp. 2d 77, 81 (N.D.N.Y. 2011) (considering "email communications

that Plaintiff's original complaint incorporated by reference" in granting motion to dismiss Title

IX claim).

## I.    PLAINTIFF FAILS TO STATE A TITLE IX CLAIM

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88, provides in

pertinent part that "[n]o person in the United States shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court first extended the scope of Title IX liability to reach a school's deliberate indifference to discriminatory harassment of students by other students in *Davis* v. *Monroe County Board of Education*. The Court took pains, however, to explain in *Davis* that while liability for student-on-student harassment can exist under Title IX, it must be confined to "certain limited circumstances," where the school's "own deliberate indifference effectively '*cause[d]*' the discrimination." *Davis* v. *Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642–43 (1999) (alteration in original) (emphasis added). Thus, when a plaintiff alleges discriminatory harassment by other students, a university can be liable for the alleged harassment only when the following three conditions are satisfied: (1) the harassment must be "sexual" in nature; (2) the harassment must be "so severe, pervasive, and objectively offensive," and must have "so undermine[d]" and "detract[ed]" from the student's educational experience that it effectively "bar[red]" the student from access to educational opportunities or benefits; and (3) the school had actual knowledge of the harassment and its response was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 633, 648, 650, 651. The *Davis* court made it clear that this is not merely a matter of evidentiary proof, but a pleading standard as well. 526 U.S. at 649.

Stated differently, to comply with Title IX, a university "must merely respond to known peer harassment in a manner that is *not clearly unreasonable*." *Id.* (emphasis added). "Clearly unreasonable" is a "'high standard'" that "seeks to eliminate any risk that [a university] would be liable in damages not for its own official decision but instead for another individual's independent actions." *Butler* v. *Mountain View Sch. Dist.*, No. 12 Civ. 2038, 2013 WL 4520839, at *7 (M.D. Pa. Aug. 26, 2013) (quoting *Davis*, 526 U.S. at 643). The *Davis* Court clarified that

the adverb "clearly" has real meaning here—this "is not a mere 'reasonableness' standard." *Davis*, 526 U.S. at 649. School administrators cannot be expected to "purg[e] their schools of actionable peer harassment," nor does Title IX grant a student the "right to make particular remedial demands." *Id.* at 648. In other words, as Justice O'Connor explained, "there is no reason why" a court, on a motion to dismiss in an "appropriate case," should not be able to "identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649.

### A. Plaintiff Fails to Allege That Columbia's Actions Were "Clearly Unreasonable" under the Circumstances

Plaintiff's Title IX claim rests on two theories. First, Plaintiff contends that despite the fact that the University "received actual notice of Plaintiff's [initial] rape as early as October 14, 2015 but no later than December 3, 2015," the University "fail[ed] to initiate a timely investigation" and that the University's "deliberate indifference to Plaintiff's initial rape exposed her to continued sexual harassment, including being sexually assaulted again." (Compl. ¶¶ 83, 86, 88.) Second, Plaintiff argues that Columbia "failed to provide reasonable accommodations." (*Id.* ¶ 85.) Thus, in order to maintain her claim under Title IX, Plaintiff must plausibly allege facts demonstrating that (1) the timing of the University's response was "clearly unreasonable," and (2) the University's response to Plaintiff's requested accommodations was "clearly unreasonable." As set forth below, she fails to do either.

### 1. The Timing and Nature of the University's Response Was Not "Clearly Unreasonable" under the Circumstances

Plaintiff concedes that prior to August 2016, she did not wish to report any of the underlying incidents to the University. (Compl. ¶¶ 30, 52, 55.) Multiple times in October of 2015 and again in January 2016, she made clear to Columbia her desire not to report the assaults, to maintain her confidentiality, and not to start an investigation. (*See, e.g.*, Ex. 4 at 2, Ex. 8 at 3.) Indeed, when she was approached by an SCCS case manager as late as January 19, 2016 (after

both alleged rapes had already occurred), Plaintiff informed the University that she did not wish to report her sexual assaults or commence an investigation.  (Compl. ¶ 52.)  Plaintiff even went so far as to tell the SCCS case manager to "not contact me ever again."  (Ex. 8 at 3.)

Pursuant to its Title IX policies, Columbia respected Plaintiff's wishes.  Columbia's policies make it clear, for example, that a "student may choose to make a full report or request confidentiality as he or she determines."  (Ex. 1 at 9.)  Moreover, "if the student wishes to maintain confidentiality, a non-confidential resource will direct the student to confidential resources, which will not report without the student's permission."  (*Id.*)  Additionally, the University's policies contemplate that a complainant may "request that the Office not disclose his or her identity to anyone else" recognizing that "such a request may limit the [University's] ability to investigate and respond to the reported misconduct."  (*Id.*)

Nonetheless, Plaintiff suggests two instances, prior to when she formally reported the underlying incidents in August 2016, in which she purportedly provided Columbia with actual knowledge of the alleged initial rape such that the University was obligated to investigate.  Neither of those instances, however, put the University on actual notice such that it was obligated to commence an investigation.

*First*, Plaintiff alleges that on October 14, 2015 she "reached out to her academic advisor," who Plaintiff alleges was "required to report Plaintiff's rape to the Gender-Based Misconduct Office," but "never made such a report."  (Compl. ¶¶ 39–40.)  Plaintiff herself concedes, however, that she did not "explicitly" tell her advisor that she was raped.  (*Id.* ¶ 39.)  Instead, Plaintiff merely "*alluded* to [the advisor] that Plaintiff had been raped."  (*Id.* (emphasis added).)  Any argument that Plaintiff's academic advisor should somehow have intuited that Plaintiff had been raped falls far short of the stringent *actual knowledge* standard required to

impose liability under Title IX.  *See Zeno* v. *Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012) ("Constructive knowledge is not enough; only actual knowledge is a predicate to liability."); *DeCecco* v. *Univ. of S.C.*, 918 F. Supp. 2d 471, 493 (D.S.C. 2013) ("vague comments suggest[ing] *possible* sexual discrimination or harassment" insufficient to satisfy actual knowledge requirement under Title IX (emphasis in original)).

*Second*, Plaintiff alleges that on December 3, 2015, she attended a student advocacy group meeting with Columbia's Executive Vice President for University Life, "along with several other student advocacy organization members," and that '[d]uring this meeting, Plaintiff shared that she had been raped, and told of the difficulties she experienced with Columbia in response to her rape up to that point."  (Compl. ¶ 44.)  But Plaintiff does not allege that she considered this discussion to constitute a "report" of the rape pursuant to Columbia's Title IX policies.  Indeed, when she was asked why she had not reported the incidents earlier after she formally reported the underlying incidents in August 2016, Plaintiff did mention the conversations with her academic advisor and the SCCS case manager, but made no reference to this meeting with other students and Columbia's Executive Vice President for University Life.  (Ex. 2 at 11.)  Moreover, this meeting took place on December 3, 2015, at which time, as is made clear by her correspondence with the SCCS case manager the following month (*see supra* at 7–8), Plaintiff still did not want to file a report, and still did not want the University to conduct an investigation.[6]  In any event, because this conversation took place in the context of a student advocacy forum, it imposed no affirmative obligation on those present to report the rape on Plaintiff's behalf.  (*See* Ex. 1 at 11 ("The disclosure of incidents of gender-based misconduct at

---

[6]    Thus, even if the Executive Vice President for University Life had reported what Plaintiff said at the student advocacy forum, any such report would have been futile given Plaintiff's insistence on January 19, 2016 that she did not want to make an official report, did not want the University to conduct an investigation, and did not want University representatives to contact her ever again.  *See supra* at 7.

such events is not considered a report to the University for purposes of triggering an investigation of a particular incident.").)

Having admittedly chosen not to report or provide any information about her alleged initial rape (or the other alleged instances of sexual harassment) to University administrators until August 2016, Plaintiff cannot complain that the University should have investigated those incidents sooner.   Indeed, Columbia's policies explicitly take this situation into account in providing that the University's "ability to investigate and respond effectively may be reduced with the passage of time."  (*Id.* at 10.)  Any such complaint by Plaintiff is particularly meritless given that Plaintiff herself concedes that the University is not required to investigate and respond to a report of sexual misconduct where "the victim explicitly requests that no investigation take place."  (Compl. ¶ 22.)  Here, that is exactly what Plaintiff did—she repeatedly indicated prior to August 2016 that she did not want an investigation to take place.  (*See id.* ¶¶ 30, 52; *see, e.g.*, Ex. 4 at 2, Ex. 8 at 3.)

While Plaintiff alleges in her Complaint that "the investigators had not interviewed anybody, did not review the swipe logs for her dormitory building for the nights of her respective sexual assaults, and could not review any security camera footage because the footage had been erased due to the length of time that had passed since Plaintiff's assaults" (Compl. ¶ 64), those allegations are meritless for the reasons set forth in the response from the Associate Vice President of SCCS.  (Ex. 6 at 1.)  Plaintiff in fact acknowledges that after she changed her mind and reported the underlying incidents in August 2016, the University promptly responded and commenced an investigation within approximately one month of Plaintiff's report.  (Compl. ¶¶ 55, 58.)  Such a response time is plainly reasonable, and certainly not clearly unreasonable.  *See, e.g.*, *Hayut* v. *State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir. 2003) (deliberate indifference may

be found "when remedial action only follows after 'a lengthy and unjustified delay'"); *Karasek* v. *Regents of Univ. of California*, No. 15-cv-03717, 2016 WL 7406431, at *18 (N.D. Cal. Dec. 22, 2016) (university not deliberately indifferent where they "began investigating [plaintiff's] assault within one month of when she reported it").

**2.     The University's Response to Plaintiff's Requested Accommodations Was Not "Clearly Unreasonable" under the Circumstances**

While Plaintiff alleges in conclusory terms that the University failed to provide reasonable accommodations for her, the Complaint is devoid of any specific allegations regarding an accommodation that Plaintiff requested that the University failed to provide.  The absence of any such plausible allegation is fatal to her claim.  *See, e.g.*, *Karasek*, 2016 WL 7406431, at *18 (dismissing Title IX claim where plaintiff had not "allege[d] that she requested any accommodations from the University that were not granted, or that she sought additional information from the University that was not given" (internal quotation marks omitted)); *see also Moore* v. *Regents of the Univ. of Cal.*, No. 15 Civ. 05779, 2016 WL 2961984, at *7 (N.D. Cal. May 23, 2016) (university's response not clearly unreasonable where plaintiff did "not aver the school ignored or rebuffed her requests for accommodations that specifically would have helped ameliorate the hostile environment to which she had been exposed").

Plaintiffs' sole vague and conclusory allegation that Columbia "failed to provide" either (1) reasonable housing accommodations or (2) academic accommodations (Compl. ¶ 69), unsupported by any specific allegations of any accommodations that were not provided, does not satisfy the requirement that a Plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

Academic Accommodations.    While Plaintiff alleges that she requested academic accommodations through Columbia's Disability Services Office (Compl. ¶ 38), and that she was

20

"forced to miss assignments, and seek extensions and other academic accommodations as a result" (*id.* ¶ 68), she does not allege that she was denied any such extensions or other accommodations. Nor does Plaintiff allege anywhere in the Complaint that she was not allowed to reschedule a test or miss class without being penalized. The reason for Plaintiff's failure to allege specific academic accommodations that she did not receive is plain—she did, in fact, receive such accommodations.

Several examples of the accommodations that were given by the University can be found in the contemporaneous communications between Plaintiff and her academic advisor that are referenced in and relied on by Plaintiff in her Complaint. The advisor reached out to Plaintiff's professors requesting extensions for various assignments, and Plaintiff expressly thanked the advisor for "*not* being part of the problem and for being attentive and on top of it." (Ex. 7 at 2 (emphasis in original).) The advisor confirmed that Plaintiff's professors "seemed very understanding" and had granted the requested extensions. (*Id.* at 1.)

Where, as here, a university provides academic accommodations, it cannot be liable for deliberate indifference. *See Spinka* v. *H.*, No. 14 Civ. 583, 2016 WL 1294593, at *5 (S.D. Ill. Mar. 31, 2016) (granting summary judgment on Title IX claim where "[t]he school made accommodations for her to finish assignments and take her AP History Exam").[7]

<u>Housing Accommodations</u>. Plaintiff similarly fails to allege any housing accommodation that she requested, but did not receive. For example, Plaintiff alleges that in October 2016 she "requested the ability to change rooms." (Compl. ¶ 34.) But she concedes that Columbia offered to accommodate that request, and that Plaintiff ultimately decided to remain in her room. (*Id.*

---

[7]   Plaintiff's allegation that she was "left to her own to seek further living and academic accommodations" (Compl. ¶ 52), even if true (which it is not, for the reasons discussed above), does not change this conclusion. *See Moore*, 2016 WL 2961984, at *7–8 (granting motion to dismiss a Title IX claim where, with respect to accommodations, defendant university "elected to leave the ball wholly in [the student's] court").

¶ 35; *see also* Ex. 15 at 1 ("We explored housing accommodations because she's unsure if a roommate was the perpetrator, but she's unsure if she could handle a move right now.  So we discussed safety planning while she's in her residence.").)

Similarly, in September 2016, when Plaintiff requested that locks be installed on her suite door, Columbia gave her the option of having a lock installed on her suite door or moving to an off-campus apartment.  (Compl. ¶ 63.)  "Plaintiff chose to have the lock installed on her suite door" and remain in her dorm room.  (*Id.*)

Plaintiff also alleges that she "requested that certain safety measures be implemented, including the installation of security cameras in and around her dormitory."  (*Id.* ¶ 59.)  But she does not allege that the University failed to provide any of the requested safety measures.  And even if the Complaint were able to identify any requested accommodations that were not granted, such an allegation would not support a claim for deliberate indifference because Title IX does not grant victims of peer harassment the "'right to make particular remedial demands.'"  *Nungesser*, 2017 WL 1135647, at *18 (quoting *Davis*, 526 U.S. at 648).

On these facts, Plaintiff does not—and cannot—allege that Columbia's response was clearly unreasonable.  *See Karasek*, 2016 WL 7406431, at *18 (dismissing Title IX claim where plaintiff had not "allege[d] that she requested any accommodations from the University that were not granted, or that she sought additional information from the University that was not given" (internal quotation marks omitted)).

## II.   PLAINTIFF'S STATE LAW CLAIMS SHOULD BE DISMISSED[8]

### A.   Plaintiff Fails to State a Claim for Negligence

Under New York's common law, "[t]he elements of a cause of action alleging common-law negligence are a duty owed by the defendant to the plaintiff, a breach of that duty, and a showing that the breach of that duty proximately caused injury to the plaintiff." *Merchants Mut. Ins. Co.* v. *Quality Signs of Middletown*, 973 N.Y.S.2d 787, 788 (N.Y. App. Div. 2013). Although Plaintiff alleges that Columbia was negligent by "failing to investigate Plaintiff's first rape" (Compl. ¶ 93), there is no independent tort claim in New York for "failure to investigate." *See Weitz* v. *State*, 696 N.Y.S.2d 656, 660 (N.Y. Ct. Cl. 1999).

Moreover, absent some separate voluntary undertaking, a university owes its students no other, non-contractual duty of care. *See, e.g.*, *Talbot* v. *N.Y. Inst. of Tech.*, 639 N.Y.S.2d 135, 136–37 (N.Y. App. Div. 1996); *Vought* v. *Teachers Coll., Columbia Univ.*, 511 N.Y.S.2d 880, 882 (N.Y. App. Div. 1987); *see also Gomez-Jimenez* v. *N.Y. Law Sch.*, 956 N.Y.S.2d 54, 60 (N.Y. App. Div. 2012) (no "special relationship or fiduciary obligation" between law school and its prospective students). Indeed, the "New York courts have rejected the doctrine of *in loco parentis* at the university level." *Nungesser* v. *Columbia Univ.*, 169 F. Supp. 3d 353, 374 (S.D.N.Y. 2016) (dismissing with prejudice student's negligence claim in Title IX action); *see also Pasquaretto* v. *Long Island University*, 106 A.D.3d 794, 795–96 (N.Y. App. Div. 2013).

Even if tort liability could somehow be imposed based on Columbia's alleged failure to investigate, Plaintiff concedes that she did not report that she had allegedly been raped until August 2016, almost eight months after the alleged second assault, and almost ten months after

---

[8]   Having dismissed the Title IX claim, this Court should decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. *See, e.g.*, *DiLaura* v. *Power Auth. of State of N.Y.*, 982 F.2d 73, 80 (2d Cir. 1992); *Williams* v. *Columbia Univ.*, No. 11-cv-8621, 2012 WL 3879895, at *5 (S.D.N.Y. Aug. 28, 2012) (dismissing Title IX claim and declining to exercise supplemental jurisdiction over plaintiff's state law claims).

the alleged first rape, at which point Plaintiff admits that Columbia did, in fact, investigate all of the underlying incidents.  (Compl. ¶¶ 55, 58.)  That Columbia did not initiate an investigation earlier is not the result of any negligence on the part of Columbia, but instead the product of Plaintiff's deliberate decision not to report the underlying incidents prior to August 2016.[9]

### B.   Plaintiff Fails to State a Claim for Premises Liability

Equally meritless is Plaintiff's premises liability claim that Columbia breached its duty to take precautions to protect Plaintiff as its tenant.  (Compl. ¶ 97.)   While it is true that a landowner has a duty to take reasonable precautionary measures to protect tenants from foreseeable criminal intrusions on the premises, "[a]bsent authority to control the conduct of a third person, a landowner does not have a duty to protect a tenant from the conduct of another tenant." *Siino* v. *Reices*, 628 N.Y.S.2d 757, 758 (N.Y. App. Div. 1995).  Indeed:

> [T]he necessary causal link between a landlord's culpable failure to provide adequate security and a tenant's injuries resulting from a criminal attack in the building can be established only if the assailant gained access to the premises through a negligently maintained entrance.  Since even a fully secured entrance would not keep out another tenant, or someone allowed into the building by another tenant, plaintiff can recover only if the assailant was an intruder.

*Burgos* v. *Aqueduct Realty Corp.*, 92 N.Y.2d 544, 550–51 (N.Y. 1998).  This common law rule is based on the sensible proposition that a landlord does not have the ability to keep other lawful tenants (as opposed to outsiders) off the premises.

Applied in the context of a university, Plaintiff's premises liability claim fails because universities "have no legal duty to shield their students from the dangerous activity of other students." *Pasquaretto*, 964 N.Y.S.2d at 601.   In other words, the common law rule that a

---

[9]   To the extent that Plaintiff is arguing that the University breached a duty by failing to identify her alleged assailant, the University cannot be deemed negligent when the Office of the New York District Attorney, with its far greater resources, was unable to identify Plaintiff's alleged rapist. *See, e.g.*, Amelia Roskin-Frazee, *Re: The New York Daily News's Editorial*, Amelia Roskin-Frazee Blog (Mar. 27, 2017), http://www.aroskinfrazee.com/writing-blog/2017/3/27/re-the-new-york-daily-newss-editorial.

landlord cannot be liable for criminal acts committed by another tenant who otherwise had lawful access to the premises applies equally to universities who are not liable when another student who otherwise has lawful access to a dormitory is alleged to have committed the crime.

Thus, because Plaintiff admits that her assailant was another Columbia student (Compl. ¶ 92), her premises liability claim must fail as a matter of law.  *See Williams* v. *Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 119 (2d Cir. 2006) (plaintiff did not submit "sufficient evidence to establish that her assailant was an intruder, and therefore, that his presence in North Hall could be attributed to Utica College's purportedly negligent administration of the breezeway entrance"); *Walton* v. *Mercy Coll.*, 940 N.Y.S.2d 54, 55 (N.Y. App. Div. 2012) ("as a matter of law," a university cannot be held liable for an assault committed by the invited guests of another dormitory resident).[10]

### C.    Plaintiff Fails to State a Claim for Gross Negligence

Gross negligence, or "the failure to exercise even slight care," *Food Pageant, Inc.* v. *Consol. Edison Co.*, 429 N.E.2d 738, 740 (N.Y. 1981), "differs in kind, not only degree, from claims of ordinary negligence" *Colnaghi, U.S.A., Ltd.* v. *Jewelers Prot. Servs., Ltd.*, 611 N.E.2d 282, 284 (N.Y. 1993), since it necessarily involves "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing."  *Id.*  Not only does Plaintiff fail to state a claim for gross negligence, but her gross negligence claim fails for the same reasons as her negligence claim.  *See Lane* v. *Fein, Such & Crane, LLP*, 767 F. Supp. 2d 382, 392 (E.D.N.Y. 2011).

### CONCLUSION

For these reasons, the Court should dismiss the Complaint in its entirety, with prejudice.

---

[10]   Plaintiff admits that the door to her room had a "manual lock, accessible with a key." (Compl. ¶ 28.) Columbia cannot be negligent in circumstances where entry into the building was limited to other students, with swipe card access, particularly when Plaintiff's room had a lock on it.

Dated:  June 5, 2017

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:  _____

Michele S. Hirshman
Roberta A. Kaplan
Darren W. Johnson

1285 Avenue of the Americas
New York, NY  10019-6064
Main: 212.373.3000
Fax: 212.757.3990
mhirshman@paulweiss.com
rkaplan@paulweiss.com
djohnson@paulweiss.com

*Attorneys for The Trustees of Columbia
University in the City of New York*

26