```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   AMELIA ROSKIN-FRAZEE,

 4                  Plaintiff,

 5          v.                              17 Civ. 2032 (GBD)

 6   COLUMBIA UNIVERSITY,

 7                  Defendant.

 8   ------------------------------x
                                            New York, N.Y.
 9                                          August 8, 2017
                                            11:05 a.m.
10
     Before:
11
                        HON. GEORGE B. DANIELS,
12
                                            District Judge
13
                              APPEARANCES
14
     THE ZALKIN LAW FIRM
15        Attorneys for Plaintiff
     BY:  ALEXANDER S. ZALKIN
16        -and-
     HANTMAN & ASSOCIATES
17   BY:  ROBERT J. HANTMAN

18   KAPLAN & COMPANY, LLP
          Attorneys for Defendant
19   BY:  ROBERTA A. KAPLAN
          -and-
20   PAUL WEISS RIFKIND WHARTON & GARRISON LLP
     BY:  MICHELE S. HIRSHMAN
21        DARREN W. JOHNSON

22

23

24

25
```

1           (Case called)

2           MR. ZALKIN:  Good morning, your Honor, Alexander

3    Zalkin on behalf of plaintiff.

4           MR. HANTMAN:  Good morning, your Honor, Robert

5    Hantman, Hantman & Associates, also for plaintiff.

6           MS. KAPLAN:  Good morning, your Honor, Roberta Kaplan

7    from Kaplan & Company for Columbia University.

8           MR. JOHNSON:  Good morning, your Honor, Darren Johnson

9    from Paul Weiss Rifkind Wharton & Garrison on behalf of

10   defendant Columbia University.

11          MS. HIRSHMAN:  Michelle Hirshman on behalf of Paul

12   Weiss and Columbia University as cocounsel with Kaplan &

13   Company.

14          THE COURT:  Good morning.

15          Why don't I start with the defense.  Who wants to be

16   heard on the motion?

17          MS. KAPLAN:  I would, your Honor.

18          Your Honor, if I may, I want to begin this morning by

19   acknowledging the circumstances of this case and by repeating

20   the first line of our moving brief which makes note of that

21   fact.  We said in that brief that plaintiff's account of the

22   two sexual assaults that she allegedly suffered while a student

23   at Columbia is heartbreaking and indeed it is, your Honor.

24          To further respect the sensitive nature of the

25   information involved in this case, I placed a telephone call to

1   my colleague, Alex Zalkin, counsel for plaintiff, Friday

2   afternoon.  And on that call I noted the fact that of the

3   exhibits that we filed, Exhibits 2 through 15 were filed under

4   seal for this reason.  And both Mr. Zalkin and I agreed not to

5   reference the contents of any of those exhibits in court today

6   since this is an open courtroom open to the public and we want

7   to respect plaintiff's confidentiality and the sensitivity of

8   the issues discussed therein.  And with all respect, your

9   Honor, we would hope that you could avoid getting into those

10  details as well in your questions.

11          Let me now turn to the applicable legal standard since

12  that is obviously what is most relevant today on a motion to

13  dismiss.  The Supreme Court first established a private right

14  of action for students alleging violations of Title IX in the

15  case of *Davis v. Monroe County* from 1999.  The *Davis* case

16  involved a fifth grade girl who was subjected to a prolonged

17  pattern of sexual harassment by the boys in her class and who

18  reported each of those incidents, but the school did nothing in

19  response.

20          In reversing the lower court decision dismissing the

21  complaint, Justice O'Connor articulated the standard that is

22  applicable here for a Title IX claim on a theory of deliberate

23  indifference, which is the theory that plaintiff is using here.

24  And that standard is as follows:  Whether the actions of the

25  educational institution receiving federal funds were clearly

1    unreasonable in light of the known circumstances.

2        Moreover, your Honor, the *Davis* court made it very

3    clear, even though it sounds like a factual standard, that this

4    clearly unreasonable standard is not merely a matter of

5    evidentiary proof but is actually an independent pleading

6    standard.  The Supreme Court was very clear in that opinion

7    that deliberate indifference cases can and should be dismissed

8    on the pleadings.  Justice O'Connor, in fact, encouraged

9    district courts to do so at 649 of that opinion when she

10   explained that there was no reason why a court on a motion to

11   dismiss in an appropriate case should not be able to identify a

12   response as not clearly unreasonable as a matter of law.

13       Here, plaintiff concedes that she did not formally

14   report the two alleged sexual assaults to Columbia until August

15   2016, 10 months after the first alleged assault occurred.  And

16   she strongly objected during that period to any investigation

17   taking place before that time.  In fact, on multiple occasions

18   plaintiff stated emphatically that she did not want to report

19   her assaults, that she did not want to start an investigation,

20   that she wanted to preserve her confidentiality, and that she

21   did not want to provide Columbia with any information necessary

22   to identify her assailants.  As soon as plaintiff changed her

23   mind, which happened during the summer after her freshman year,

24   and did decide to make a formal report, Columbia acted promptly

25   to investigate.

 1          THE COURT:  Remind me on which occasions she indicated

 2   that she did not want them to investigate.

 3          MS. KAPLAN:  She acknowledges in her complaint that

 4   she did not formally report it until that summer.

 5          THE COURT:  I understand that.

 6          MS. KAPLAN:  At paragraph 59, I believe it is, of the

 7   complaint, your Honor, she told them in January '16, paragraph

 8   52, that she did not want to officially report her sexual

 9   assaults.

10          THE COURT:  I'm sorry.  You said that was --

11          MS. KAPLAN:  Paragraph 52, your Honor, last sentence.

12          THE COURT:  It doesn't have a date.

13          MS. KAPLAN:  That was January 2016.  The next

14   paragraph is February 2016.

15          THE COURT:  And remind me under what context that

16   conversation --

17          MS. KAPLAN:  In the previous paragraph it sets forth

18   the context.  It does say it's January 2016, paragraph 51.  She

19   received a call from Adrienne Blount, a case manager at

20   Columbia Student Conduct and Community Standards Office.  I can

21   read the rest of the paragraph, your Honor, but the context is

22   there had been a university-wide survey that plaintiff filled

23   out.  She says it was anonymous.  Actually, people were named

24   in filling it out.  In that survey, which actually had nothing

25   to do with these issues, she reported that she had been

1    assaulted.  Columbia immediately followed up with a call from

2    Ms. Blount and on that call she even concedes that she told

3    Blount that she did not wish to officially report her sexual

4    assault, paragraph 52.

5            THE COURT:  When was the conversation that you've

6    alluded to when you quoted her saying that she didn't want to

7    be contacted again about this?

8            MS. KAPLAN:  That is that conversation, your Honor,

9    and that's in the exhibits that I said that I would not refer

10   to.

11           THE COURT:  We are talking about the Blount

12   conversation.

13           MS. KAPLAN:  Yes.

14           THE COURT:  That's January of 2016.

15           MS. KAPLAN:  Yes, your Honor.

16           THE COURT:  Are we talking about any other indication

17   that she did not want to investigate either before January or

18   after January?

19           MS. KAPLAN:  Well, she does allege in her complaint --

20   I am going to try to limit this to things that are not in the

21   exhibits for now because I said I would.

22           In her complaint she alleges a number of times in

23   which she had contacts with Columbia personnel.  She talks

24   about speaking to a nurse, for example, and she makes an

25   accusation that that nurse improperly referred to her as a

1    lesbian.  She makes some comments about that.  She talks about

2    a conversation after that with her advisor.  We are going to

3    get to that conversation in more detail.

4          In each of those conversations it's very clear that

5    she did not officially report and did not want to make a report

6    because from the complaint itself, in the complaint much later,

7    paragraph 52 says she is still saying she doesn't want to

8    officially report the assault.

9          She does not affirmatively allege prior to that point

10   that she did in any respect officially report the assault, but

11   she did not.  There is no allegation in there before that that

12   she officially reported the assault to Columbia.

13         THE COURT:  Give me a timeline here.  The allegation

14   in the complaint, the first assault is what date?

15         MS. KAPLAN:  October 5, 2015, your Honor.

16         THE COURT:  And the second assault is what date?

17         MS. KAPLAN:  The second assault is December 14, 2015.

18         THE COURT:  December 14?

19         MS. KAPLAN:  December 14, 2015.

20         THE COURT:  What is the conversation with Columbia

21   between October 2015 and December 2015?

22         MS. KAPLAN:  Your Honor, I thought you might ask that

23   question.  I actually prepared a chart.  I have not showed it

24   to my adversary.  Can I show it to my adversary and then, if he

25   concedes, show it to your Honor?

1          THE COURT:  Sure.

2          MS. KAPLAN:  May I approach, your Honor.

3          THE COURT:  Yes.

4          MS. KAPLAN:  Your Honor, the two alleged assaults show

5     up here on October 5 and December 14, 2015.  You'll see that

6     there is a third column, type of resource, and that's very key

7     because under both DOE laws and regulations and Columbia's own

8     policies, certain people that plaintiff spoke to, like the

9     nurse on the sexual violence hotline, have an obligation, if

10    plaintiff so requests, which she did here, to keep any

11    information she can base it on confidential.

12          We have noted in the third column over which contacts

13    were confidential resources pursuant to the guidelines and

14    pursuant to, and I'll talk about this more, Columbia's policies

15    with respect to sexual assault on campus and which were not,

16    and then I am going to focus in quite specifically on the two

17    that were not, which plaintiff focuses on in her brief and in

18    her complaint.

19          THE COURT:  We have the October 5 first alleged

20    assault on your chart and then on October 12 you say that she

21    went to the medical service, but between October 5 and October

22    12, there was no either report or medical treatment sought with

23    regard to the first.

24          MS. KAPLAN:  That's as far as we know, your Honor, and

25    as far as plaintiff alleges, yes.

1          THE COURT:  Then on October 13 she calls the hotline.

2          MS. KAPLAN:  Correct.

3          THE COURT:  And in response to that they say they will

4    have someone contact her and someone calls back on October 14.

5          MS. KAPLAN:  Correct.  Again, without disclosing

6    details.  That's Exhibit 15.

7          THE COURT:  You say October 14 is the first time she

8    indicated that she did not want to report the assault.

9          MS. KAPLAN:  No.  She indicated that to the SVR, the

10   nurse on the SVR hotline.

11         THE COURT:  On October 13 and October 14 you say that

12   she indicated to the hotline person and the staff advocate that

13   she did not want to report the assault.

14         MS. KAPLAN:  That's correct, your Honor.  Again, if

15   I'm focusing solely on allegations in the complaint, she does

16   not allege that she did do that.

17         THE COURT:  You had three boxes after October 14.

18   Does that mean all those things happened on October 14?

19         MS. KAPLAN:  No.  I'm getting a nod from my very

20   knowledgeable colleague nodding yes.

21         THE COURT:  On the same day she goes to counseling and

22   the psychological services office and speaks to the academic

23   advisor.

24         MS. KAPLAN:  Yes.  I am going to come back to that,

25   your Honor, because there are only two times, as I understand

1    her argument, that she says she said something that would have

2    constituted the kind of notice or report that should have

3    provoked Columbia to nevertheless do something, frankly,

4    against her wishes, and those two are the discussion with her

5    academic advisor that you just referred to and a later

6    conversation with the executive vice-president for University

7    Life.

8            THE COURT:  But you don't claim the discussion with

9    the advisor was a discussion about the assault.

10           MS. KAPLAN:  Correct.

11           THE COURT:  You say that that was a discussion about

12   some academic accommodation.

13           MS. KAPLAN:  Correct.  I can tell you what she says in

14   her complaint, your Honor, and I think her words are very

15   carefully chosen.  And in her complaint the most she says about

16   this meeting is that she strongly alluded, strongly alluded to

17   that something had happened.  I believe that's paragraph 22,

18   your Honor.  Let me doublecheck.  No.  I apologize.  That's

19   paragraph 39, your Honor.

20           THE COURT:  Without explicitly saying that she was

21   raped, plaintiff strongly alluded to the advisor that plaintiff

22   had been raped.

23           MS. KAPLAN:  I want to keep to my promise to counsel.

24   We have provided the documentation on that in the exhibits

25   filed under seal.

1          THE COURT:  Give me a little bit more detail about

2     this December 3 meeting with the student advocate.  Is this

3     some kind of forum?

4          MS. KAPLAN:  Yes.

5          THE COURT:  Some kind of faculty/student discussion

6     group?  How do you characterize this?

7          MS. KAPLAN:  Let me give you the context.  The

8     executive vice-president for the University Life at Columbia is

9     a person who has been charged officially with dealing with this

10    issue, among other issues on campus, including Columbia's Title

11    IX policies and procedures and how Columbia deals with that and

12    improvements, what can be done.  Columbia revises its policies

13    almost every year, things like that.  That is among the

14    policies that the executive vice-president for student life is

15    responsible for.

16          And plaintiff, and I think you can see this in her

17    complaint, is an advocate in this group.  The main group at

18    Columbia is called No Red Tape, student activists about sexual

19    assaults on campus, and she is very involved in that group.

20    There was a meeting.  They have periodic meetings between a

21    whole bunch of students and the executive vice-president of

22    University Life, in which plaintiff attended, to discuss

23    precisely those issues.  There, for lack of a fancier term,

24    their complaint, their beefs with the way Columbia handles

25    these issues on campus --

```
 1              THE COURT:  How large a meeting is this?

 2              MS. KAPLAN:  My understanding, there were several

 3    students there, and she doesn't contest that.

 4              THE COURT:  So at this meeting --

 5              MS. KAPLAN:  She says in her complaint several other

 6    student advocacy organization members.  Paragraph 44, your

 7    Honor.

 8              THE COURT:  At this meeting she indicated that she had

 9    been raped?

10              MS. KAPLAN:  Correct.  That's what she alleges.

11              THE COURT:  That was December 3.  At that point she

12    would be referring to the October 5.

13              MS. KAPLAN:  Correct, your Honor.  Logically, that's

14    what she would have meant.

15              THE COURT:  Then December 14 was the second assault.

16              MS. KAPLAN:  Correct, your Honor.

17              THE COURT:  And on the next day she goes to St. Luke's

18    Hospital for treatment of her injuries and rape kit.

19              MS. KAPLAN:  Correct, your Honor.

20              THE COURT:  Now, let's get back to where you started,

21    the January 19 phone call.  The January 19 phone call was a

22    phone call initiated by Ms. Blount, the case manager.

23              MS. KAPLAN:  Correct, your Honor.

24              THE COURT:  Because she saw a survey that was

25    submitted.
```

1          MS. KAPLAN:  Um-hum.

2          THE COURT:  And that survey was submitted relative to

3    what?  Is that in conjunction with this December 3 meeting?

4          MS. KAPLAN:  Totally unrelated.  It was a

5    university-wide survey.  It was actually, as I understand it,

6    in connection with Columbia's accreditation process.  It had

7    nothing to do with Title IX or sexual assaults on campus.

8          THE COURT:  When was this survey filled out?

9          MS. KAPLAN:  Shortly before that, your Honor.  I can

10   get you the date.

11         THE COURT:  You think in January?

12         MS. KAPLAN:  Yeah.  That's my understanding.

13         THE COURT:  Ms. Blount sees the survey.

14         MS. KAPLAN:  And that, from Columbia's perspective,

15   her name is on the survey.  She is actually incorrect in

16   alleging here that it was anonymous.  Her name actually was on

17   it.  That's the first time that Columbia had a nonconfidential

18   communication to Columbia specifically alleging these assaults.

19   I can get back to the executive vice-president meeting and why

20   that doesn't count in a second.

21         In response, Columbia followed up immediately with

22   this call.

23         THE COURT:  They called her, Ms. Blount called her,

24   and the plaintiff had described which incident, both incidents?

25         MS. KAPLAN:  It says sexual assaults.  Again, I'm

1    trying not to get into the exhibits, but there is no

2    description.

3         THE COURT:  It doesn't say, I was assaulted on October

4    5 and/or December 4.  Is there some kind of box that's checked?

5         MS. KAPLAN:  No.  She actually wrote it in because

6    it's not pertinent to anything that's in this --

7         THE COURT:  The information she provided on the survey

8    was that she had been -- what was described?  What information

9    did she provide then?

10         MS. KAPLAN:  That she had been sexually assaulted.

11         THE COURT:  They contacted her in response to this

12    information on the survey, Ms. Blount.

13         MS. KAPLAN:  Correct.

14         THE COURT:  In that conversation, on January 19, that

15    was when she indicated that she did not want to officially

16    report the assaults.

17         MS. KAPLAN:  Correct.  That's based on her allegation.

18         THE COURT:  She also indicated to them that she did

19    not want them to contact her again about those assaults?

20         MS. KAPLAN:  That's correct, your Honor.  That's based

21    on the document that we submitted.  What she says is that she

22    didn't want them to contact her ever again.

23         THE COURT:  And then the next communication about

24    these incidents was not until August 5, when she made a formal

25    what?  What did she do?

1          MS. KAPLAN:  She made a formal report.

2          THE COURT:  I don't know what that means.

3          MS. KAPLAN:  I believe it was by e-mail.  Again, I'm

4     trying to avoid the exhibits.  She did make a formal

5     communication to Columbia that she now wanted to formally

6     report.

7          THE COURT:  I'm just trying to understand.  That

8     triggers what?  What does a formal report mean and --

9          MS. KAPLAN:  What that meant, given this context, is

10    that not only did she want Columbia to go forward with an

11    investigation, but, critically, she was willing to cooperate

12    with that investigation.  This was very important because the

13    first time Columbia is aware of any of the details, your Honor

14    just referred to that, any of the details of what she alleges

15    happened to her, where it happened, how it happened, etc., was

16    not until that summer, late that summer, and then her official

17    interview happens pretty soon after she comes back to campus in

18    September.

19         THE COURT:  The thing you don't have on this chart is

20    that they began an investigation on September 8.

21         MS. KAPLAN:  Yes, I believe that's correct, your

22    Honor.

23         THE COURT:  Now we are talking about 2016.  And that

24    investigation entailed what?

25         MS. KAPLAN:  Interviewing plaintiff.  As I recall,

1    there was a request to speak to others who might be witnesses

2    or might have information.  She said that there were no such

3    people and she did not want her roommates to be contacted.

4    There are some allegations about some evidence, some notes that

5    she alleges the assailant posted in the dorm and they asked for

6    those notes and she told them she had thrown them away.

7           There is some other evidence -- again, I'm trying to

8    avoid any details here, and I apologize, your Honor -- about

9    how the second assault was conducted, and they asked if she had

10   any of those things and she was told that, no, she had

11   thrown -- she told them that, no, she had thrown all those

12   away.

13          They looked at the swipe records for people who had

14   swiped into the dorms during the relevant periods.  One of the

15   problems here, your Honor, is that there are three dorms that

16   are all interconnected, so anyone could come into any one of

17   the three dorms and it get access to where her suite was.

18   There were thousands of entries on those forms.

19          The description that she gave of her assailant, which

20   is in the complaint, your Honor, is that he had wavy hair,

21   short, wavy, dark hair and was somewhere in the nature of five

22   foot six to six feet tall and that's all she could describe.

23   So given that information, there was really nothing that could

24   be done with the swipe records because that's too little detail

25   to try to identify 3,000 people on swipe records.  And the

1    video of the thing that she seems to have been most concerned,

2    most upset about, is that the video of people going into the

3    dorms by that point had been erased, so there was -- not

4    erased, but written over, so there was no video.

5         THE COURT:  What's the retention policy on that, three

6    months, six months?

7         MS. KAPLAN:  I don't know the retention period, but it

8    was past the retention period.

9         THE COURT:  I have also --

10        MS. KAPLAN:  I'm sad to say, your Honor, that with

11   respect to these alleged assaults, assuming they occurred, that

12   the person was not able to be found, given what she could

13   provide and given the lapse in time.

14        THE COURT:  So I also have, after the formal report on

15   August 5, an investigation was initiated September 8.

16        MS. KAPLAN:  Yes.  I think that's when she came and

17   had the first interview.

18        THE COURT:  And on September 9 she asked that locks be

19   placed on her suite.

20        MS. KAPLAN:  Locks, yes, your Honor.

21        THE COURT:  And then on September 16 Columbia offered

22   to put the locks on the suite or give an off-campus apartment.

23        MS. KAPLAN:  That's correct, your Honor.  And she

24   chose to have the locks on her suite.

25        THE COURT:  Those were done when?

1          MS. KAPLAN:  I think promptly thereafter.  I don't see

2     any allegation from her that there was some undue delay on that

3     point.

4          THE COURT:  Then October 17 the report was completed,

5     the investigative report.

6          MS. KAPLAN:  Yes, your Honor.

7          THE COURT:  Do I have that right?

8          I have also that there was some sort of housing

9     accommodation on December 9.  Was that an off-campus apartment

10    or lock on the suite?

11         MS. KAPLAN:  I don't know, your Honor, but I can check

12    while my adversary is speaking.

13         THE COURT:  I'm referencing paragraph 67 of the

14    complaint.

15         MS. KAPLAN:  I don't think Columbia -- I can't give

16    you the details, but I don't think we would deny that she

17    requested the housing accommodation as it says here on

18    September 9.  She was given the housing accommodation.  I don't

19    have the details about what that was, your Honor.  I apologize.

20         THE COURT:  Go ahead.  Continue.

21         MS. KAPLAN:  Given kind of just what we went through,

22    your Honor, the chronology that your Honor helpfully outlined,

23    we believe that this case, while, as I said, heartbreaking,

24    presents a narrow question, actually, that we believe is fully

25    capable of being resolved by this Court on this motion to

1    dismiss:  Mainly, does the university act in a manner that

2    could possibly be construed as clearly unreasonable when it

3    respects a college student's repeated knowing unambiguous

4    requests and refusals, either for the university to investigate

5    or to cooperate with such investigation and indeed in

6    circumstances where any meaningful investigation would have

7    been impossible without the student's cooperation.

8         We believe, your Honor, that the only answer to this

9    question is no.  Given the facts as pleaded in the complaint,

10    it could not have been clearly unreasonable for Columbia to

11    respect plaintiff's wishes that she did not want to report the

12    alleged assault or for there to be an investigation.

13         Indeed, the fact that Columbia did conduct such an

14    investigation almost as soon as plaintiff reported it, as

15    plaintiff concedes, and we looked at those paragraphs,

16    paragraph 56 and 58, is itself proof that it was not

17    deliberately indifferent to her needs.

18         In fact, I think it's important in this case, your

19    Honor, to take a step back and try to eliminate the benefit of

20    hindsight.  It is important to understand that without

21    plaintiff being willing to disclose the details of the alleged

22    assaults, as she did not do until August 2016, it was all but

23    impossible for Columbia to conduct a meaningful investigation

24    or to know what happened, how it happened or where it happened

25    and, therefore, there is no way that Columbia's conduct could

1   be clearly unreasonable under the circumstances.

2         Let me kind of go through the underlying, if I could

3   your Honor, the DOE, the federal law and guidance and why

4   Columbia has these policies and why they exist.

5         The federal guidance from the DOE office of civil

6   rights, OCR, repeatedly emphasizes the importance of honoring a

7   student's refusal to disclose a sexual assault or to

8   participate in an investigation.  Columbia's policies mirror

9   this guidance, as they must, as a recipient of federal funds,

10  and there are strong public policy considerations underlying

11  these policies as well.

12        Let me start with the federal guidelines.  They come

13  from two sources:  The dear colleague letter from 2011 and the

14  questions and answers on Title IX and sexual violence from

15  2014, both of which plaintiff actually attached to her

16  complaint.

17        The dear colleague letter from 2011 says as follows:

18  Schools should inform and obtain consent from the complainant

19  before beginning an investigation.  If the complainant requests

20  confidentiality or asks that the complaint not be pursued, the

21  school should take all reasonable steps to investigate and

22  respond to the complaint consistent with the request for

23  confidentiality or request not to pursue an investigation.  If

24  a complainant insists that his or her name or other

25  identifiable information not be disclosed, the school should

1    inform the claimant that its ability to respond may be limited.

2           Similarly, in the questions and answers from 2014, the

3    DOE said as follows:  OCR strongly supports a student's

4    interest in confidentiality in cases involving sexual violence.

5    There are situations in which a school must override a

6    student's request for confidentiality in order to meet its

7    Title IX obligations.  However, these instances will be

8    limited.

9           Let me turn, your Honor, now, if I may, to Columbia's

10   policies, which, as I said, mirror this federal guidance.

11   Columbia's policies say the following:  If a student wishes to

12   maintain confidentiality, a nonconfidential resource will

13   direct the student to confidential resources, which is some of

14   those early communications that we talked about, which will not

15   report without the student's permission.  A student may choose

16   to make a full report or request confidentiality as he or she

17   determines.  That's at page 9 of the Columbia policies.

18          Same page:  A student who reports gender-based

19   misconduct to the Columbia's gender-based misconduct office can

20   request that the office not disclose his or her identity to

21   anyone else, including the person who allegedly committed the

22   misconduct.  Such a request may limit the ability to

23   investigate and respond.

24          Let me turn to the reasons why these policies I just

25   read to your Honor exist.  The reason, and I am going to tell

1    you that this comes from federal guidance, is that the policy

2    makers and the Federal Government have concluded that the

3    interests of a student who has been victimized or allegedly

4    victimized in confidentiality has to be of utmost concern.

5         Here is what the OCR guidance said.  It says:  A

6    school should be aware that disregarding requests for

7    confidentiality can have a chilling effect and discourage other

8    students from reporting sexual violence.  To improve trust in

9    the process for investigating sexual violence complaints, a

10   school must take steps to protect the complainant as necessary.

11        Moreover, the student advocacy organization, called No

12   Red Tape, of which plaintiff is a member, emphasizes the goal

13   of empowering survivors and allowing survivors to control the

14   process.  Indeed, in its very first statement of values, No Red

15   Tape states that members of firm actively support every

16   survivor's right to seek justice in healing in the way that

17   they choose.  The work we do is always centered on the needs

18   and experiences of survivors themselves.

19        Finally, your Honor, we cited in our brief, plaintiff

20   herself wrote a blog post that she published on Huffington Post

21   on June 6, 2016, so the same summer that she changed her mind

22   and formally reported a month or so later, the blog post is

23   called Why We Don't Report It.  And she says, with respect to

24   her own decision, I don't report it because it's not best for

25   me.  Reporting is detrimental to my well-being and I have no

1   obligations to do anything after an assault that doesn't have

2   my best interests and only my best interests at heart.

3         Your Honor, the fundamental premise or core of

4   plaintiff's thesis in this case is that in order for this case

5   to proceed is that somehow Columbia had an obligation under

6   Title IX to override plaintiff's wishes.  That on its own would

7   be quite a hurdle for your Honor for her to make, without the

8   federal guidance and policies that make it very clear that when

9   a complainant takes the kind of position that this plaintiff

10   took, there is grave concern about protecting that person's

11   confidentiality and not pushing a complainant to do something

12   that they are not comfortable with.  And then indeed here you

13   have the very practical, what I call the hindsight problem,

14   which is, given the nature of these alleged offenses, without

15   plaintiff being willing to explain to someone at Columbia in a

16   nonconfidential way when it happened, where it happened, how it

17   happened, I would submit, your Honor, as a practical matter

18   there was absolutely nothing that Columbia could have done.

19        THE COURT:  How was that policy communicated to the

20   student body and university community?

21        MS. KAPLAN:  It's communicated in the policies that we

22   attach as Exhibit 1.  It's the only nonconfidential exhibit I

23   submitted to your Honor.  It's fully available to every student

24   and the students in this No Red Tape group, like plaintiff,

25   were very, very familiar with.  If you look at the

1   documentation, the confidential documentation that we submitted

2   under seal, she says over and over again how familiar she was

3   with the policies.

4          THE COURT:  Is there any either written or oral

5   communication to the student who indicates that they are

6   reluctant to move forward with an investigation, what the

7   consequences of that reluctance --

8          MS. KAPLAN:  Yes, there is.  There is a written policy

9   that says if a student is reluctant to go forward, that's going

10  to have a great -- I just talked about it.  We cite it in our

11  brief.  That will have an adverse impact on Columbia's ability

12  to investigate, which is exactly what the DOE's regulations

13  state.

14         THE COURT:  If a student in the abstract says I've

15  been sexually assaulted, I want to let you know about it, but I

16  don't want to initiate a formal investigation.  What's the

17  student told about what that would mean?

18         MS. KAPLAN:  The policy itself says that that could

19  hamper an investigation.

20         THE COURT:  I know.  What does that mean?  To hamper

21  an investigation doesn't tell me whether or not you are going

22  to do an investigation.

23         MS. KAPLAN:  She was never told here that Columbia was

24  going to seek to override by Columbia those wishes and, again,

25  as I said, without knowing more, I don't know how Columbia

1    could have.  You have to contrast the facts alleged here.

2          THE COURT:  Columbia could have done a number of

3    things, not just for her benefit, but for the benefit of all

4    students.  If someone reports a series of sexual assaults at a

5    certain location when obviously Columbia would have some

6    interest, even if that particular student doesn't want their

7    own individual situation to be revealed, the university would

8    have an interest in making sure that that location is a safe

9    location for all the students.

10          MS. KAPLAN:  That didn't happen in a nonconfidential

11    way, your Honor, until August, when Columbia officially started

12    investigating.

13          THE COURT:  It didn't happen, but it's not to say it

14    couldn't have happened.

15          MS. KAPLAN:  It could have happened.  If she had sat

16    down with someone in a nonconfidential way and explained what

17    she said in August to Columbia officially, I think Columbia

18    would have probably tried to do something about it.

19          THE COURT:  I assume that if Columbia had gotten

20    reports from 10 different students that they were at a certain

21    location on the campus and they all were sexually assaulted by

22    some individual that they described, that regardless of their

23    wishes to not do an individual formal investigation, Columbia

24    would take its own action to ensure that other students aren't

25    sexually assaulted.

1    MS. KAPLAN:  Absolutely, your Honor.  DOE guidance and

2  Columbia's policies provide for that and absolutely in today's

3  world, your Honor -- these things make me feel old, I'm sad to

4  say -- and a lot of these instances and some of the cases I am

5  going to refer your Honor to, people actually take videotapes

6  of assaults where you have pictures of people and things can be

7  investigated from that and are and, heaven forbid and God

8  forbid, if it was a picture of Columbia or video of Columbia, I

9  am sure we would have done something.

10    This is where the hindsight problem comes in here.

11  Until she did that survey where she said there are two assaults

12  without any information about where, how, when, etc., Columbia

13  had no information that it was clear from all the

14  accommodations that she was asking for that something had

15  happened to her, she believed something had happened to her.

16  But she refused to give Columbia details about that.

17    This is really one of those scenarios where I am not

18  sure that -- Columbia had, A, no way of knowing there was a

19  danger or a potential danger on campus, allegedly; and, B,

20  without that information, I am not sure what they could have

21  done in the circumstances.  Surely there are circumstances

22  where public safety concerns would override that based on the

23  notice that was given and what the university knew.  The

24  hypothetical your Honor posited certainly would have provoked

25  that.  As I said, there is all kinds of cases in the case law

1    about Instagram and videotapes and all kind of stuff that I

2    honestly can't imagine this world would ever get to that point,

3    but it has.  In those circumstances of course a college or

4    university should follow up.

5         THE COURT:  At what point do you say that the

6    university received specifics or detail about the two --

7         MS. KAPLAN:  I don't think that's in dispute, your

8    Honor, not until that summer in 2016.

9         THE COURT:  Not until that August?

10        MS. KAPLAN:  No.

11        THE COURT:  Even the survey didn't give any detail --

12        MS. KAPLAN:  I am going to try to provide the detail,

13   your Honor, on the break.  As I recall, it just said sexually

14   assaulted.  It's like a one-sentence handwritten thing.

15        THE COURT:  You think that those were the words used,

16   sexually assaulted?

17        MS. KAPLAN:  I believe so.  I want to double check.

18        THE COURT:  And no other description.  Did it give the

19   date?

20        MS. KAPLAN:  No.

21        THE COURT:  And place where this occurred?

22        MS. KAPLAN:  No.  That I'm sure.

23        THE COURT:  Just in general made reference to, I had

24   been sexually assaulted.

25        MS. KAPLAN:  Correct.  There is a follow-up in January

```
 1   and on the follow-up she says, I don't want to officially
 2   report.  And you have the document where she says, don't ever
 3   contact me.
 4           She does have two contacts.  In her case she has two
 5   potential communications which she alleges should have provoked
 6   Columbia to do the kinds of things your Honor is suggesting.  I
 7   want to deal with both of those specifically, if I may, your
 8   Honor.  We have already dealt with them somewhat.
 9           The first is her meeting with her advisor on October
10   14, 2015.  As I said, the complaint in general is carefully
11   worded.  There she pleads –– the best she is able to plead is
12   she that strongly alluded to advisor.  We are living in a world
13   of *Iqbal* and *Twombly* and in that regime, your Honor, if she had
14   said to her advisor I was raped, we don't think that it's
15   plausible to assume she would have only alleged that she
16   strongly alluded to.  It's almost a suggestion or admission
17   that she not give the advisor enough to know what had happened.
18           Moreover, the advisor's response –– in other words,
19   under *Iqbal* it would be implausible to read plaintiff's words
20   to mean that she somehow said something much more specific than
21   she alleges in the complaint.
22           THE COURT:  You're merging two different
23   conversations.  The October 13 she called the hotline.
24           MS. KAPLAN:  Yes.
25           THE COURT:  She calls the hotline and says what?
```

```
 1              MS. KAPLAN:  That you have, your Honor, but that was a

 2    confidential communication that cannot be reported without her

 3    permission, and she doesn't even allege that anything should

 4    have been done as a result of that.

 5              THE COURT:  The way you characterize it here is

 6    incomplete.  You say:  Plaintiff calls the sexual violence

 7    response hotline but does not want to report the alleged

 8    assault.

 9              MS. KAPLAN:  Right.

10              THE COURT:  That couldn't have been the conversation.

11              MS. KAPLAN:  No.  You have the conversation, your

12    Honor.  It's in the exhibits.  Exhibit 2, your Honor.  Again,

13    we are in an open courtroom.

14              THE COURT:  That's fine.  I am just trying to figure

15    out what you're alluding to when you said -- let me just put it

16    to you this way.

17              MS. KAPLAN:  Your Honor, I apologize.  It's Exhibit 4.

18              THE COURT:  I assume that what you are doing by this

19    outline is saying that on October 13, she informed them on the

20    hotline that she had been sexually assaulted.

21              MS. KAPLAN:  Yes.  But that's a confidential -- that's

22    a rape crisis hotline.

23              THE COURT:  I understand that.  I'm just talking from

24    common sense.  If she calls the sexual violence response

25    hotline, but does not want to report the alleged assault, one
```

1    can only assume that she called the hotline to report the

2    assault.  And what you are trying to say is that she called the

3    hotline, but she indicated that she didn't want to report it,

4    so she asked for some sort of confidential consult.

5         MS. KAPLAN:  Your Honor, I'm uncomfortable.  If you

6    look at page 5 of the document, she says:  I'm not reporting

7    it.  But I have an agreement --

8         THE COURT:  I understand that.  I'm just going off the

9    chart you gave me.  The chart you gave me is a public document

10   and you say the plaintiff calls the sexual violence response

11   hotline but does not want to report the alleged assault.  I

12   don't know what kind of conversation that's alluding to because

13   the only thing you say is that she said to them, she didn't

14   want to report --

15        MS. KAPLAN:  Your Honor, she doesn't allege that she

16   reported it on that hotline for purposes of starting any of

17   these proceedings.

18        THE COURT:  I know.  You are going to get into a

19   dispute about whether or not -- you say that she has to report

20   it for a purpose and they argue that she just has to report it.

21        MS. KAPLAN:  No, no, no.  If she reports it to certain

22   sources, if you look at the chart, who are confidential

23   sources, like rape hotline nurses, those people are not

24   permitted to tell anyone else without her permission and she

25   does not argue otherwise.

1          The only two things that she says Columbia should have

2   followed up on -- she is not ever arguing that Columbia should

3   have followed up on this.  The only two things that she said

4   Columbia should have followed up on before the summer of 2016

5   is the meeting with her advisor and the meeting with the

6   executive vice-president of student life, only two things.

7   That's because, again, she is an expert on these things.  She

8   understands and knows that these other things are all

9   statutorily designated as confidential, and she did not give

10  anyone permission to disclose.

11          THE COURT:  Is there something in the complaint that

12  alludes to this sexual violence response hotline conversation?

13          MS. KAPLAN:  I believe there is, your Honor.  It's

14  paragraph 32.

15          THE COURT:  Paragraph 32.  That's what I alluded to.

16  This isn't confidential.  It says:  Plaintiff reported that she

17  had been raped.  It says:  In response to plaintiff's report

18  that she had been raped.  That's what the complaint says.  The

19  complaint says that she called the hotline.  And then in

20  response to a report that she had been raped she was advised

21  that she could report it to the police.  That's what the

22  complaint says.

23          MS. KAPLAN:  Yes.  But she does not argue in her

24  papers, nor could she, that that report on October 13 to the

25  sexual violence hotline, which is statutorily protected, could

 1   have or would have caused anyone at Columbia to do anything.

 2           THE COURT:  That would not have initiated an

 3   investigation because the hotline is a confidential hotline.

 4           MS. KAPLAN:  Correct.

 5           THE COURT:  And people who call the hotline don't

 6   expect you to disclose it to other individuals, not even the

 7   university official.

 8           MS. KAPLAN:  Correct.

 9           THE COURT:  Without your permission.

10           MS. KAPLAN:  You have the transcript of what she said

11   and she clearly did not agree.

12           THE COURT:  Is there a reference to this October 14

13   call in the complaint?

14           MS. KAPLAN:  Yes.  It's paragraph 39.

15           THE COURT:  That's why I'm confused because I can't

16   really reconcile the facts in the complaint as alleged and in

17   your chart as alleged because in the complaint 32 says that she

18   gave a report that she had been raped.  That's what it says.

19   It says in response to plaintiff's report that she had been

20   raped.

21           MS. KAPLAN:  That's like the rape crisis hotline.

22           THE COURT:  That is the sexual violence response

23   hotline.

24           MS. KAPLAN:  Right.

25           THE COURT:  She said she had been raped.

```
 1                MS. KAPLAN:  Correct.

 2                THE COURT:  In 32.

 3                MS. KAPLAN:  Correct.

 4                THE COURT:  In 39 it says that she did not explicitly

 5     say that she had been raped.

 6                MS. KAPLAN:  The difference, your Honor, is who she is

 7     talking to.

 8                THE COURT:  Am I supposed to read your chart in this

 9     complaint as indicating that on October 13, when she called the

10     hotline, she said that she had been raped, but when the person

11     called her the next day, she did not say she had been raped?

12                MS. KAPLAN:  No.  That's a different communication.

13                THE COURT:  I know it's a different communication.

14                MS. KAPLAN:  The communication with the hotline -- I

15     am going to tell you the exhibit numbers and you can read them.

16     Again, I am going to try to honor my agreement.  The call with

17     the hotline is Exhibit 4.  The call right after, the

18     communication, the follow-up after the hotline is Exhibit 15.

19     Both of those are confidential people who do not have

20     permission to report what is said to them unless she gives them

21     permission to do so.

22                THE COURT:  I understand that.  But I'm trying to

23     understand --

24                MS. KAPLAN:  That's different from the conversation

25     with her advisor, who was not such a confidential person.
```

1          THE COURT:  I understand all that perfectly.  I'm just

2    saying that on the conversation on the 13th, it says that she

3    has reported a rape.  In paragraph 32.

4          MS. KAPLAN:  Maybe this is the confusion, your Honor.

5    When we use the word report on here, she uses the word herself

6    in the conversation, we report it for purposes of Title IX.

7          THE COURT:  I understand that.  But she said she had

8    been raped.

9          MS. KAPLAN:  But it was not a report for purposes of

10    Title IX.

11          THE COURT:  I understand that, and I am not debating

12    it.  I am just trying to get the facts.  On the 13th she had a

13    conversation with someone and in that conversation she

14    indicated on that hotline that she had been raped.

15          MS. KAPLAN:  But does not want to report it.

16          THE COURT:  Again, don't advocate it right now.  I'm

17    just trying to get the facts.  She said she had been raped.

18    The next day, when the person called her back to discuss it

19    with her, in paragraph 39, it says that she did not explicitly

20    say --

21          MS. KAPLAN:  That's a different person, your Honor.

22    There are three people.  There is the rape crisis hotline nurse

23    is the first person.  Then there is the person who follows up

24    from the rape crisis hotline nurse, who is a rape crisis

25    counselor.  Those are both confidential.  Then there is her

1   academic advisor, who is not part of that process at all.  She

2   is just sort of an academic advisor.  The academic advisor is

3   the person that she allegedly she strongly alluded to.

4           THE COURT:  This is referencing the academic advisor

5   rather than the staff advocate?

6           MS. KAPLAN:  When you say this, your Honor, what are

7   you referring to?

8           THE COURT:  I'm referring to paragraph 39.

9           MS. KAPLAN:  Paragraph 39 is referring to her academic

10  advisor, correct.

11          THE COURT:  That's not, the staff advocate called me.

12          MS. KAPLAN:  Correct.

13          THE COURT:  That's what I'm trying to understand.

14          MS. KAPLAN:  I apologize.

15          THE COURT:  The reason why I'm confused is because

16  those are three different calls and you only have two calls on

17  your chart.

18          MS. KAPLAN:  We have all three.  They are just on

19  different dates, but we have all three.  We have the sexual

20  violence response hotline on October 13, we have the call to

21  Barbacane on October 14.

22          THE COURT:  Right.

23          MS. KAPLAN:  And we have, reaches out to her academic

24  advisor, and you skip a box and go to the next box.

25          THE COURT:  The plaintiff reaches out to her academic

1   advisor.  That box is the October 14, second conversation with

2   someone different than the staff advocate.

3           MS. KAPLAN:  Different than the nurse.  But the first

4   person she alleges she spoke to who was not under

5   confidentiality obligations.

6           THE COURT:  What you are trying to point out is that

7   in the confidential hotline conversation she may have called

8   the hotline and talked to them about a rape.  But the day that

9   she spoke to the academic advisor she may have discussed with

10  the staff advocate a rape, but she did not say to the academic

11  advisor that same day that she was raped.

12          MS. KAPLAN:  Correct, your Honor.

13          THE COURT:  You are saying she had the confidential

14  conversation with the hotline, the initial call to the hotline,

15  and then they call back to her where she discusses the rape in

16  confidence with the hotline.  But when she reached out to her

17  academic advisor, she did not mention her rape.

18          MS. KAPLAN:  Correct.

19          THE COURT:  I'm trying to understand, in what way was

20  the conversation with the academic advisor a conversation

21  about -- was that just an academic conversation or was that a

22  conversation about her being sexually assaulted?

23          MS. KAPLAN:  It was about accommodations.

24          THE COURT:  That's what I'm trying to say.

25  Accommodation for what reason?

1          MS. KAPLAN:  Turning in papers late, missing classes.

2          THE COURT:  Not accommodation about changing the locks

3     or moving to another --

4          MS. KAPLAN:  Correct.

5          THE COURT:  That's where I'm confused.  When you talk

6     about accommodation, mostly we are talking about whether they

7     accommodated her request to put the locks --

8          MS. KAPLAN:  There are two categories, academic and

9     housing.

10         THE COURT:  The academic conversation you say had

11    absolutely nothing to do nor did she disclose that she had been

12    sexually assaulted to the academic --

13         MS. KAPLAN:  She was asking for accommodations.  When

14    students ask for accommodations, often they are asking for them

15    because something happened to her.

16         THE COURT:  Not the way you just said.  You said

17    something about the paper was due.  If I'm in college and I

18    have a late paper, it doesn't have anything to do with a sexual

19    assault.  It means I just didn't do my paper.  If someone said,

20    my paper is due next Monday, but I can't have it to you until

21    Tuesday, why would anybody think that's a conversation about

22    sexual assault?

23         MS. KAPLAN:  Plaintiff told Columbia when she applied

24    to Columbia she had been sexually assaulted in high school, and

25    she was very involved in this and was very clearly deeply

 1  involved in these issues.  She asked for accommodations.  She

 2  clearly was concerned and upset.  The advisor gave her those

 3  accommodations.

 4          THE COURT:  That's what I'm trying to understand.  She

 5  asked for an accommodation.  What kind of an accommodation did

 6  she ask for and what reason did she give for that

 7  accommodation?

 8          MS. KAPLAN:  They were medical accommodations and they

 9  were relating to her academic tests, getting -- the document is

10  in here.  I'm trying to limit this.

11          THE COURT:  I don't understand in what way that was a

12  conversation about being raped.

13          MS. KAPLAN:  It wasn't.

14          THE COURT:  In what way was that a conversation about

15  being sexually assaulted in any way?

16          MS. KAPLAN:  It wasn't other than she pleads that she

17  strongly alluded to.  You have the documentation and she

18  doesn't say that.

19          THE COURT:  You just confused me when you said, when

20  people ask for accommodations they assume it had something to

21  do with a sexual assault.

22          MS. KAPLAN:  What I'm saying is, that's one of the

23  reasons people can ask for accommodations, but she does not say

24  I was sexually assaulted; therefore, I want these

25  accommodations.

```
 1              THE COURT:  Was it understood between the two people
 2     in the conversation that she was asking for an accommodation
 3     because she had been assaulted?
 4              MS. KAPLAN:  I think it was understood that she was
 5     asking for accommodations because she was in a bad way, but
 6     there were no details about why she was in a bad way is the way
 7     I would put it.
 8              THE COURT:  Why would somebody assume she is in a bad
 9     way because she had been recently sexually assaulted?
10              MS. KAPLAN:  I agree.  I don't think that's a fair
11     inference.  That's precisely our argument, your Honor.  I don't
12     think under Iqbal and Twombly that's plausible.  I completely
13     agree.
14              THE COURT:  I don't understand what the dispute is
15     between the two of you.  What exhibit are you alluding to?
16              MS. KAPLAN:  The communications with her advisor?
17              THE COURT:  Yes.
18              MS. KAPLAN:  That's Exhibit 7.
19              THE COURT:  Without indicating on the record, can you
20     at least point me to the paragraph that you say is relevant.
21              MS. KAPLAN:  Here is the perfect example.  If you look
22     at page 3 of 5, in the middle.
23              THE COURT:  These are e-mail exchanges.
24              MS. KAPLAN:  Yes.  Take a look in the middle.  There
25     is an e-mail dated October 14, 2015 at 4:46, and there is a
```

1    statement to her from the advisor.  I think that's the best

2    explanation.

3                THE COURT:  Let me look at that.

4                MS. KAPLAN:  Then some of the academic accommodations

5    I was referring to, your Honor, are on page 1 of that document.

6                THE COURT:  Is there somewhere in this document where

7    it indicates what occurred to her?

8                MS. KAPLAN:  No.

9                THE COURT:  Show me, what does CPS stand for?

10               MS. KAPLAN:  Counseling and psychological services.

11               THE COURT:  Now, are these documents reflecting some

12   person-to-person, face-to-face conversation that occurred

13   between her and the advisor?

14               MS. KAPLAN:  She says she reached out to her academic

15   advisor.  It's not clear -- we don't know.  She doesn't say she

16   called her or met with her, but we do have these e-mails from

17   that date.

18               THE COURT:  You are not saying that this is the entire

19   communication between her and the advisor and you don't know

20   whether or not she walked into the advisor's office and had a

21   unrecorded conversation with the advisor.

22               MS. KAPLAN:  There is a reference here to reaching out

23   on that date and there is a reference in the complaint that we

24   do have communications on that date between her and her

25   advisor, which is what we provided.

1          THE COURT:  I understand.

2          MS. KAPLAN:  Let's just go back to that.  First of

3    all, if we just kind of eliminate the exhibits, your Honor, and

4    just look at the language in the complaint, the best that she

5    can come up with is strongly alluded.  We just don't think it's

6    plausible that strongly alluded is enough in this context.  If

7    you go to the document, you can see from the context that the

8    advisor has no basis or no information from which to assume or

9    have knowledge of the alleged assaults.

10         Then, on top of that, remember, your Honor, the

11   standard here is, is it clearly unreasonable under the

12   circumstances.  Even despite all that, as you see in the

13   document, the advisor goes out of her way to provide plaintiff

14   with every possible accommodation she is asking for.  This is

15   not a deliberately indifferent university.  So given that fact,

16   there is no way that she can meet the standard either.

17         I want to turn, if I could, your Honor, to the second

18   time.  Again, there are only two occasions that she says would

19   have triggered a duty to investigate prior to the time the

20   investigation actually occurred.  The second one is on December

21   3, and we have talked about it a bit, and that's with the

22   executive vice-president of University Life.  This is a meeting

23   that's explicitly dealt with in Columbia's policies and in the

24   OCR guidelines.

25         What the DOE guidelines say is that in order for

1    students to feel free to participate in preventative

2    educational programs and access resources for survivors, or

3    other forums at which students disclose experiences with sexual

4    violence are not considered notice to the school for the

5    purposes of triggering an individual investigation, unless the

6    survivor initiates a complaint.  Columbia's policies, once

7    again, mirror this, and you can look at Exhibit 1 attached to

8    my affidavit, which are the policies at page 11.

9         The meeting with the executive vice-president of

10   student life, as we have discussed a bit already, your Honor,

11   is precisely that kind of forum.  Both the DOE laws and regs

12   and Columbia's policies explicitly say that that does not

13   trigger an investigation unless the student asks for an

14   investigation.

15        What the plaintiff argues in response in her papers is

16   that that explicit guidance for that particular situation

17   should be overridden by general guidance.  Just as a matter of

18   kind of legal reasoning, as we explained in our brief, your

19   Honor, that doesn't make any sense.

20        Moreover, when you go to plausibility standards, here

21   we actually have more because she herself admits, and we talked

22   about this at the beginning, that when she is reached out to in

23   January, after she fills out the survey, she tells the person

24   in January, after this meeting, weeks after, that she doesn't

25   want to officially report.  So even if you didn't have the

1    specific guidance, but you do, about student advocacy forums,

2    which clearly applies here, it would be implausible, I believe,

3    your Honor, for the Court to conclude that she would have given

4    a different answer had she been contacted after that meeting

5    than she did several weeks later when she told them, don't ever

6    contact me again.

7         If I could, your Honor, let me turn to the case law.

8    A district court in Virginia last year, faced with the same

9    conundrum you're faced with, your Honor, noted there are very

10   few cases addressing this issue of a university's obligation,

11   if any, to proceed with an investigation into sexual assault

12   where the victim does not want to participate.  And the cite

13   there is the *Butters* case, which is cited in our reply brief at

14   page 5, footnote 3.

15        Indeed, the courts have generally recognized that it's

16   hard to imagine how a university could take action reasonably

17   calculated to end the harassment here due to an investigation

18   without revealing the nature of the harassment, the identity of

19   the harassers, and even the plaintiff's own identity, which in

20   this case would have obviously been the plaintiff.

21        That is the problem that Columbia faced here, your

22   Honor, that I've been discussing.  Up until the summer of '16,

23   Columbia really had no way of knowing what had happened, when

24   or where it had happened, or who may have done it without

25   plaintiff agreeing to cooperate.

1      I am going to point your Honor to two cases that deal

2  with this specifically.  There are not many cases, but there

3  are two.  One is the *Butters* case that I already referred your

4  Honor to, and there the plaintiff alleged that she was

5  assaulted by three male students and that the assault was

6  filmed on videotape.  She told the investigators -- actually,

7  the facts were better in *Butters* than they are here.  She told

8  the investigators that she did want there to be an

9  investigation, but she wanted confidentiality, and she wanted

10 the investigation to happen without her involvement.

11     The school officials concluded that the video alone

12 wasn't enough information and they didn't pursue the

13 investigation without her cooperation.  The Court agreed that

14 that could not start a Title IX violation because, as the Court

15 concluded, given the plaintiff's grave concerns with

16 confidentiality, it was not clearly unreasonable for the

17 university to want her to consent to the process before

18 investigating or charging the assailants.

19     Indeed, as here, once she did file her complaint

20 later, the Court said that their lack of indifference, the

21 university's lack of indifference, is further highlighted by

22 the university's swift response once she did file her

23 complaint.  The key language in that case, your Honor, appears

24 on pages 755 and 756.  It's 208 F.Supp.3d 755 and 756.

25     There is another case, your Honor, which we did not

1    cite in our briefs and I apologize for that.  It's called *Roe*

2    *v. St. Louis University*.  It's an Eighth Circuit case from

3    2014.  The cite there would be 746 F.3d 874.  There the Eighth

4    Circuit affirmed a district court's finding that a university

5    did not act with deliberate indifference where, after a school

6    employee learned that the plaintiff had been assaulted, the

7    employee met with the plaintiff, referred her to a counselor,

8    informed her how to file complaints, but the plaintiff declined

9    to file a formal report of the assault and told university

10   employees that she did not want her parents told.  Again, the

11   Eighth Circuit in that case relied expressly on the plaintiff's

12   desire and intention and expression of wanting there to be

13   confidentiality and not wanting to cooperate.

14          That's it, unless your Honor has questions.  That's

15   really my argument on the first claim that she has, which is

16   the claim that the university should have somehow overridden

17   her wishes, at least based on those two communications I talked

18   about, and commenced an investigation anyway.

19          Let me turn to her other Title IX claim, which is for

20   failure to accommodate.  Here her argument, as I understand it,

21   is that the university failed to provide her with the

22   accommodations she asked for.  Here, your Honor, we are dealing

23   with a somewhat different problem.  Here there is just zero

24   specific allegations in the complaint of accommodations that

25   she asked for and was not provided.  Indeed, as your Honor

1    noted very early in my argument, when she talks about

2    accommodations in the complaint, she actually concedes that

3    they were provided to her.

4          Without that kind of specificity, the complaint has to

5    fail. And indeed, as the cases we have cited say, a university

6    is not obligated under Title IX to give a plaintiff or a

7    student exactly what she asks for. It's only required to give

8    reasonable accommodation. And here there is nothing in the

9    complaint that alleges any reasonable accommodation that she

10   asks for that was not provided.

11         And the Exhibit 7 that we looked at, your Honor, with

12   respect to academic accommodations really shows how Columbia

13   was going as far as it could and really working as hard as it

14   could to provide her with every single type of accommodation

15   that she was looking for. Given that, I just don't see any

16   claims stated in this complaint for failure to accommodate.

17         There is one more Title IX claim that she states, and

18   we apologize. I apologize for this, your Honor, because we

19   were a little confused. When we first saw her complaint she

20   has a complaint or a Title IX claim based on, quote, a sexually

21   hostile culture. We thought it was the same thing she was

22   alleging for the issues that we just talked about. Upon

23   getting her papers we realized that she was alleging something

24   different, that she was alleging preassault conduct by Columbia

25   that was so egregious, in her view. This is what the cases

1    say, that Columbia violated Title IX before anything ever

2    happened to her.

3         Your Honor, generally, this kind of preassault Title

4    IX violation is looked down upon by the courts, it's frowned

5    upon, and it's exceedingly rare. It's happened in a couple of

6    cases. We cite them in our brief. But in those cases the

7    plaintiff has to allege a general policy of indifference to

8    sexual misconduct on campus. That comes from the *Gebser* case,

9    which we cite, and the *C.T. v. Liberal School District* case,

10   which we also cite in our briefs.

11        The factual situations in the cases that I found this

12   are quite extreme, completely unlike anything that she alleges

13   here or possibly could be alleged about Columbia. In *Simpson*,

14   which is considered kind of the paradigmatic example of this,

15   there is an official school program that was for football

16   recruiting in which female students known as ambassadors were

17   paired with male football recruits and asked to show them a

18   good time. In that kind of pretty egregious scenario, the

19   courts have found that you could have this preassault Title IX

20   claim.

21        Baylor University, which I'm sure your Honor read

22   about, Starr, Special Counsel Starr was actually the president

23   and had to resign as a result of what happened there. There

24   were allegations of just widespread ignorance and indifference

25   in repeated occasions of trying to wipe complaints of sexual

1    misconduct under the rug.  Again, there is not a single

2    allegation that there is anything like that in this complaint

3    about Columbia, nor could there be.

4            Even in *Tubbs*, which plaintiff cites which comes from

5    closer to this area, the allegation was that there had been a

6    finding by the DOE against SUNY in that case of repeated

7    violations -- there are no allegations of any finding against

8    Columbia by OCR and there has not been -- that SUNY agreed to

9    remedy the violations that DOE found and that SUNY subsequently

10   failed to do so.  Again, you are looking at extreme, for lack

11   of a better term, *mens rea* on the part of the university that

12   the plaintiff does not allege and could not allege with respect

13   to Columbia.  I think that deals with respect to the preassault

14   sexually hostile claim.

15           All I have left, your Honor, and I'm happy to address

16   it, if your Honor wishes -- I am not sure whether we have a

17   dispute on this.  I can leave it to plaintiffs -- all I have

18   left are the state law claims.  Our view, your Honor, as you

19   might expect, if you dismiss the federal claims, then you have

20   discretion and you should dismiss the state law claims here.

21   As well, if plaintiff disagrees with that, I'm happy to address

22   them on the merits.

23           THE COURT:  Let me hear from the plaintiffs.

24           Mr. Zalkin.

25           MR. ZALKIN:  Good morning, your Honor or I guess it's

 1    afternoon.

 2              THE COURT:  Good afternoon.

 3              MR. ZALKIN:  Your Honor, I'd like to start with the

 4    extrinsic evidence offered in this case by defendant and

 5    offered with defendant's motion.  It's our position that the

 6    exhibits sought to be introduced by defendant are wholly

 7    inappropriate, that they do not meet the requirements for the

 8    incorporation by reference doctrine and, therefore, it would be

 9    inappropriate for this Court to consider any of their contents

10    when ruling on this motion.

11              Your Honor, this exact approach that defendant has

12    taken here, namely, submitting extrinsic evidence on a motion

13    to dismiss, and citing the incorporation by reference doctrine,

14    was attempted and summarily rejected by the Court in *Tubbs v.*

15    *Stony Brook University.*  In that case the defendant university

16    introduced or sought to introduce and rely on 21 exhibits,

17    similar in nature to the exhibits defendant has offered here.

18    And what the Court said in that case is, consideration of such

19    evidence is wholly improper on a motion to dismiss where the

20    inquiry is limited to whether plaintiff's allegations, accepted

21    as true, state a claim as a matter of law.

22              THE COURT:  Let's start with that because I'm not

23    quite sure you objected shotgun approach to every one of their

24    documents.  I am not sure I know which ones you are really

25    fighting about.  The facts, as you're alleging them, are not

1    inconsistent with the doctrines, nor are you alleging that

2    those documents are somehow doctored or don't reflect the facts

3    as you understand them to be.

4         It seems to me the crux of your argument is whether or

5    not -- I'm trying to get a handle on the nature of your

6    allegation, what it is that you say that she informed them of

7    and what it is that she asked them to do that they failed to do

8    and why did they have the responsibility to do an investigation

9    when she said that she did not want an investigation.  Those

10   are the central issues here, as you've alleged.

11        MR. ZALKIN:  If I understand your Honor's questions,

12   they are kind of two separate questions there.  One is, why

13   were these documents inappropriate.

14        THE COURT:  I don't know which document you're

15   fighting over.  I don't know what that document says that you

16   somehow are saying that, oh, that creates some disputed issue

17   of fact that you think is inappropriate at this stage.  The

18   documents pretty much reflect what you say, unless you say that

19   there is something that the documents are adding to your

20   complaint or detracting from your complaint that you think is

21   unfair.  I don't need to concentrate on the documents.  I need

22   to concentrate on what you say the facts were and what you say

23   she informed them of and what it is that she asked them to do

24   that they failed to do.

25        MR. ZALKIN:  We do maintain that the documents,

1    several of the documents, seek to either disprove her

2    allegations or expand on her allegations, both of which are

3    inappropriate at the motion to dismiss stage.

4            THE COURT:  Fine.  Then I'll accept that premise.  I

5    still want to know the answers to my questions with regard to

6    your complaint.  I can tell you right away that it is an

7    insufficient allegation, factual allegation to simply say,

8    without explicitly saying that she was raped, plaintiff

9    strongly alluded to her academic advisor that plaintiff had

10   been raped.  That's not a factual statement.  I don't even know

11   what that means.  That's like saying, I went into McDonald's

12   and without saying I wanted french fries, I strongly alluded to

13   the fact that I wanted french fries.  That's not a fact.

14           You've got to give me something that you say happened.

15   If you don't want me to rely on their extrinsic evidence, then

16   you have to put in some facts that tell me that I should

17   conclude that the nature of this conversation was a

18   conversation about rape and a conversation in which the only

19   reasonable response would have been that they would have

20   initiated an investigation that this person was raped, even

21   though this person never said that they were raped.  What does

22   that mean?

23           MR. ZALKIN:  I think at the pleading stage, your

24   Honor, you are required to accept all reasonable inferences.

25           THE COURT:  Of facts.

1              MR. ZALKIN:  Right.  The inference to be drawn from

2    that allegation --

3              THE COURT:  How can you say someone didn't explicitly

4    say they were raped but they strongly alluded to the fact that

5    they been raped and that's supposed to be a fact that I am

6    supposed to rely on?  How is that a fact?  That's not a fact.

7    That's a conclusion.  What are the facts that make that a

8    reasonable conclusion?  What is it that you are claiming that

9    she said to the advisor that one would reasonably interpret as

10   a conversation about rape?

11             MR. ZALKIN:  Your Honor, that's probably best left for

12   discovery.

13             THE COURT:  No, it's not.  You've got to give me a

14   fact.  That's not a fact.  You say that you are relying on the

15   fact that they had a conversation that would have put them on

16   notice that it was about rape, even though no one said it was

17   about rape.  How am I supposed to say that that's a sufficient

18   factual allegation?  That's not a factual allegation.  What is

19   it that you say occurred in that conversation that would make

20   the person that you could allege factually that would

21   reasonably make that person on notice that this conversation

22   was about rape?

23             MR. ZALKIN:  We allege that she alluded to being

24   raped.

25             THE COURT:  What does that mean, she alluded to?  How

1    does one allude to being raped?

2         MR. ZALKIN:  There is no other allegation in the

3    complaint.

4         THE COURT:  I know.  That's not a factual allegation.

5    I can't say you alluded to being run over by a truck.  That's

6    not a factual allegation.  You have to tell me what was said.

7    What was said that you say is alluding to a rape?  What

8    factually are you trying to say?

9         MR. ZALKIN:  I don't have the exact words that

10   happened in that conversation.

11        THE COURT:  Then I can't conclude that she alluded to

12   being raped because you say she didn't say she was raped.  In

13   what way did she allude to it?

14        MR. ZALKIN:  She had a conversation with her academic

15   advisor in which she alluded to it.  I don't know the words,

16   the specific words that she used.

17        THE COURT:  What makes you say she alluded to it?

18        MR. ZALKIN:  I do know that her academic advisor was

19   concerned enough to take it up the chain and say, something

20   happened, something serious happened to this girl --

21        THE COURT:  What would make that something serious

22   that happened, being raped rather than some sort of emotional

23   or mental breakdown?

24        MR. ZALKIN:  Right.  I don't have the exact words that

25   were said.

1          THE COURT:  Give me in substance what words were said

2     that would make me conclude that they had a conversation about

3     rape.  It is wholly inconsistent to say, without explicitly

4     saying she was raped, she strongly alluded that she had been

5     raped.  It means nothing.  I don't know what that means.  How

6     does one strongly allude to being raped if one doesn't say that

7     they were raped?

8          MR. ZALKIN:  I think in conversation we can allude to

9     events without specifically --

10         THE COURT:  What events are you saying she alluded to?

11         MR. ZALKIN:  To being raped in her dorm room.

12         THE COURT:  How does she allude to that event?

13         MR. ZALKIN:  I get your --

14         THE COURT:  What the nature of that conversation is

15    and the way you've alleged it in the complaint and the way you

16    are trying to explain it to me now makes me think that she

17    never said anything about rape.  You have given me no fact that

18    you and I would conclude that she alluded to a rape.  What

19    makes you think that she alluded to a rape?

20         MR. ZALKIN:  Because my client has explained to me

21    that in this conversation she alluded to being raped, that her

22    academic advisor understood that she was sexually assaulted,

23    that she reported it up the chain, that the wellness advisor --

24         THE COURT:  But she didn't report it up the chain.

25         MR. ZALKIN:  The academic advisor reported it to her

 1    immediate supervisor.

 2             THE COURT:  Did the academic advisor report to her

 3    immediate supervisor that the plaintiff had been raped?

 4             MR. ZALKIN:  I don't know the nature of what her

 5    academic --

 6             THE COURT:  But that's what you are claiming.

 7             MR. ZALKIN:  That's why we need to have discovery.

 8             THE COURT:  No.  That's why you need to give me the

 9    facts because you know what your client said to the academic

10    advisor and you know whether or not your client -- you know

11    your client didn't say she was raped, right?

12             MR. ZALKIN:  Right.

13             THE COURT:  You want me to infer that somehow there

14    was a conversation, that if you and I were in that conversation

15    the only reasonable conclusion would be that we were in a

16    conversation about rape.  I don't know how to conclude that

17    without a fact.  You have to tell me what she said that would

18    make -- I have no idea how one cannot say that they were raped

19    but could allude to the fact that they were raped.  I have no

20    idea what that means.

21             MR. ZALKIN:  I understand, your Honor, and I don't

22    have an answer to that question presently today.  I can confer

23    with my client and amend the complaint, if that is the crux of

24    your Honor's decision.  I would ask for leave to amend to allow

25    me to provide that context to your Honor.

1          But notwithstanding that conversation, your Honor, she

2     did explicitly report that she was raped to the senior

3     vice-president for student life.

4          THE COURT:  I'm sorry.  Who?

5          MR. ZALKIN:  Executive vice-president for student

6     life.

7          THE COURT:  When was that?

8          MR. ZALKIN:  That was on December 3, 2015.

9          THE COURT:  The executive vice-president?

10         MR. ZALKIN:  Yes.

11         THE COURT:  December 3.

12         MR. ZALKIN:  And at that point, because that

13    individual was not a confidential employee, she was required by

14    Columbia's own policy to report plaintiff's rape to the

15    gender-based misconduct office and/or the Title IX office,

16    which she didn't do.

17         THE COURT:  Why would she do that?  Why would she have

18    an obligation to do that if your client said she did not want

19    to report it?

20         MR. ZALKIN:  My client did not say that at that point.

21         THE COURT:  Well, it doesn't matter at what point.

22    Let's start at the point that she did say that, if she said

23    that on January 19.

24         MR. ZALKIN:  Correct.

25         THE COURT:  Is there any reason that they would have

1    had a responsibility between January 19 and August 5 to open an

2    investigation if she specifically told them not to open an

3    investigation and she specifically said, don't contact me ever

4    again about this?

5        MR. ZALKIN:  Yes.  First, your Honor, the conversation

6    I was referencing occurred prior to.

7        THE COURT:  I understand that.  I just want to start

8    with that because I want to see how far your argument goes.  If

9    she says on January 19, and then we can go back to December, if

10   she says on January 19 that, I don't want to officially report

11   this, I don't want you to investigate this, and in fact don't

12   ever contact me again about this, what is your argument that

13   from January 19 to August 5 that they had an obligation to do

14   exactly what she told them not to do?

15       MR. ZALKIN:  My argument is twofold, your Honor.

16   First, the reason that she said those things to Ms. Blount at

17   that time was because of her frustration with the process that

18   she had received prior to that point in time.

19       THE COURT:  Why would that matter?

20       MR. ZALKIN:  Because at that point she had called the

21   sexual violence hotline and she had said, I was raped, what are

22   my options, what are my resources under Title IX, and the

23   sexual hotline person did not know.  They kept trying to

24   convince her to report it to the police.

25           Then she asked the staff advocate, what are my options

under Title IX?  The Title IX staff advocate did not have an

answer for her.  She asked for housing accommodations.

THE COURT:  What housing accommodations?  You mean to

put the lock --

MR. ZALKIN:  She asked to move.  She didn't feel safe

in her dorm.  She was told:  OK.  You have 24 hours from some

arbitrary date that we are going to give you to move.  You

don't get any help with moving your physical belongings.  You

are going to have to pay $500 and we are going to have to tell

your parents why you are moving.

THE COURT:  The awkward part of this is that despite

all of that, on August 5, she said she did want the university

to investigate.  How does that change the analysis?  That was a

decision that she made.  She had the same information that

you're playing out for me now.

MR. ZALKIN:  Yes.

THE COURT:  At one point in time that information made

her conclude that she did not want it investigated and she did

not want to be contacted again.  At a later point that same

information made her conclude that she did want to go forward

with an investigation.  It's sort of irrelevant why she made

whichever decision she made.

The question is, if she said to them, for whatever

reason, she distrusts them, they didn't treat her well, somehow

they didn't respond appropriately, that doesn't go to whether

1    or not once she said, I don't like you, I don't want to put

2    this in your hands, I don't think you are doing what you should

3    be doing, so leave me alone and forget about it, why does that

4    put a burden on them to do just the opposite simply because of

5    her motivation of why she doesn't want them to do that,

6    particularly in light of the fact that months later she changes

7    her mind and does want them to do that?  What difference does

8    it make what her motivation is?  If she says, I don't want you

9    to do it, if she says that because I want my confidentiality

10   protected or she says that because I don't think you people

11   will do an adequate job and I don't want you to bother me at

12   all about this because you just don't know what you are doing,

13   regardless of what her reasons were, why would that put the

14   obligation on them to do something when she told them not to do

15   something?

16           MR. ZALKIN:  Your Honor, the Supreme Court actually

17   imposes that obligation on educational institutions.

18           THE COURT:  To do what?  To investigate --

19           MR. ZALKIN:  To respond in a manner that's not clearly

20   unreasonable to actual knowledge of sexual misconduct.

21           THE COURT:  What is it that you think that they should

22   have done if she said that she didn't want to make an

23   investigation, she didn't want to initiate an investigation,

24   and she was not going to cooperate with that investigation?

25   And, in fact, she made it real clear that she didn't even want

1    them to ever contact her again about this incident.

2         I understand all your other arguments about what could

3    or couldn't have been done before January 19.  I'm just trying

4    to figure out how far you are trying to stretch that argument

5    and whether you are trying to tell me to find some legal

6    obligation on the part of Columbia to open an investigation

7    after she said, I don't want you to open an investigation, I

8    don't want you to do anything about this, I don't even want you

9    to ever contact me again about this.  What is the legal

10   obligation that they have after she makes those statements to

11   do anything to investigate until she comes back to them in

12   August and says, you know what, I changed my mind, I want you

13   to investigate?  Why is anything that they did between January

14   19 and August 5 inappropriate, given her position with regard

15   to what she wanted them to do?

16        MR. ZALKIN:  Your Honor, the obligation is to respond

17   in a way that is not clearly unreasonable.  That may not

18   necessarily mean that they need to formally investigate, but

19   they are under an obligation to respond.

20        THE COURT:  What are they under an obligation to do if

21   she said she wasn't going to cooperate with any investigation

22   and she wasn't going to give them any further information, and

23   they didn't even have a suspect at that point in time, and she

24   was not willing to cooperate to provide them any further

25   information and didn't want them to contact anybody

 1    specifically to ask them about this incident?

 2           You say, they can't do something that's clearly

 3    unreasonable.  What do you say would have been the reasonable

 4    response to her saying, don't open an investigation, leave me

 5    alone, don't contact me again, don't contact anybody else who

 6    might be witnesses because I don't want to get them involved.

 7    I want you to do nothing.  Wouldn't you agree that what she

 8    said to them January 19 is that I want you to do nothing?

 9           MR. ZALKIN:  Yes.

10           THE COURT:  Once she says to them, I want you to do

11    nothing, and I will not cooperate, and I don't even want you to

12    come to me and discuss this with me again, why would they say,

13    yes, we will respect that, an unreasonable response?

14           MR. ZALKIN:  Because I think they have an obligation

15    to not only plaintiff at that point, but to the greater student

16    community.

17           THE COURT:  The greater student body isn't suing.  She

18    is suing personally for personal injury to herself.  This isn't

19    a class action.  This is her saying that she was injured by the

20    fact that they didn't do the investigations that she told them

21    not to do.  That part, you can understand, is an awkward part

22    of your case between January and August because what I see, and

23    we can go back and maybe you had a stronger argument prior to

24    January.

25           But the scenario as you have relayed it is, in January

1    she said they took the initiative to try to discuss this with

2    her, to try to initiate an investigation. She said, don't do

3    it. She said, I don't want to talk to you about it anymore. I

4    don't want you to talk to others about it. For whatever

5    reason, good or bad or indifferent, I don't want you to do

6    that. They say, fine, we will respect that, and we won't do

7    anything because the reality is, the nature of your

8    circumstance, the allegations are such there is not much we can

9    do unless we can get some more information from you about the

10    way, where, who, how, what happened. You don't want to give us

11    that information. You don't want us to talk to other people

12    who might have that information, and you don't want to be

13    contacted about this again. We will respect that.

14        Then in August she changes her mind and she says, you

15    know what, I changed my mind. I want you to investigate. At

16    that point clearly the proper response would have been, OK, we

17    will open an investigation. That's what happened. She said, I

18    changed my mind 10 months later or whatever months later. I

19    want you to investigate. They said they would. She says that

20    just before school starts, as I understand. As soon as school

21    starts, within a month, they open an investigation. They

22    investigate. They take her statement. They try to find

23    videotapes which aren't existing anymore about intruders from a

24    year earlier, and they do an investigation.

25        I don't understand why their response to the July 19

1    request not to investigate and their response to the August 5

2    request to investigate, I am not sure I understand, by the

3    nature of your allegation, why their response to those two

4    incidents was inappropriate.  We can go back to before that and

5    after that, but tell me what was inappropriate about what they

6    did in January and how they responded to her request not to

7    investigate and what they did in August, how they responded to

8    her request to investigate in August.  What was inappropriate

9    about their response?

10              MR. ZALKIN:  So the reason why I'm arguing that they

11    had an obligation to do something in January is because you

12    can't divorce that conversation from its context, everything

13    that happened prior to.  To accept that premise would be to

14    incentivize educational institutions to drag their feet, to not

15    accommodate students, to discourage students from reporting.

16    And then when a student finally throws their hands up and says,

17    you know what, forget about it, it absolves them of any

18    responsibility from doing anything.  That's not consistent with

19    the Title IX.

20              THE COURT:  But the problem I have with your

21    allegation is that in this timeline I don't see any place where

22    she made a formal request or report of the incident, one that

23    would clearly be a report indicating that she wanted them to

24    investigate.  Would you agree that between October 5 and

25    December 3 that she did not make a report on which she expected

 1   them to do an investigation?

 2           MR. ZALKIN:  She did not make a formal report.

 3           THE COURT:  I didn't say it that way.  I said it even

 4   broader than that.  Don't you agree that she did not make a

 5   report that she expected the university to initiate an

 6   investigation as a result of that report any time between

 7   October 5 and December 3?

 8           MR. ZALKIN:  I don't think her subjective expectations

 9   are what the law --

10           THE COURT:  I didn't ask you that.  I just asked you a

11   fact.  Is that a fact?

12           MR. ZALKIN:  That is a fact.  She did not say to

13   anybody --

14           THE COURT:  You want to characterize the meeting with

15   the executive vice-president as her request -- that her

16   reporting a rape and asking them to investigate.

17           MR. ZALKIN:  I'm characterizing that as the

18   university's actual knowledge that she was raped.  And what the

19   Supreme Court in *Davis* tells us is that a university or an

20   educational institution, upon receiving actual knowledge, not

21   necessarily a formal report, not any subjective report or

22   desire to investigate or anything like that, the Supreme Court

23   says, upon receiving actual knowledge of sexual misconduct an

24   educational institution has a duty to respond in a manner that

25   is not clearly unreasonable in light of the known

 1   circumstances.

 2           THE COURT:  If she tells them on December 3 that she

 3   was assaulted on October 5 and then she is again assaulted on

 4   December 14, you are not arguing that they were put on notice

 5   of the December 14 assault.  That's not your argument.

 6           MR. ZALKIN:  No, that's not our argument.

 7           THE COURT:  Your argument is they had an obligation to

 8   respond only to the October 5 because obviously as of December

 9   3 there was no way to report a December 14 assault.

10           MR. ZALKIN:  Sure.

11           THE COURT:  After December 14 she does not report that

12   assault, the second assault, and then by January 19 they reach

13   out to her.

14           MR. ZALKIN:  Yes.

15           THE COURT:  It's clear, by January 19 they are on

16   notice of a sexual assault.

17           MR. ZALKIN:  Yes.

18           THE COURT:  January 19 they reach out to her.  At that

19   point she has been assaulted twice.

20           MR. ZALKIN:  Yes.

21           THE COURT:  In October and in December.  On January

22   19, approximately 35 days after the second assault, she says to

23   them that she does not want to officially report her assault,

24   that she doesn't want an investigation open, and that they are

25   not to contact her ever again.  What is their obligation at

1   that point?

2               MR. ZALKIN:  Their obligation would have started --

3               THE COURT:  At that point.

4               MR. ZALKIN:  At that point, presumably, they would

5   have responded in some way to her initial report.

6               THE COURT:  Not presumably.  We know they didn't

7   respond.

8               MR. ZALKIN:  Should have responded.

9               THE COURT:  Fine.  They should have responded.  But as

10  of January 19, approximately a month after the second assault

11  that she did not formally report, she told them that she did

12  not want an investigation done of either assault and they

13  should never contact her again.

14              MR. ZALKIN:  Yes.

15              THE COURT:  I am trying to figure out from your

16  complaint what it is you say is their obligation at that time.

17              MR. ZALKIN:  They have an obligation to take

18  reasonable steps to mitigate the sexually hostile environment

19  for plaintiff on campus.

20              THE COURT:  What does that mean?

21              MR. ZALKIN:  For one, they could have moved her.

22              THE COURT:  But she didn't ask to be moved.

23              MR. ZALKIN:  She had already asked to be moved prior

24  to that.

25              THE COURT:  That's not my understanding.  When did she

1    ask to be moved?

2            MR. ZALKIN:  She asked to be moved --

3            THE COURT:  My recollection is, she asked to be moved

4    after they did the investigation in September and October of

5    2016.

6            MR. ZALKIN:  She asked again to be moved at that

7    point.  She asked to be moved originally.

8            THE COURT:  When?

9            MR. ZALKIN:  In her conversation with the sexual

10   violence response staff advocate.

11           THE COURT:  How is that supposed to have gotten to the

12   university?  That's a confidential conversation.  That's not a

13   conversation with the university.

14           MR. ZALKIN:  She was also told by the housing --

15           THE COURT:  When did she tell the university?

16           That I want to be moved because I was raped?  Is that

17   what you are saying?  Because I don't see that.  She doesn't

18   say that, does she?

19           MR. ZALKIN:  My understanding, your Honor, is she

20   spoke to the staff advocate, reported that she was raped.

21           THE COURT:  You say the conversation with the staff

22   advocate triggers their responsibility.

23           MR. ZALKIN:  What I'm saying is, she was told by the

24   staff advocate that if she wanted to be moved, these were the

25   owner's conditions that were going to be placed on her.

1          THE COURT:  Let me ask you this.  Is the staff

2     advocate an employee of the university?

3          MR. ZALKIN:  I believe so.

4          THE COURT:  Are you arguing that the conversations

5     with the sexual violence response hotline is a conversation

6     that should be imputed to the university?

7          MR. ZALKIN:  No.  I'm arguing that this Court can

8     consider those conversations in assessing the reasonableness of

9     defendant's conduct.

10          THE COURT:  Your first argument, when we started this

11     part of the conversation, was that she asked for a reasonable

12     accommodation which they denied and then I asked you, where did

13     she ask for a reasonable accommodation of the university?  And

14     you say, well, she said something to the staff advocate about

15     it.  Well, that's not a request to the university, is it?

16          MR. ZALKIN:  I think it was a request for information

17     about --

18          THE COURT:  Right.  If that person gave her wrong

19     information, that's not imputed to the university.

20          MR. ZALKIN:  I think if that person gave her the wrong

21     information, it would actually be evidence of the

22     reasonableness of defendant's conduct.

23          THE COURT:  But I'm still not following that argument.

24     If she wants a reasonable accommodation, is the appropriate

25     person to ask for an accommodation the staff advocate at the

1    sexual violence response hotline?

2          MR. ZALKIN:  I don't know if there is necessarily an

3    appropriate person.

4          THE COURT:  It's not the appropriate person.  That

5    person doesn't have that responsibility and that communication

6    with that person is not to be shared with the university.

7    Isn't that the premise of how the hotline is set up?

8          MR. ZALKIN:  That's true.  My understanding is the

9    advocate is somebody that you can speak to in order to

10   understand your rights and resources under Title IX, one of

11   which is, as the gender-based misconduct policy states, that a

12   student will get reasonable accommodations.  If you are asking

13   the staff advocate, what are my rights and resources under

14   Title IX, I think that staff advocate would not know the

15   policies --

16         THE COURT:  But you are not saying that she asked the

17   staff advocate, Paul, to give her another room and Paul refused

18   to do so.  That's not what you are arguing, right?

19         MR. ZALKIN:  No.

20         THE COURT:  And you are not arguing that she ever

21   asked the university to give her another residence and the

22   university refused to do so, are you?

23         MR. ZALKIN:  The university never refused to give her

24   another room.

25         THE COURT:  You said, well, they didn't accommodate

 1    her.  And I said, well, what didn't they accommodate?  You

 2    said, giving her another room.  I said, when she asked for

 3    either a lock on the door or another off-campus location, they

 4    offered her the choice and she took one or the other, so they

 5    did accommodate her.  But you said they didn't accommodate her

 6    back in October of 2015 when she wanted an accommodation.  Then

 7    I asked you, when in October did she ask the university for an

 8    accommodation and you say to me, well, she just asked some

 9    questions of the staff advocate but never really asked the

10    university if she could have another room.  As a matter of

11    fact, at that point she never even told the university that she

12    had an incident, right?

13         MR. ZALKIN:  Correct.

14         THE COURT:  How would they be informed of a reasonable

15    accommodation with regard to a rape if she never informed the

16    university at that point in time that she had been raped.

17         MR. ZALKIN:  That's fair, your Honor, and admittedly I

18    don't know the exact person and circumstances.  I know she

19    discussed it with the staff advocate.  I don't know exactly if

20    she formally requested that accommodation.

21         THE COURT:  So the crux of your complaint is that as

22    of December 3, when she was in the meeting with the

23    university's executive vice-president, and she said in that

24    open forum that she had been raped, that triggered their

25    responsibility to do an investigation, take some affirmative

1    action, and reasonably accommodate her?

2              MR. ZALKIN:  Yes.

3              THE COURT:  Don't they have to reasonably accommodate

4    some request?

5              MR. ZALKIN:  Well --

6              THE COURT:  She didn't make a request.

7              MR. ZALKIN:  That's correct, your Honor.  If she had

8    made a formal request for accommodations --

9              THE COURT:  But she did not.

10             MR. ZALKIN:  Right.  But it does trigger their

11   obligation to respond in a way that's clearly not unreasonable.

12             THE COURT:  Isn't part of the university's response

13   that the case manager, Ms. Blount, called on the 19th and said,

14   I understand that you were raped, we want to investigate this,

15   and she said, no, don't do it?  Wouldn't that be a reasonable

16   response?  To call and say to her that we understand that you

17   have indicated to us, we are acknowledging that as of January

18   we think that you have been raped, it's our obligation to do

19   something, let us do something, and she says no, don't do

20   anything?

21             MR. ZALKIN:  Yeah.  I think a reasonable juror could

22   look at that and say, it was reasonable to not investigate.

23   They could informally question people on her floor.

24             THE COURT:  Didn't she say she didn't want them to

25   talk to anybody?

1          MR. ZALKIN:  The allegations are still that she was

2     violently raped twice in her dorm room.  I think they had an

3     obligation at least to try to figure out what, if anything,

4     happened.

5          THE COURT:  Not on the scenario you just stated

6     because they had no information at that point that she had been

7     raped.

8          MR. ZALKIN:  They had information that she was at

9     least raped once.

10         THE COURT:  You said there was information that she

11    had been raped twice.  She may have discussed the December 3

12    incident in a public forum, but she never discussed the

13    December 14 incident with the university.

14         MR. ZALKIN:  Correct.  I misspoke if I said twice.  I

15    meant to say they had at least knowledge, actual knowledge of

16    one of her assaults, and they could have at least done

17    something --

18         THE COURT:  They did do something.  They did something

19    on January 19.  They said, we understand that you were raped

20    and we want to do an investigation.

21         MR. ZALKIN:  Correct.

22         THE COURT:  That's what they did do.  That would be

23    the appropriate thing to do, correct?

24         MR. ZALKIN:  That could be an appropriate thing to do.

25         THE COURT:  That was an appropriate thing to do.

 1                MR. ZALKIN:  Because there is also the larger question

 2      of, there is an alleged rapist on the loose at Columbia

 3      University, in your dorm room perhaps, and they did nothing to

 4      determine what, if anything --

 5                THE COURT:  I am not sure that she has standing to sue

 6      for that because that didn't cause her any injury.

 7                MR. ZALKIN:  It did, your Honor.

 8                THE COURT:  What injury did it cause her once she told

 9      them she did want not want them to investigate, so they stopped

10      investigating.  And once she told them she did want them to

11      investigate, then they did investigate.  What is the injury

12      that was caused by them -- you say, well, they had an

13      obligation to others.  I'm concentrating on the obligation they

14      had to her because she is the one suing.  She is not suing on

15      behalf of others.  She is here suing on behalf of her behalf

16      saying that she suffered injury because, one, they didn't

17      properly investigate the rapes and, two, because they didn't

18      accommodate her.  I am not sure in what way you are arguing

19      that they didn't accommodate her and a reasonable accommodation

20      that she requested from them, and I am not sure what you are

21      saying that they should have done other than what they did in

22      January.  If they did on December 4 what they did on January

23      19, wouldn't that have been an appropriate response?

24                MR. ZALKIN:  That would potentially would have been

25      part of the appropriate response.

 1           THE COURT:  That would have been the appropriate

 2    response because she said in light of that response she didn't

 3    want them to do anything else.  Is it your argument that even

 4    though she said she didn't want them to do anything else for

 5    her that they should have done something else for her?

 6           MR. ZALKIN:  Yes, your Honor.

 7           THE COURT:  What else should they have done for her

 8    when she said she didn't want them to do anything else for her?

 9           MR. ZALKIN:  I think what she said is, I don't want to

10    talk to you about this.

11           THE COURT:  You don't need a rocket scientist to

12    figure out what that means.  It means leave me alone.  I don't

13    want you to do an investigation and I don't want to talk about

14    this anymore.  What should have they done?  They should have

15    forced her to cooperate?

16           MR. ZALKIN:  They could have perhaps, like I said,

17    interviewed other people on the floor, her suite mates, to see

18    if anybody saw anything.  They could have reviewed the security

19    tapes at the time.

20           THE COURT:  Suppose at that point they spoke to

21    people, they found out who it was and they took action against

22    that person.  I can't say it that way because I am not sure

23    what they could have done with that information if she said she

24    didn't want that information ever disclosed.

25           MR. ZALKIN:  That presupposes that if they had

 1    actually found the individual that did this that she would have

 2    been consistent in saying --

 3             THE COURT:  You have to presuppose that because she

 4    cut that off.  She prevented that from happening.

 5             MR. ZALKIN:  She prevented that under the belief that

 6    Columbia had not done anything in response --

 7             THE COURT:  In response to what?

 8             MR. ZALKIN:  Initially, when she called the sexual

 9    violence hotline, that she was giving no information.

10             THE COURT:  What does that have to do with whether

11    Columbia is going to do an investigation, calling the hotline?

12             MR. ZALKIN:  Your question was, if they had caught

13    this individual and they wanted to do something about it.

14             THE COURT:  And she said, don't talk to me ever again.

15             MR. ZALKIN:  I'm saying, I don't think it's a fair

16    assumption to make that she would say, don't do it again, I

17    don't want anything to do with this if in fact they had

18    investigated and caught the individual.

19             THE COURT:  On October 3, when she spoke to the sexual

20    violence response hotline and reported that she had been

21    assaulted, tell me what they should have done.

22             MR. ZALKIN:  When she had asked what her rights and

23    resources under Title IX were --

24             THE COURT:  I'm talking about the first conversation

25    on October 3.  What is it that they did that was improper?

1            MR. ZALKIN:  They were unaware of Title IX, the rights

2      and resources available to sexual assault victims.  They

3      weren't able to give her that information.

4            THE COURT:  Give her what information?  I don't know

5      what you're talking about because you have not alleged

6      anything.  Is there some factual allegation in this complaint

7      regarding that?  I am not sure what you're talking about.  She

8      asked them what?

9            MR. ZALKIN:  She asked for, what are her rights and

10     options and resources available to her as a sexual assault

11     victim.

12            THE COURT:  When she was on the phone, on the hotline.

13            MR. ZALKIN:  Yes.

14            THE COURT:  And the hotline person told her --

15            MR. ZALKIN:  Was unable to answer that question.

16            THE COURT:  So the hotline person said, I will have

17     somebody call you the next day?

18            MR. ZALKIN:  Right.

19            THE COURT:  You don't think that that was an

20     appropriate response if the person really doesn't know who is

21     on the hotline that they would say, well, I will have somebody

22     call you back tomorrow?

23            MR. ZALKIN:  What we allege in our complaint, your

24     Honor, is that that sexual violence hotline operator was

25     untrained.  What we are saying is that what's reasonable is if

1     you are going to have a sexual violence hotline where you know

2     victims of sexual violence are going to call and report these

3     things and undoubtedly are going to ask what are my options, it

4     would be reasonable to train the individuals to take those

5     calls to answer those questions.

6            THE COURT:  I don't understand.  The next day, the

7     very next day, on October 14, they in fact had, I assume, a

8     more knowledgeable person call her back.

9            MR. ZALKIN:  That's an incorrect assumption.

10           THE COURT:  I assume they had a less knowledgeable

11    person call her back.  I'll give it whatever inference you

12    want, but the person called her back.

13           MR. ZALKIN:  And she asked him, what are my rights and

14    resources under Title IX, and he was unable to answer that

15    question.

16           THE COURT:  The problem is, you have the October 5

17    assault.  You have an October 14 conversation.  Even in that

18    conversation she says that she doesn't want to report the

19    assault.

20           MR. ZALKIN:  To the police.

21           THE COURT:  I don't know.  You say that.  She said she

22    wanted to report it to the university but not the police.

23           MR. ZALKIN:  I can represent to you now that if

24    allowed to amend the complaint on that issue I can tell you

25    that she did not want to report this to the police.

```
 1                THE COURT:  Did she want to report it to the
 2    university?
 3                MR. ZALKIN:  At that point she wasn't sure.  But she
 4    wanted to know --
 5                THE COURT:  Did she say to the person, I don't want to
 6    report this alleged assault?
 7                MR. ZALKIN:  She said that in the context of the
 8    police.
 9                THE COURT:  Did she say she did want to report it to
10    the university or she said nothing about the university, or she
11    said she didn't want to report it to the university?
12                MR. ZALKIN:  She didn't say anything about reporting
13    it to the university.  What she asked for were, what are my
14    rights, what are my options, what are my resources under Title
15    IX at this point.  That would have included what her option --
16                THE COURT:  I assume that they told her in that
17    conversation that she could report it either to the police or
18    she could report it to the university, right?  Are you saying
19    they didn't have that basic information?
20                MR. ZALKIN:  As alleged, when asked, did she report it
21    to the school -- when asked, what are my options under Title
22    IX, the operator was unable to answer that question.
23                THE COURT:  You are not arguing that she didn't know
24    that her options were to either report this to the police or
25    report it to the university?
```

1              MR. ZALKIN:  Right.

2              THE COURT:  You are not arguing that.  That's not

3    really a reasonable argument to make.

4              MR. ZALKIN:  No, your Honor.

5              THE COURT:  She spoke to the hotline on October 3,

6    made some inquiries of the hotline.  They said we would have

7    somebody call you back October 4.  They called her back.

8    Regardless of what questions they could or couldn't answer, she

9    knew that there were at least two options.  She could make a

10   formal criminal complaint, an actual criminal investigation by

11   the police, and/or she could report it to the university on the

12   university's procedure that she was well aware of and the

13   university would have had an obligation to investigate, right?

14   She knew that.

15             MR. ZALKIN:  She knew she had the option to report it

16   to the school, yes.

17             THE COURT:  She did not, right?

18             MR. ZALKIN:  At that point, no.

19             THE COURT:  And you say that her statement on December

20   3 at this meeting was her attempt to report this to the

21   university for the university to investigate it?

22             MR. ZALKIN:  No.  I'm saying what that was was actual

23   knowledge.

24             THE COURT:  You are just saying that put them on

25   knowledge, but that wasn't her request.

1           MR. ZALKIN:  It wasn't a formal or otherwise a request

2      to investigate.  It put them on knowledge that the Supreme

3      Court tells us that's the trigger that obligates a response.

4           THE COURT:  Is there any indication prior to August 5

5      of 2016 that she wanted to report this to the university,

6      wanted the university to investigate it, and she would

7      cooperate with such an investigation?  Is there any indication

8      that she was of that mind at any time prior to August 5?

9           MR. ZALKIN:  I think the fact that she continued to

10     call the university --

11          THE COURT:  What do you mean by the fact that she

12     continued to call --

13          MR. ZALKIN:  There is confidential resources at first.

14     She gets raped.  She calls the sexual violence hotline.  That's

15     step No. 1.

16          THE COURT:  As long as she knows that's not a report

17     for an investigation.

18          MR. ZALKIN:  Right.  But you are asking me to assess

19     whether or not she would have potentially participated in some

20     investigation.

21          THE COURT:  No.  I'm trying to find out what posture

22     the university was in when they were having communications with

23     her and what communications they had with her and what is the

24     basis for alleging that she sought them to do something to

25     either protect her from further injury or to alleviate her

1    situation, and she sought that kind of assistance from the

2    university and they denied her that assistance.  That's the

3    first thing I'm trying to figure out.  I can't see any place

4    before August 5 that she ever requested or took any steps to

5    initiate that kind of activity by the university.  On August 5,

6    when she did do that, the university did respond.

7             MR. ZALKIN:  My response to that, your Honor, is the

8    law doesn't put the burden on the victim to request or initiate

9    that response.  It puts the burden on the university once they

10   obtain actual knowledge to put that response in motion.  She is

11   not obligated to go to the university and say, I want you to

12   investigate.

13            THE COURT:  What is the university's responsibility if

14   a person says, this is what happened to me, I don't want it

15   investigated, I don't want you to talk to me about it further.

16   I don't want you to talk to witnesses about it.  I don't want

17   you to do anything about it.  What is their obligation with

18   regard to that particular individual?

19            MR. ZALKIN:  The only answer I have to that is to

20   respond in a way that's not clearly unreasonable.

21            THE COURT:  What is unreasonable how they handled her?

22   Because she is the plaintiff and you want relief.

23            MR. ZALKIN:  What I'm alleging is that it's

24   unreasonable to not train your first responders to sexual

25   violence on policies and procedures.

1          THE COURT:  Where is that in this complaint?  Is there

2     a paragraph --

3          MR. ZALKIN:  Paragraph 32 to 33 and 34.

4          THE COURT:  Inadequate information from the hotline?

5          MR. ZALKIN:  Correct.

6          THE COURT:  Which paragraph?

7          MR. ZALKIN:  32 through 34.

8          THE COURT:  In 32, though, you do say that she was

9     advised that she could report her rape to the police.

10         MR. ZALKIN:  That's not at issue.

11         THE COURT:  What is the inadequate information that

12    they didn't have that she was seeking from them that's

13    reflected in paragraph 32?

14         MR. ZALKIN:  I think what would be reasonable to

15    respond to, when someone says, what are my rights and options

16    under Title IX.

17         THE COURT:  That's not what it says.  You don't say in

18    this paragraph that she ever says, what are my rights and

19    options.

20         MR. ZALKIN:  She asked what her resources were.

21         THE COURT:  In paragraph 32?

22         MR. ZALKIN:  32 and 33.

23         THE COURT:  I don't see that in 32.  It says she

24    reported to them that she was raped, and they advised her that

25    she could report her rape to the police.  That's what 32 says.

1    Doesn't say anything about any other adequate or inadequate

2    information or requests for information.  In 33 it said she

3    requested of the nurse information about how to receive

4    academic and housing accommodations and that they didn't know

5    anything about academic and housing accommodations.  That's

6    what 34 says.

7             MR. ZALKIN:  That's what I'm referring to.

8             THE COURT:  Why would the hotline necessarily know

9    what the options would be for academic and housing

10   accommodations?

11            MR. ZALKIN:  Because those are necessarily the

12   accommodations that are made to victims of sexual assault under

13   Title IX.

14            THE COURT:  Wasn't she aware of what those options

15   were?  The option was exactly what she did.  She went to her

16   academic advisor and she sought those accommodations from her

17   academic advisor.

18            MR. ZALKIN:  Ultimately, yeah.

19            THE COURT:  Ultimately meaning when?

20            MR. ZALKIN:  I believe it was October 14.

21            THE COURT:  The next day.

22            MR. ZALKIN:  Yes.

23            THE COURT:  Wait a minute.  Think about what you just

24   said.  You said the totally inadequate thing they did they did

25   on October 13 and 14.  It was not explained to her what her

1    options were with regard to academic and housing accommodation.

2    And the very same day she calls up her academic advisor and

3    gets that information.

4                    MR. ZALKIN:  Yes.

5                    THE COURT:  How can you say that that's an inadequate

6    response?

7                    MR. ZALKIN:  What I'm saying, your Honor, is that the

8    failure to train the sexual assault hotline --

9                    THE COURT:  She wasn't deprived that information.  She

10   is suing because she says she was deprived that information.

11                   MR. ZALKIN:  What she is suing, her claim is that the

12   school was deliberately indifferent.

13                   THE COURT:  But they weren't deliberately indifferent

14   to her on that issue because they not only gave her the

15   information, they gave her the accommodation, the very same

16   day, within 24 hours of her request.

17                   MR. ZALKIN:  She was fortunate enough to know to go to

18   her academic advisors.

19                   THE COURT:  Then she did not suffer an injury because

20   of their ignorance.  That's not her personal claim, right,

21   under Title IX?

22                   MR. ZALKIN:  When you look at the claim holistically

23   it's, did this school act clearly and unreasonably --

24                   THE COURT:  Why should she recover as a result of that

25   if she was not damaged by that?

1    MR. ZALKIN:  I think that probably goes to our first

2  cause of action, which is a general policy of indifference to

3  sexual misconduct on campus.

4    THE COURT:  What is the facts that you give me that

5  show that there is a general indifference to assaults on

6  campus?  What paragraphs do you lay that out?

7    MR. ZALKIN:  Paragraphs 8 and 15, your Honor, we

8  allege, there have been close to 30 administrative complaints

9  filed by Columbia students with the department of education

10  each claiming Columbia failed --

11    THE COURT:  Where are you reading from?

12    MR. ZALKIN:  Paragraphs 8 and 15.

13    THE COURT:  Which one did you just read?

14    MR. ZALKIN:  Paragraph 8.

15    THE COURT:  Paragraph 8 says:  Among the key

16  allegations in these administrative complaints were accusations

17  against Columbia.  You were relying on those accusations

18  against Columbia.

19    MR. ZALKIN:  Yes.  If I can back up, your Honor, and

20  talk about the case law interpreting this cause of action.  In

21  *Tubbs*, your Honor, the Court found that there could be

22  preassault Title IX reliability where the university was aware

23  of the significant amount of sexual assaults on campus.

24    THE COURT:  You don't have those facts here.  Those

25  facts have not been established as to Columbia.

1          MR. ZALKIN:  We have alleged that at least 30

2    individuals filed claims with the department of education

3    claiming that they were assaulted.

4          THE COURT:  That's not what it says.  Where does it

5    say that?

6          MR. ZALKIN:  In my notes I have it at paragraph 8 and

7    paragraph 15.

8          THE COURT:  Is that in this complaint?  You say the

9    people have complained about certain things to the department

10    of education about Columbia.

11          MR. ZALKIN:  Yes.  We also added that Columbia is

12    under several OCR investigations.

13          THE COURT:  You said those investigations in and of

14    itself.

15          MR. ZALKIN:  They are being investigated for their

16    failure to comply with department of education guidelines in

17    response to sexual misconduct on campus.  We say that Columbia

18    has pressured victims not to report their sexual misconduct.

19          THE COURT:  I'm sorry.  Where do you say that?

20          MR. ZALKIN:  Again, in my notes I have it at

21    paragraphs 8 and 15.

22          THE COURT:  Where in paragraph 8 or 15?

23          MR. ZALKIN:  I don't have the complaint in front of

24    me, your Honor.  I'm sorry.

25          THE COURT:  I don't see it in 8.  You say 15.

1          MR. ZALKIN:  Yes.

2          THE COURT:  15 says:  In the spring of 2015, Columbia

3    threatened student activists and journalists with suspension or

4    expulsion for handing out flyers to prospective students asking

5    for better sexual violence prevention education at Columbia.

6    Two students subsequently had to attend disciplinary meetings

7    where they were threatened with expulsion.

8          How does that make this Title IX sexual assault

9    responses to individual cases inappropriate?

10         MR. ZALKIN:  I think my notes should reflect

11   paragraphs 8 through 15 because I think that's that whole

12   section with the heading that says Columbia's kind of general

13   misconduct or policy.

14         THE COURT:  How do you characterize your independent

15   claim, as a what?

16         MR. ZALKIN:  It is a claim that Columbia had a general

17   policy of indifference to sexual misconduct on campus.

18         THE COURT:  How does she recover on that claim?  What

19   are you asking for?

20         MR. ZALKIN:  I think that the *Doe 1 v. Baylor* case

21   answers that question.  And what the Court said in that case

22   was that this general policy of indifference creates a

23   heightened risk for sexual misconduct to occur.  It effectively

24   creates a sexually hostile culture on campus.

25         THE COURT:  You're extrapolating that they are

1    responsible for her having been raped.

2           MR. ZALKIN:  Yes.

3           THE COURT:  She is suing them for the rape injuries

4    because they didn't meet their obligations to her with regard

5    to preventing this rape?

6           MR. ZALKIN:  With regard to complying with Title IX.

7           THE COURT:  I don't know what you mean by complying

8    with Title IX.  Either they are responsible for her assault or

9    they are not responsible for her assault under this theory.  Is

10   that what you are saying, they are responsible for her assault

11   to the extent that they must pay her damages for her injuries?

12          MR. ZALKIN:  They are responsible for creating a

13   sexually hostile environment in which sexual violence was

14   ignored.

15          THE COURT:  Not in your case on those circumstances.

16   Nobody in those cases holds the institution responsible for the

17   rape because --

18          MR. ZALKIN:  In both *Tubbs* and *Doe 1 v. Baylor*, the

19   courts did actually that.

20          THE COURT:  Held them responsible for the rapes and

21   damages to the plaintiff?

22          MR. ZALKIN:  They deny the defendant's motions to

23   dismiss on the exact same theory that we are offering here.

24          THE COURT:  So you say that they have created some

25   environment that makes it more likely that students are going

1   to be raped?

2           MR. ZALKIN:  Yes.

3           THE COURT:  And you say that in the ways that are

4   alleged in paragraphs 8 through what?

5           MR. ZALKIN:  Through 15.

6           If I could back up, your Honor, in the *Doe 1 v. Baylor*

7   case, under the same theory, the Court denied the defendant's

8   motion to dismiss where the plaintiff alleged that the school

9   misinformed victims about their rights under Title IX.

10          THE COURT:  You don't have any allegation that

11  Columbia misinformed people.

12          MR. ZALKIN:  No.  And I'm not arguing that Columbia's

13  actions here exactly mirror the allegations in the other cases,

14  but what I'm saying is, we have alleged allegations similar in

15  nature such that this Court could also find that Columbia's

16  deficiencies created a sexually hostile culture on the campus

17  in violation --

18          THE COURT:  That's a totally different claim.  You

19  claim that they caused the rape is a different claim than they

20  didn't respond accurately under Title IX.

21          MR. ZALKIN:  Two distinct theories of liability.

22          THE COURT:  Not just two distinct theories of

23  liability.  They are not even based on the same set of facts.

24          MR. ZALKIN:  They are not based on the same set of

25  facts, no.  One involves preassault conduct and a kind of

1    general policy argument.  One involves specific actions

2    postknowledge --

3         THE COURT:  You say at this point that your complaint

4    is sufficient to allege sexually hostile culture at the

5    university that makes them liable for her rape and, two, that

6    they violated Title IX and their obligations to her under Title

7    IX by not taking steps earlier than her request that they

8    investigate by not taking steps to investigate this when they

9    first became aware of her claim of having been assaulted in

10   October of 2015.

11        MR. ZALKIN:  That's correct, your Honor.  And we are

12   also arguing that their failure to adhere to the department of

13   education guidelines also supports the theory of liability.

14        THE COURT:  Which theory of liability?

15        MR. ZALKIN:  The one that they acted with deliberate

16   indifference to her specific report of sexual violence.

17        THE COURT:  I'm trying to understand, when do you say

18   they acted with deliberate indifference?

19        MR. ZALKIN:  From the point where --

20        THE COURT:  From what date to what date?

21        MR. ZALKIN:  From the point where reported it

22   initially to the sexual violence hotline to the point where

23   they concluded their investigation.

24        THE COURT:  You are taking that beyond January 19.  In

25   way were they indifferent to her circumstances after August 5

1    of 2016?  They did an investigation.  You don't say it was

2    anything inadequate --

3          MR. ZALKIN:  They did an investigation, correct.  Our

4    argument is, they should have done that investigation when they

5    first learned of her sexual assault.  At that point there would

6    have been more resources available to them.  They would have

7    had the security footage.  More than likely, witnesses would

8    have had a fresher recollection in their mind.

9          THE COURT:  You think that they had a responsibility

10   to do an investigation on January 20?

11         MR. ZALKIN:  I think they had an ongoing

12   responsibility to respond beginning --

13         THE COURT:  That's not my question.  My question is,

14   on January 20, do you think that they had an obligation to

15   investigate?

16         MR. ZALKIN:  Yes.  They had an obligation to do

17   something.  The reason I bring up the department of education

18   is because the department of education, their guidelines

19   actually say, even if the victim doesn't want to report or

20   wants to remain confidential, the school must still take all

21   reasonable steps --

22         THE COURT:  What do you think would have been a

23   reasonable step?  What else --

24         MR. ZALKIN:  As I mentioned before, they could have

25   interviewed people in her dorm.

1          THE COURT:  Even if she didn't want them interviewed?

2          MR. ZALKIN:  Even if she didn't want them interviewed.

3          THE COURT:  That's not respecting her confidentiality

4     if they are going to tell everybody in her dormitory that she

5     is a victim of a rape.

6          MR. ZALKIN:  They don't have to necessarily say --

7          THE COURT:  How can they ask them questions?

8          MR. ZALKIN:  Did you see anything suspicious?  Did you

9     hear anything suspicious?  Has there been any stranger lurking

10    around this room?

11         THE COURT:  She didn't provide them with any

12    information that anybody would have been able to give any such

13    information, did she?

14         MR. ZALKIN:  She reported that she was raped in her

15    dorm.  What I'm saying is --

16         THE COURT:  They should have canvassed the dorm and

17    asked people what?

18         MR. ZALKIN:  They could have taken some steps.  They

19    could have looked at swipe logs at the time.  They could have

20    seen if there was a student in the dorm that didn't live there.

21    They could have asked if there has been any suspicious people

22    in the dorm.  They could have asked the resident advisor if the

23    resident advisor had seen anybody --

24         THE COURT:  And you think that I should say and you

25    think there is case law to support the conclusion that they

 1   should have done that even though she specifically asked them

 2   not to do that?

 3          MR. ZALKIN:  The department of education says that.

 4   And what the case law says is that failure to adhere to the

 5   department of education's guidelines is some something that a

 6   reasonable juror could look to and say, they didn't act

 7   reasonably.

 8          THE COURT:  I guess part of it is my not understanding

 9   the theory.  If they didn't do these things and they didn't do

10   these things because she asked them not to do these things, how

11   were they liable to her?  There may be somebody else out there

12   who might have a complaint about it, who wanted it

13   investigated, and it could have prevented some other incident

14   that might have happened.  How are they liable to her as a

15   plaintiff if they did what she asked them to do?

16          MR. ZALKIN:  Because the damage in a Title IX case is

17   the exposure to a sexually hostile environment.  It is gender

18   discrimination --

19          THE COURT:  You don't claim that she was exposed to a

20   sexually hostile environment after she reported it.

21          MR. ZALKIN:  We do.

22          THE COURT:  What type of hostile environment do you

23   allege that she was exposed to that she is suing for?

24          MR. ZALKIN:  Her rapist was on the loose.

25          THE COURT:  But she didn't want him caught.  She

 1    didn't say, investigate, go get the rapist.  She said, don't do

 2    it.

 3            MR. ZALKIN:  The reason she said don't do it --

 4            THE COURT:  There may be a very good reason, but that

 5    doesn't mean that if she has a good reason that she doesn't

 6    want them to investigate by them respecting that good reason

 7    that they are somehow liable in damages because they did what

 8    she asked them to do.

 9            MR. ZALKIN:  The reason the context is important is

10    because it ultimately got to the point where in her mind she

11    was throwing up her hands saying, these guys don't care about

12    anybody.

13            THE COURT:  You know what the problem with that

14    argument is, that argument doesn't apply to any lawsuit.

15    That's not a justification.  That doesn't change the law.

16    Because I say, well, don't drive me across the bridge because I

17    don't think you know how to drive.  If you drive me off the

18    bridge into the water, it doesn't change what the claim is.

19    The claim is irrelevant to what her motivations were as to why

20    she asked them to take certain action and not take certain

21    action.

22            It would be one thing if you were saying that she

23    asked them to investigate this and they refused to investigate.

24    But it's more difficult for you to argue that she can sue them

25    if she asked them not to expose her this way in an

1   investigation.  They did what she asked them to do.

2        And then you say to me now, well, the only reason she

3   asked them not to do it is because she thinks that they were

4   doing a terrible job.  They may have been doing a terrible job.

5   But then you can't fault them for not doing a good job because

6   you told them not to do any job.

7        MR. ZALKIN:  I understand that logic, your Honor.

8        THE COURT:  Case law says that you can sue on that

9   basis or makes a difference whether you had a good reason or a

10   bad reason to tell them, don't investigate.  If you tell them

11   don't investigate, they don't owe you an investigation, right?

12        MR. ZALKIN:  Right.  I'm unaware of any case law that

13   addresses that specific issue.  I know that the department of

14   education explicitly says that the wishes of the victim, while

15   important, are not completely dispositive of a university's

16   decision to investigate or not.

17        I also know that the law does not place the onus on a

18   victim to ask the university to respond to a report.  It puts

19   the onus on the university once they attain actual knowledge to

20   respond.

21        THE COURT:  I understand.

22        Did you have anything quickly you want to respond?  I

23   kept the court reporter over.

24        MR. ZALKIN:  Thank you, your Honor.

25        MS. KAPLAN:  Your Honor, subject to not torturing the

1    your court reporter further, I am going to be brief.

2         As your Honor has pointed out in your questioning,

3    there is a strong river of irony underlying plaintiff's theory

4    in this case.  Plaintiff herself says in the documents we

5    submitted over and over again that she was an expert on

6    Columbia's policies.  She concedes that she was a member of the

7    activist groups relating to these issues on campus and was

8    fully familiar with the resources available, the law, and the

9    obligations.

10        In our brief I noted that had Columbia overridden her

11   wishes and investigated anyway, she likely would have sued us

12   for doing that.  But to put it another way, your Honor, if you

13   had posited to any student activist, like the plaintiff, at the

14   beginning of this case, when she first entered Columbia, that

15   Columbia in these circumstances should have overridden the

16   clear and express desires of the victim, they would have told

17   you you were insane.  I talked about for the reasons cited in

18   our brief, underlying their policy, which is reflected in the

19   DOE is the utmost respect for the dignity and the

20   confidentiality and the wishes of victims, subject to certain

21   conditions that we talked about earlier.

22        Now, Exhibits 4 and 5, which I'll refer your Honor

23   to -- again, I'm trying to be sensitive here -- are the

24   contemporaneous communications of both the sexual violence call

25   on October 13 and the follow-up afterwards.  And I would refer

1    your Honor on Exhibit 15 to the footnote at the bottom that has

2    two little stars on it. I'm not going to read it into the

3    record, but it explains quite well, I believe, exactly what was

4    going on. And in the transcript of the call, the sexual

5    violence hotline there are repeated references throughout on

6    page 3, on page 5 about her insistence about not reporting.

7        Moreover, I want to clarify one point that came up in

8    your conversation with my friend here. There is no evidence in

9    the record anywhere that plaintiff told anyone that the alleged

10   assault had happened in her dorm room until she formally

11   reported in the summer. Indeed, if you look at the paragraph

12   in the complaint that talks about the student forum with the

13   executive vice-president of University Life, she alleges at

14   paragraph 44 that she shared that she had been raped, but she

15   does not allege that she shared that she had been raped in her

16   dorm room. And in all the exhibits we submitted anywhere else

17   there is no allegation that plaintiff specified anything about

18   her dorm room until she formally reported later in the summer.

19       With respect to the meeting with the executive

20   vice-president of life, I'll refer your Honor again to

21   Columbia's policies about student advocacy forums, as well as

22   the DOE guidelines on that, both of which expressly limit and

23   exclude those forums from official reporting obligations.

24       As your Honor pointed out with respect to the contact

25   in January, in January, again, there is kind of a causation

1    problem.

2            In my spare time, as your Honor probably knows, I

3    practice securities law, and in securities law there is this

4    concept of very complicated concepts of but for and proximate

5    causation. Here, given the fact that in January she told

6    Columbia she didn't want there to be an investigation, she

7    wouldn't cooperate and don't contact her, it is hard to see,

8    even if it wasn't a student advocacy form, which it is, what

9    sort of damages she could have sustained from the failure of

10   Columbia to contact her until later in January.

11           Finally, your Honor, with respect to the preassault

12   theory, I want to correct myself. I think I might have said

13   that those cases or that the law there hinge on an allegation

14   of general culture of indifference. That's not correct. If I

15   said it, I'm correcting myself.

16           The few cases that have upheld such a theory say that

17   they are limited to extreme situations. I am going to refer

18   your Honor and your law clerk to cases that we cite -- of

19   course I am very explicit about that -- to extreme cases where

20   there is a situation where there truly is a sexually hostile

21   culture on campus. Again, the examples are the football player

22   ambassador program where girls were encouraged to kind of give

23   football player recruits a good time, the situation at Baylor

24   that led to the resignation of Kenneth Starr as president of

25   Baylor and situations like that.

1              As your Honor pointed out in your exchanges with my

2     friend, there is nothing in this complaint that comes close to

3     those kinds of allegations about Columbia.  The fact that

4     students raised allegations is very different even in the *Tubbs*

5     case where not only were there allegations, but there were

6     filings by the DOE of these issues.  SUNY said it would respond

7     and would ameliorate those findings and then it did nothing.

8     Here there has been no findings, nothing even close.  You can't

9     come close to a sexually hostile culture claim.

10             And with that, your Honor, I'm done.

11             THE COURT:  Thank you.

12             I am going to get back to the papers and look at the

13    complaint further.  Hopefully I'll get you a decision in the

14    next 30 to 60 days.

15                                 o0o

16

17

18

19

20

21

22

23

24

25