**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMELIA ROSKIN-FRAZEE                          :

        Plaintiff,                          :

     -against-                                  :

COLUMBIA UNIVERSITY,                          :

        Defendant.                          :

                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>MEMORANDUM DECISION AND</u>
<u>ORDER</u>

17 Civ. 2032 (GBD)

GEORGE B. DANIELS, United States District Judge:

Plaintiff Amelia Roskin-Frazee is an undergraduate student who was a victim of sexual assault on Defendant Columbia University's campus. Plaintiff brings this action alleging that Defendant created a culture of sexual hostility on campus and acted with deliberate indifference in responding to Plaintiff's report of sexual assaults and request for certain accommodations as a result of the assaults. (Compl., ECF No. 1.) Plaintiff seeks to hold Defendant liable for monetary damages pursuant to Title IX, 20 U.S.C. § 1681, and several state causes of action. (*Id.*) Defendant moves to dismiss Plaintiff's complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Mot. to Dismiss, ECF No. 27.)

Defendant's motion is GRANTED.

## I.     FACTUAL BACKGROUND

Plaintiff is an undergraduate student who enrolled at Columbia as a freshman in the fall of 2015. (Compl. ¶ 27.) Plaintiff was sexually assaulted twice in her room of her dormitory suite.

### A.    First Sexual Assault And Defendant's Response

The first instance of sexual assault occurred on October 5, 2015 (the "October 2015 Assault"). (*Id.* ¶ 29.) After falling asleep that evening, Plaintiff awoke to a man on top of her who

pinned her down and proceeded to rape her.  (*Id.*)  Plaintiff ended up "passing out" due to the pain, but later awoke to see "a man, roughly six feet tall, with short, curly hair leaving her dorm room . . . ."  (*Id.*)

Reluctant and afraid to report the rape, Plaintiff scheduled a medical appointment with Columbia's Medical Services some time thereafter, indicating on the online scheduler that she was seeking an appointment for "flu like symptoms."  (*Id.* ¶ 31.)  During the appointment, Plaintiff explained that she was experiencing genital pain.  (*Id.*)  However, Plaintiff left the appointment without seeking or receiving any further medical treatment.  (*Id.*)

On October 13, 2015, Plaintiff called Columbia's 24/7 Sexual Violence Response Hotline ("SVR") and spoke with an SVR representative regarding the October 5, 2015 Assault.  (*Id.* ¶ 32.) The SVR representative transferred Plaintiff to an SVR Staff Advocate who then agreed to meet Plaintiff the next day to discuss the possibility of Plaintiff changing dorm rooms.  (*Id.* ¶ 34.)  On the next day, the SVR advocate allegedly explained to Plaintiff that if she wanted to change rooms, Plaintiff would have to:  (i) choose a new room within 24 hours of being provided with a reassignment date; (ii) pay up to $500 for the reassignment; (iii) and consent to Columbia's informing her parents of the reassignment.  (*Id.* ¶ 35.)  Plaintiff did not move forward with her request to change rooms at this time.  (*Id.*)  Later that day, Plaintiff also met with a therapist from Columbia's Counseling and Psychological Services ("CPS"), and filed paperwork with Columbia's Disability Services Office (the "DSO") in which she indicated that she was suffering from Post-Traumatic Stress Disorder for which she was seeking academic accommodations.  (*Id.* ¶¶ 37–38.)

On October 14, 2015, Plaintiff reached out to her academic advisor about the rape (the "2015 Academic Advisor Meeting").  (*Id.* ¶¶ 39, 83; Pl.'s Opp'n to Mot. to Dismiss ("Opp'n"),

ECF No. 31, at 12.)  Without explicitly stating that she had been raped, Plaintiff "strongly alluded" to the advisor that she had.  (*Id.*)  In response, the advisor never informed Plaintiff about any of her rights or options under Title IX, nor reported Plaintiff's rape to Columbia's Gender-Based Misconduct Office ("GBMO"), as required by Columbia's policies and procedures for sexual misconduct (the "Sexual Misconduct Policy").  (Compl. ¶¶ 39–40.)

On October 22, 2015, the DSO contacted Plaintiff regarding her request for academic accommodations.  (*Id.* ¶ 42.)  The DSO informed Plaintiff that for each accommodation sought, Plaintiff would have to report her symptoms and have a therapist contact the DSO to confirm the need for the accommodation.  (*Id.*)  Given the onerous process for obtaining academic accommodations, Plaintiff decided to seek accommodations on her own.  (*Id.* ¶ 43.)

On December 3, 2015, Plaintiff attended a student advocacy group meeting which included Columbia's Executive Vice President for University Life and the administrator in charge of Columbia's Sexual Misconduct Policy (the "2015 Student Advocacy Group Meeting").  (*Id.* ¶ 44.) At the meeting, Plaintiff shared explicitly for the first time with others that she had been raped. (*Id.*)  In response, Plaintiff allegedly was never informed about her rights and options under Title IX, or referred to the Title IX office.  (*Id.* ¶ 45.)  The Executive Vice President also allegedly never reported Plaintiff's rape to the GBMO, even though she was required to do so by Columbia's Sexual Misconduct Policy.  (*Id.* ¶ 46.)

**B.      Second Sexual Assault And Defendant's Response**

On December 14, 2015, Plaintiff was sexually assaulted for the second time (the "December 2015 Assault").  (*Id.* ¶ 47.)  As Plaintiff was walking into her dorm room that night, she was pushed into her room from behind, tied up with an iPhone charging cord, and gagged.  (*Id.* ¶ 48.)  The assailant then proceeded to rape and physically cut Plaintiff with several foreign objects.

(*Id.*)  Because Plaintiff's room was completely dark, Plaintiff was, once again, unable to identify the assailant.  (*Id.*)

The next day, Plaintiff sought treatment for her injuries at St. Luke's Hospital, where it was confirmed that Plaintiff had suffered "vaginal tearing, cuts to her wrists and thighs, and several bruises on her legs." (*Id.* ¶ 50.) On January 19, 2016, Plaintiff received a call from a case manager from Columbia's Student Conduct and Community Standards ("SCCS") office, informing Plaintiff that based on an anonymous survey submitted to the SCCS office regarding a sexual assault, the case manager had reason to suspect that Plaintiff was the author of the survey.  (*Id.* ¶ 51.) While acknowledging to be the author of the survey, Plaintiff explicitly told the case manager that she did not wish to report her sexual assaults, given her lack of trust in Columbia's remedial measures. (*Id.* ¶ 52.)

In February 2016, Plaintiff witnessed several harassing messages on a public bulletin board in her dormitory hall.  Plaintiff recalls seeing one note that read, "Isn't it fun to wake up to someone [f–ing] you?" and another that read, "I'll buy you a new phone charger," an apparent reference to the iPhone charging cord used to tie Plaintiff's hands together during the December 2015 Assault. (*Id.* ¶¶ 53–54.)

## C.    Columbia's Investigation

Plaintiff reported her sexual assaults on August 5, 2016 to the SCCS office.  (*Id.* ¶ 55.) The SCCS office allegedly told Plaintiff that it would not investigate her report unless she could identify her assailant.  (*Id.* ¶ 56.)  Yet, Defendant officially opened an investigation into Plaintiff's claims on September 8, 2016.  (*Id.* ¶ 58.)  Plaintiff reached out to several employees responsible for investigating her claims and requested that certain safety measures be implemented, including the installation of security cameras in and around her dormitory, and locks on her suite door.  (*Id.*

¶¶ 59–60.) Eight days later, on September 16, 2016, Plaintiff was given the option of moving to an off-campus apartment, or having locks installed on her suite door. (*Id.* ¶ 63.) Plaintiff chose the latter. (*Id.*)

Defendant concluded its investigation on October 7, 2016. (*Id.* ¶ 64.) In carrying out its investigation, Defendant allegedly did not interview anyone, review the swipe logs for Plaintiff's dormitory building for the nights of her respective sexual assaults, or review any security camera footage because such footage had been erased due to the length of time that had elapsed since the occurrence of Plaintiff's assaults. (*Id.*) Defendant was ultimately unable to identify Plaintiff's assailant. (*See id.* ¶¶ 64–66.) Following the conclusion of the investigation, on December 5, 2016, Plaintiff requested a housing accommodation for the upcoming 2017–18 academic school year, which Defendant granted four days later, on December 9, 2016. (*Id.* ¶ 67.)

**D.      Alleged General Policy Of Indifference To Sexual Misconduct**

Aside from her specific instances of assault, Plaintiff also alleges that Defendant actively created and has been deliberately indifferent to a culture of sexual hostility on campus. (*Id.* ¶ 77.) For example, Plaintiff alleges that Defendant has a general policy of deliberate indifference, which includes pressuring victims not to report sexual assault or harassment, failing to adequately train individuals who handle disciplinary proceedings for campus assaults, and failing to meaningfully discipline students for sexual misconduct. (*Id.* ¶ 8.) As a result of such policy, students have allegedly filed administrative complaints with the Department of Education's Office for Civil

Rights ("OCR") and protested against Defendant in several ways, including holding multiple forms of on-campus protest.  (*Id.* ¶¶ 7, 10, 12–14.)

**E.      Plaintiff's Lawsuit**

As a result of her sexual assaults, Defendant's perceived lack of response to them, and Defendant's general policy of deliberate indifference towards on-campus sexual misconduct, Plaintiff brought the instant action alleging two separate causes of action for Title IX liability against Defendant—one based on Defendant's general policy of deliberate indifference to sexual misconduct on campus, and the other based on Defendant's specific response to Plaintiff's assaults. (*See generally* Compl.)  Plaintiff's complaint also includes several state causes of action based on the same underlying events.  (*Id.*)

## II.      LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully."  Stating a facially plausible claim requires pleading facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Thus, the factual allegations pled "must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.[1]

---

[1] "In deciding a motion to dismiss under Rule 12(b)(6), the court may refer 'to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'"  *Fishbein v. Miranda*, 670 F. Supp. 2d 264, 271 (S.D.N.Y. 2009) (quoting *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

A district court must first review a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The court then considers whether plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*; *see also Targum v. Citrin Cooperman & Co., LLP*, No. 12 Civ. 6909, 2013 WL 6087400 (SAS), at *3 (S.D.N.Y. Nov. 19, 2013). In deciding the 12(b)(6) motion, the court also draws all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 119–20 (2d Cir. 2013).

## III.    PLAINTIFF FAILS TO SUFFICIENTLY ALLEGE A TITLE IX CLAIM

Plaintiff alleges Title IX liability against Defendant on two grounds: first, that Defendant created a sexually hostile culture through its policies and practices (the "First Cause of Action"); and second, that Defendant acted with deliberate indifference in responding to Plaintiff's report of sexual assaults and request for certain accommodations as a result of the assaults (the "Second Cause of Action"). Both of these claims fail to withstand a motion to dismiss.

### A.    Title IX

Title IX of the United States Education Amendments of 1972, 20 U.S.C. § 1681(a), provides that, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The statute applies to a school's disparate provision of programs, aid, benefits or services, or the inequitable application of rules or sanctions on the basis of sex. *Davis v. Monroe Cty. Bd. Of Educ.*, 526 U.S.

629, 646–47 (1999).   It also prohibits a school's deliberate indifference to acts of sexual harassment committed by one student against another.   *Id.*

To survive a motion to dismiss, a plaintiff bringing a student-on-student sexual harassment Title IX claim must allege that: (1) a federally funded educational institution (2) was deliberately indifferent to and (3) had actual knowledge of (4) sexual harassment that was so severe, pervasive, and objectively offensive that it could be said to have deprived the plaintiff of access to the educational opportunities or benefits. *Davis*, 526 U.S. at 650.  A defendant acts with deliberate indifference for Title IX purposes "when the defendant's response to known discrimination is *clearly* unreasonable in light of the known circumstances." *Gant ex rel. Gant v. Wallingford Bd. Of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999) (quotations and citation omitted) (emphasis added). Stated differently, to comply with Title IX, a university must respond to known student harassment in a manner that is not clearly unreasonable.

Both the "clearly unreasonable" and "actual knowledge" prongs have real meaning. "Clearly unreasonable" is not a mere reasonableness standard. *Davis*, 526 U.S. at 649.  Rather, it is a high standard that seeks to eliminate any risk that an educational institution "would be liable in damages not for its own official decision but instead for [another individual's] independent actions." *Id.* at 643.  Likewise, a university cannot be held liable pursuant to Title IX without actual knowledge or notice of the harassment.  Constructive knowledge (*i.e.*, allegations that the school should have known of the harassment) is not enough. *Zeno* v. *Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012).  On a motion to dismiss, courts may determine, as a matter of

law, whether the response alleged was not clearly unreasonable and whether the university is alleged to have had actual knowledge of the alleged harassment. *See Davis*, 526 U.S. at 649.

## A.      Plaintiff's First Cause Of Action: Deliberate Indifference Prior To The Assault

Plaintiff's First Cause of Action asserts Title IX liability against Defendant on the basis that Defendant created a sexually hostile culture through its general policy of indifference to sexual misconduct on campus. (Opp'n at 17–20; Compl. ¶ 77.) Plaintiff asserts that such policy includes, "[l]ittle to no meaningful discipline of students who committed acts of sexual misconduct," "[i]nterference with female students' access to Title IX resources," "[n]ot reporting incidents of sexual misconduct to the appropriate campus offices," and "[f]ailing to provide accommodations to female victims of sexual assault." (Compl. ¶ 77.) As a result of such policy, Plaintiff alleges that she was subject to multiple forms of sexual assaults by her assailant, including the October 2015 Assault and December 2015 Assault, and a hostile educational environment. (*Id.* ¶ 78.)

Plaintiff's First Cause of Action is dismissed because Plaintiff fails to sufficiently allege that Defendant possessed actual knowledge of a heightened risk of sexual assault in a specific context. Courts generally have refused to impose Title IX liability based on a university's official policy. *See Tubbs v. Stony Brook Univ.*, 15 Civ. 0517 (NSR), 2016 WL 8650463, at *8 (Mar. 4, 2016). However, a small handful of cases, including all of those cited by Plaintiff in her Opposition, have suggested that liability on such basis can exist, but only in a very limited set of circumstances. This line of cases is generally known as Title IX "pre-assault" cases—a reference to cases that approve of Title IX liability based on a university's response to a general problem of

sexual misconduct on campus, rather than to a plaintiff's specific instance(s) of harassment (*i.e.*, post-assault response).

Pre-assault cases have found that universities may be held responsible for its pre-assault, deliberate indifference when they have "actual knowledge of sexual assault(s) committed in a *particular* context or program or by a *particular* perpetrator or perpetrators."[2]  *Tubbs*, 2016 WL 8650463, at *9 (emphases added).  For example, in the leading pre-assault case, *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170 (10th Cir. 2007), plaintiffs were sexually harassed while involved in a school-sanctioned football recruiting program in which high school recruits were brought to the university and paired with female "Ambassadors," like plaintiffs, for the purpose of showing the recruits a "good time."  *Id.* at 1173.  In reversing the lower court's grant of summary judgment in favor of defendant, the court held that there was sufficient evidence for a reasonable jury to find that defendant had an official policy of maintaining and supporting a specific recruiting program, despite possessing actual knowledge of a significantly heightened risk of sexual assault within that very program.  *Id.* at 1184–85.  Likewise, *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282 (11th Cir. 2007), another pre-assault case cited by Plaintiff, involved a similar situation.  The court in *Williams* reversed the lower court's grant of defendant's motion to dismiss because, prior to plaintiff's assault, the university allegedly knew specific facts about the perpetrator's history of past sexual harassment at other colleges that substantially increased the risk that the perpetrator would harass another student at the university.  *Id.* at 1296–97.

Here, on the other hand, plaintiff's allegations involve a very different set of circumstances—circumstances that courts have not recognized as a basis for pre-assault liability. Nowhere in the complaint does Plaintiff allege facts that indicate that Defendant had specific

---

[2] The Second Circuit has yet to address a pre-assault Title IX claim.

knowledge of a heightened risk of sexual assault either by her assailant or in the particular contexts in which her assaults occurred, such as an official university policy or program.   Rather, Plaintiff makes the general allegation that Defendant has been the target of multiple student-led complaints and protests due to its discouragement of students from reporting on-campus sexual misconduct, and its failure to adequately respond to and address such reports when made.  (Compl. ¶¶ 6–18.)

While these allegations may support the inference that Defendant was generally aware of the problem of sexual misconduct on campus and a deficiency in response to such a problem, this general level of awareness or deficiency is insufficient for purposes of asserting pre-assault, Title IX liability.  As pre-assault cases have readily acknowledged, "something more than [a] general knowledge of assaults campus-wide (*i.e.*, some greater specificity) is required to satisfy the actual knowledge requirement [for Title IX liability]."  *See Tubbs*, 2016 WL 8650463, at *9.  Allowing or imposing liability in circumstances when such specific knowledge is absent would come "too close to asking that [a] [u]niversity be held liable for its failure to purg[e] [its] schoo[l] of [all] actionable peer harassment," which *Davis* specifically warned is not the intent of Title IX.  *Karasek v. Regents of the Univ. of Cal.*, No. 15 Civ. 03717 (WHO), 2015 WL 8527338, at *10 (N.D. Cal. Dec. 11, 2015) (citing *Davis*, 526 U.S. at 648) (quotation marks omitted).

Accordingly, because Plaintiff fails to sufficiently allege that Defendant had specific knowledge of a heightened risk of sexual assault within a particular context, Plaintiff's First Cause of Action is dismissed.[3]

**B.**     **Plaintiff's Second Cause of Action: Deliberate Indifference Following The Assaults**

Plaintiff's Second Cause of Action for Title IX liability is based on Defendant's alleged deliberate indifference in responding to Plaintiff's report of sexual assaults and request for certain

---

[3] Aside from *Williams* and *Simpson*, Plaintiff also relies on *Tubbs* and *Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646 (W.D. Tex. 2017) in support of its First Cause of Action.  However, these cases are also inapposite.

accommodations as a result of the assaults. Plaintiff alleges that despite receiving notice of Plaintiff's initial rape "as early as October 14, 2015 but no later than December 3, 2015," Defendant failed to timely and adequately investigate her claims and provide reasonable accommodations, which contributed to the occurrence of Plaintiff's second rape. (Compl. ¶¶ 83–89.) Plaintiff asserts that, in doing so, Defendant violated its own Sexual Misconduct Policy and the guidelines issued by the Department of Education ("DOE Guidelines") regarding the implementation, interpretation, and enforcement of Title IX. (*Id.*)

Plaintiff's Second Cause of Action is dismissed because Plaintiff fails to sufficiently allege that Defendant responded to Plaintiff's sexual assaults and request for accommodations in a clearly unreasonable manner, once it had actual knowledge of the assaults. As indicated above, in order to properly allege a Title IX claim for student-on-student sexual harassment, plaintiff must, *inter alia*, assert that a university had actual knowledge of the harassment and responded in a way that was clearly unreasonable. *Davis*, 526 U.S. at 650. Thus, the first step in the inquiry is to determine if and when defendant had actual knowledge of the alleged assault. Only then can it be determined whether defendant acted with deliberate indifference in responding to the assault. *See Moore v. Murray State Univ.*, No. 12 Civ. 00178, 2013 WL 960320, at *5 (W.D. Ky. Mar. 12, 2013) ("Case

---

*Tubbs* found that plaintiff sufficiently alleged pre-assault liability based on her allegation that, despite agreeing to remedy certain deficiencies identified in an investigation conducted by the OCR into defendant's sexual harassment policies, defendant never followed through on such a promise. *Tubbs*, 2016 WL 8650463, at *9. No such facts are present in this case. While Plaintiff alleges that the OCR is currently investigating Defendant, (Compl. ¶ 18), she does not allege that the OCR has made any conclusions regarding Defendant's Sexual Misconduct Policy, let alone that Defendant agreed to undertake specific remedial measures, but never ended up doing so. Likewise, *Doe 1* held that defendant created a "heightened risk of sexual assault" by "repeatedly misinform[ing] victims of sexual assault as to their rights under Title IX . . . fail[ing] to investigate reported sexual assaults . . . discourag[ing] those who reported sexual assaults from naming their assailants or otherwise coming forward[,]" and falsifying reports to the DOE regarding the number of sexual assaults on campus. *Doe 1*, 240 F. Supp. 3d at 662. Such allegations are not present here. (*See* Compl. ¶¶ 6–18.)

law supports the proposition that Title IX liability arises only *after* the institution learns of harassment and is deliberately indifferent to it.") (emphasis added).

### i.    Actual knowledge

Contrary to what Plaintiff alleges, while Defendant had actual knowledge of the October 2015 Assault, it did not acquire such knowledge until December 3, 2015.  Plaintiff asserts that Defendant had actual notice of her October 2015 Assault "as early as October 14, 2015" when she met with her academic advisor nine days after her initial rape. [4]  (Compl. ¶ 83; Opp'n at 12.) However, Defendant could not plausibly have acquired knowledge of the assault at that point because Plaintiff herself concedes that she never actually told the advisor during their meeting that she had been raped.  Rather, Plaintiff alleges that she merely "alluded to . . . that [she] had been raped."  (Compl. ¶ 39.)  This is not enough.  While an insinuation of assault may constitute constructive knowledge, it plainly does not rise to the level of actual knowledge and is therefore insufficient for purposes of Title IX liability. [5]  *Zeno*, 702 F.3d at 666 ("Constructive knowledge is not enough; only actual knowledge is a predicate to liability.").

Defendant did, however, acquire actual knowledge of the October 2015 Assault on December 3, 2015.  For nearly two months after the events on October 14, 2015, Plaintiff did not

---

[4] Because Plaintiff's contention is that Defendant had actual knowledge of her initial rape as early as October 14, 2015, not before, this Court begins its analysis of when Defendant plausibly had actual knowledge with the events that took place on October 14, 2015.  However, one event that occurred on October 13, 2015 is worth noting.  On October 13, 2015, Plaintiff alleges that she called Columbia's 24/7 SVR and reported that she had been raped.  (Compl. ¶ 32.)  Yet, this report is insufficient for purposes of conferring actual notice on Defendant because Plaintiff merely reported her rape to an SVR representative, who Plaintiff does not allege had any authority to take corrective action to remedy her assault.  As the Supreme Court has held, a report of assault must be made to an "official . . . with authority to take corrective action to end the discrimination," for defendant to have been put on actual notice of the assault.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1989).

[5] Plaintiff did take three other steps on October 14, 2015 in response to her initial rape.  Aside from meeting with the advisor, Plaintiff met with a Staff Advocate from the SVR office, a therapist from CPS, and filed paperwork with the DSO indicating that she was suffering from PTSD and seeking academic accommodations.  (Compl. ¶¶ 35, 37, 38.)  Yet, nowhere in the complaint does Plaintiff allege that she

discuss or even mention her assault to any official at Columbia. (*See* Compl. ¶¶ 35–43.) Yet, on December 3, 2015, Plaintiff attended the 2015 Student Advocacy Group Meeting with Columbia's Executive Vice President for University Life, along with several other student advocacy organization members. At the meeting, Plaintiff explicitly shared with the group "that she had been raped." (*Id.* ¶ 44.) Plaintiff then went on to discuss the difficulties she had experienced with Columbia's response to her rape up to that point. (*Id.*) This acknowledgement was sufficient to put Defendant on actual notice of Plaintiff's October 2015 Assault because such disclosure, unlike Plaintiff's allusion to the advisor, was an affirmative assertion of assault to "an official of [Columbia] with authority to take corrective action to end the discrimination." *Gebser*, 524 U.S. at 290 (holding Title IX liability to be predicated upon notice to an "appropriate person," who is "an official of the [university] with authority to take corrective action to end the discrimination.")

Accordingly, Defendant had actual knowledge of the October 2015 Assault, which it acquired on December 3, 2015, not October 14, 2015. This, then, is the point from which to evaluate Defendant's response to determine whether it was clearly unreasonable.

### ii.    Deliberate indifference

#### Prior to Plaintiff's Report

Once Defendant had actual knowledge of Plaintiff's assault on December 3, 2015, Defendant responded in a manner that was not clearly unreasonable. Following the 2015 Student Advocacy Group Meeting, Plaintiff was raped for the second time on December 14, 2015. (Compl. ¶ 47.) On January 19, 2016, a case manager from Columbia's SCCS office contacted Plaintiff to investigate her rape claims, based on a call he had received from an employee who had a duty to

---

mentioned, or even alluded to, her October 2015 Assault in any one of these instances. (*See id.* ¶¶ 35–38.) As a result, none of these other instances can plausibly serve as a basis for claiming that Defendant had actual knowledge of her initial rape as early as October 14, 2015.

report sexual misconduct pursuant to Columbia's Sexual Misconduct Policy. (*Id.* ¶ 51.) In response, Plaintiff told the case manager that she did not wish to report her sexual assaults at the time. (*Id.* ¶ 52.) As a result, Defendant did not take any further action with respect to Plaintiff's rape claims until after August 5, 2016, when Plaintiff decided that she wanted to finally report them. (*Id.* ¶ 55.)

This particular response by Defendant was not clearly unreasonable because Defendant acted in a manner that merely respected Plaintiff's wishes. Once Defendant received actual notice that Plaintiff had been raped, it reached out to Plaintiff approximately a month later to investigate her claims. Yet, despite being afforded an opportunity to pursue her claims, it was Plaintiff, not Defendant, who decided not to proceed with an investigation. When she did so, Defendant honored her request and took no further action.[6]

In respecting Plaintiff's wishes, Defendant also complied with its Sexual Misconduct Policy and the DOE Guidelines. As Plaintiff points out, Columbia's Sexual Misconduct Policy specifically provides that if a victim requests that no investigation take place, Columbia may grant such request. (*Id.* ¶ 22.) Likewise, the DOE Guidelines clearly state that "[i]f the complainant requests . . . that the complaint not be pursued, the school should take all reasonable steps to . . . respond to the complaint consistent with the . . . request not to pursue an investigation." (Compl., Ex. A, ECF No. 1-1 ("DOE Guidelines"), at 5.) As such, Plaintiff fails to plausibly assert that Defendant's response to Plaintiff's rapes—a response that honored Plaintiff's wishes and complied with Defendant's sexual misconduct policies and guidelines—was clearly unreasonable. *See Roe v. St. Louis Univ.*, 746 F.3d 874, 883 (8th Cir. 2014) (holding that a university did not act with

---

[6] The fact that Plaintiff refused to pursue an investigation due to her lack of trust that Columbia would take the proper remedial action is irrelevant. (Compl. ¶ 52.) Plaintiff's motivation for refusing the investigation does not alter the fact that Defendant reached out to Plaintiff to investigate her claims.

deliberate indifference when it honored plaintiff's wish to keep her rape confidential and did not initiate an investigation until the rape was officially reported to the university).

Plaintiff contends that, despite reaching out to her and ultimately respecting her wishes not to pursue an investigation, Defendant, nonetheless, acted in a clearly unreasonable manner because the Executive Vice President for University Life failed to inform Plaintiff of her Title IX rights and report Plaintiff's initial rape to the GBMO immediately following the 2015 Student Advocacy Group Meeting. (Compl. ¶¶ 45–46.) Plaintiff alleges that, had she done so, Plaintiff might have been spared from continued sexual harassment, including her second rape. (*Id.* ¶ 88.)

Plaintiff's arguments are unconvincing for several reasons. First, Plaintiff fails to allege how, and in what way, the failure to inform Plaintiff of her Title IX rights, following the 2015 Student Advocacy Group Meeting, was clearly unreasonable. For instance, Plaintiff does not point to any violation of Columbia's Sexual Misconduct Policy or the DOE Guidelines by Defendant. Even if the failure to inform Plaintiff of her Title IX rights violated university policy, such violation alone would be insufficient to establish deliberate indifference. As courts have held, "a school's violation of its own policy does not alone establish deliberate indifference for purposes of Title IX." *Moore v. Regents of the Univ. of Cal.*, No. 15-cv-05779-RS, 2016 WL 7048991, at \*2 (N.D. Cal. Dec. 5, 2016). Furthermore, Defendant's failure to inform Plaintiff of her Title IX rights, constitutes, at most, negligence, which falls short of Title IX's clearly unreasonable standard. *Facchetti v. Bridgewater Coll.*, 175 F. Supp. 3d 627, 638 ("[T]here is ample authority holding that neither a school's negligence in addressing a sexual assault, nor its failure to provide the remedy wanted by the victim, constitutes deliberate indifference under Title IX.") (collecting cases).

Second, contrary to Plaintiff's allegations, there was no affirmative duty under Columbia's Sexual Misconduct Policy or the DOE Guidelines to report Plaintiff's initial rape to the GBMO.

Columbia's Sexual Misconduct Policy provides that any non-confidential employee who receives a report of assault is required to report the incident to the GBMO.  (Decl. of Roberta Kaplan in Support of Def.'s Mot. to Dismiss, Ex. 1 ("Sexual Misconduct Policy"), ECF No. 27-1, at 9)[7]; (*See* Compl. ¶ 21.)  However, the policy also states that disclosure of rapes at public awareness events, such as protests, "survivor speak outs," and other student advocacy forums, "is not considered a report to the University for purposes of triggering an investigation of a particular incident." (Sexual Misconduct Policy at 11.)  Likewise, the DOE Guidelines state that public awareness events and "forums at which students disclose experiences with sexual violence are not considered notice to the school for the purpose of triggering an individual investigation unless the survivor initiates a complaint."  (Compl., Ex. 2 ("DOE Guidelines FAQ"), ECF No. 1-2, at 24.)[8]

Here, there was no affirmative duty to report Plaintiff's rape because Plaintiff disclosed it in the context of a student advocacy meeting between school officials and various student advocacy group members to discuss Columbia's sexual assault policies.  (*Id.* ¶ 44.)  The disclosure was not the type of "report" required to be escalated to the GBMO.  As a result, there was no violation of Columbia's Sexual Misconduct Policy or the DOE Guidelines.  Even if there was, such violation alone, as indicated earlier, would be insufficient to establish deliberate indifference. *Moore*, 2016 WL 7048991, at *2.

As for Plaintiff's assertion that an investigation might have taken place sooner had Plaintiff's initial rape been reported, thereby potentially preventing the December 2015 Assault and further sexual harassment, there was no affirmative obligation to report Plaintiff's rape.

---

[7] This Court takes judicial notice of Columbia's Sexual Misconduct Policy because it is incorporated into Plaintiff's complaint by reference.

[8] This Court takes judicial notice of the DOE guidelines because they are incorporated into Plaintiff's complaint by reference.

Furthermore, as Plaintiff makes clear, despite the failure to report Plaintiff's rape to the GBMO, Defendant ultimately did reach out to Plaintiff approximately a month later in January 2016 to open an investigation into her claims, which Plaintiff rejected. (Compl. ¶¶ 51–52.) Absent an indication that Defendant's contacting Plaintiff a month later constituted an unjustified delay, this the lapse of a month before Defendant contacted her was not clearly unreasonable. As the Second Circuit has held, a delay in remedial action may constitute deliberate indifference only when such delay is "lengthy and unjustified," which Plaintiff does not allege.[9] *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir. 2003) (citation and quotation marks omitted); *see also Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006) (holding that a school's nine-month delay in convening a hearing on the Title IX plaintiff's sexual harassment allegations was insufficient to create a triable issue of fact on deliberate indifference because there was no evidence that the delay was more than "negligent, lazy, or careless" or the result of a "deliberate attempt to sabotage [p]laintiff's complaint or its orderly resolution."). Accordingly, because Defendant's response respected Plaintiff's request for privacy and was reasonably timely, Defendant did not act with deliberate indifference in responding to Plaintiff's rape.

### After Plaintiff's Report

Once Plaintiff finally decided to report her rapes, and other instances of sexual harassment, Defendant once again responded in a manner that was not clearly unreasonable. A week and a half after the 2015 Student Advocacy Group Meeting, Plaintiff was raped for the second time, on December 14, 2015. (Compl. ¶¶ 47–49.) In February 2016, shortly after declining to pursue an investigation into her rapes, Plaintiff suffered additional instances of sexual harassment, namely

---

[9] Plaintiff does allege that Defendant "deliberately chose to delay almost a year before initiating an investigation into Plaintiff's reports of multiple sexual assaults." (Compl. ¶ 84.) However, such a conclusory allegation, without more, is insufficient under *Iqbal/Twombly*.

in the form of harassing messages on a public bulletin board in her dormitory hall that appeared to be authored by her assailant. (*Id.* ¶¶ 53–54.) As a result of this continued harassment, Plaintiff finally decided to report her sexual assaults to Defendant on August 5, 2016. (*Id.* ¶ 55.)

When Plaintiff did, Defendant responded to her report promptly and reasonably. Approximately a month after receiving Plaintiff's report, Defendant opened a timely investigation into Plaintiff's claims on September 8, 2016. (*Id.* ¶ 58.) After taking about a month to investigate, despite knowing very little about the assailant, Defendant concluded its investigation on October 7, 2016 and informed Plaintiff that it was unable to identify her assailant based on the little information she had provided. (*See id.* ¶¶ 29, 64.) Defendant then promptly provided Plaintiff a copy of its official investigation report ten days later, on October 17, 2017. (*Id.* ¶ 65.)

Nonetheless, Plaintiff contends that, despite such efforts, Defendant responded to her August 5, 2016 report with deliberate indifference for several reasons. First, Plaintiff claims that Defendant failed to timely investigate Plaintiff's claims. (*See id.* ¶ 86.) Yet, for the reasons indicated earlier, a mere delay of less than a month—from the moment Plaintiff consented to an investigation (August 5, 2016) to when Defendant officially opened an investigation (September 8, 2016)— without more is not clearly unreasonable.

Plaintiff also argues that Defendant responded with deliberate indifference by failing to adequately investigate Plaintiff's claims. Plaintiff alleges that at no point during the investigation did Defendant: 1) interview anybody; 2) review the swipe logs for her dormitory building for the nights of her respective sexual assaults; or 3) review the security camera footage because such footage had been erased due to the length of time that had passed since her assaults. (*Id.* ¶ 64.) However, these decisions by Defendant were not clearly unreasonable in light of the little information Defendant had regarding the identity of Plaintiff's assailant. All Defendant (and

Plaintiff) ever knew about the assailant was that he may have been "roughly six feet tall, with short, curly hair." (*Id.* ¶ 29.)

Based on such dearth of information, Defendant could reasonably have concluded that the process of identifying and interviewing individuals, for example, would have been futile. Nowhere in the complaint does Plaintiff allege that she identified certain individuals, whom she saw on the night of the rapes or spoke to about the assaults, and whom Defendant, in turn, failed to interview. Furthermore, Defendant, in accordance with Columbia's Sexual Misconduct Policy and the DOE Guidelines, which both emphasize the importance of respecting a student's right to privacy, (Sexual Misconduct Policy at 7–8; DOE Guidelines FAQ at 16–17), could reasonably have concluded that interviewing Plaintiff's peers about her rapes could have unduly exposed Plaintiff to additional unwanted attention or embarrassment. Likewise, Defendant could have decided not to review the swipe logs for Plaintiff's dorm for the nights of her respective assaults due to the sheer number of swipes recorded on both nights, with little way of narrowing them down in any practical manner. Given that Plaintiff's assaults took place on two separate dates, there could have been hundreds, if not thousands, of swipes to review, with the only identifying information available being the assailant's height and hair style.

Similarly, with regard to Defendant's failure to review the security footage, it was Plaintiff, not Defendant, who decided to pursue an investigation into her assaults on August 5, 2016, almost a year later than when her first rape actually took place. In fact, Columbia's Sexual Misconduct Policy explicitly states that while Defendant does not limit the time for submitting a report of assault, its "ability to investigate and respond effectively [to such report] may be reduced with the passage of time." (Sexual Misconduct Policy at 10.) Thus, Plaintiff cannot now plausibly allege

that it was Defendant's deliberate indifference that led to the security footage being erased and unavailable for review.

### Request for Academic and Housing Accommodations

In a further effort to plead clearly unreasonable conduct, Plaintiff alleges that, despite Defendant's investigation of Plaintiff's claims, Defendant nevertheless acted with deliberate indifference by failing to provide Plaintiff with interim measures to secure her safety on campus, namely reasonable academic and housing accommodations. (Compl. ¶¶ 75, 85–86.) Yet, Plaintiff's own allegations demonstrate that every time Plaintiff requested either an academic or housing accommodation, Defendant responded to her request promptly. When Plaintiff first asked the SVR office about the possibility of changing dorm rooms a week after her initial rape, on October 14, 2015 (the "First Request"), the SVR office immediately informed Plaintiff—in the very same conversation—of the various steps required to change dorm rooms, including the payment of a $500 reassignment fee and the notification of her parents of the move. (*Id.* ¶ 35.) Plaintiff ultimately decided not to take these steps. (*Id.*) When Plaintiff requested that locks be installed on her suite door on September 9, 2016 (the "Second Request"), Defendant responded a week later by offering Plaintiff the choice of proceeding with the installation or moving to an off-campus apartment, of which Plaintiff chose the latter. (*Id.* ¶¶ 60, 63.)[10] And finally, when Plaintiff

---

[10] As part of her second request for housing accommodations, Plaintiff also requested Defendant to implement certain additional security measures, including the installation of security cameras in and around her dormitory. (Compl. ¶ 59.) The complaint suggests that Defendant never honored such request. However, the Supreme Court has made clear that Title IX does not grant a student the "right to make particular remedial demands." *Davis*, 526 U.S. at 648.

requested housing accommodations for the 2017–18 academic school year on December 5, 2016, Defendant granted her request a mere four days later. (*Id.* ¶ 67.)

Yet, Plaintiff alleges that Defendant's response to her First Request was unreasonable because Defendant imposed conditions on her request that were "onerous" and "essentially forced [Plaintiff] to remain in the room in which she had been raped." (*Id.* ¶ 35.)  However, Defendant did not know about Plaintiff's October 2015 Assault at the time of the request.  If Defendant had, Defendant may very well have offered Plaintiff housing accommodations under less "onerous" conditions.  For instance, once Defendant had actual knowledge of Plaintiff's rapes and began investigating them in September 2016, Defendant responded to Plaintiff's Second Request promptly, without the imposition of any additional "onerous" conditions. (*Id.* ¶¶ 60, 63.)  Similarly, when Plaintiff made her Third Request several months later, Defendant granted the request without question.  (*Id.* ¶ 67.)  Thus, based on what Defendant knew about Plaintiff's circumstances at the time, Defendant's response to Plaintiff's First Request was not clearly unreasonable.

Likewise, Defendant's response to Plaintiff's request for academic accommodations was not clearly unreasonable.  When Plaintiff requested academic accommodations, for the first and only time, on October 14, 2015 from the DSO, the DSO contacted Plaintiff eight days later explaining the process for receiving accommodations, which included the need to have a therapist call the DSO to confirm the need for the accommodations.  (*Id.* ¶ 42.)  Plaintiff alleges that as a result of such lengthy process, which she chose not to undertake, she was forced to "miss assignments, and seek extensions and other academic accommodations [on her own] . . . ." (*Id.* ¶ 68.)  Yet, nowhere in the complaint does Plaintiff identify an academic accommodation she sought that she did not receive.  The mere fact that Plaintiff sought academic accommodations on her own does not lead to the conclusion that Defendant acted in a clearly unreasonable manner.

While the requirements presented to Plaintiff for receiving academic accommodations may have been difficult for an individual in Plaintiff's situation to navigate, Defendant was responding at a time when it had no knowledge of Plaintiff's initial rape. As a result, there is no plausible basis for concluding that Defendant responded to Plaintiff's requests for academic accommodations with deliberate indifference.

Accordingly, Plaintiff's Second Cause of Action is dismissed because Plaintiff fails to sufficiently allege that after acquiring actual knowledge of her assaults, Defendant responded in a clearly unreasonable manner.

## IV.    PLAINTIFF'S STATE LAW CLAIMS ARE DISMISSED

Having dismissed the only claims over which it has original jurisdiction, this Court declines to exercise supplemental jurisdiction over the remaining state law and common law claims at this early stage in the litigation. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction."); *Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir. 1994) ("[T]he exercise of supplemental jurisdiction is left to the discretion of the district court.").

## V.    CONCLUSION

Defendants' motion to dismiss Plaintiff's complaint is GRANTED.

The Clerk of Court is directed to close the motion at ECF No. 27 and this case.

FEB 2 1 2018

Dated: February ___, 2018
New York, New York

SO ORDERED.

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge